Charles R. Jacob III (CJ-4143)
Claire L. Huene (CH-2278)
MILLER & WRUBEL P.C.
250 Park Avenue
New York, New York 10177
(212) 336-3500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TERWIN WAREHOUSE MANAGEMENT LLC, as Program Administrator for and Assignee of TERWIN MORTGAGE WAREHOUSE TRUST II, SERIES VI,<br><br>                      Plaintiff,<br><br>   -against-<br><br>FINANCIAL MORTGAGE, INC.<br>and VIJAY TANEJA,<br><br>                    Defendants. | 07 Civ. 10309 (LLS)<br><br><br>**DECLARATION OF<br>BARBARA CHELL** |

The undersigned, BARBARA CHELL, declares as follows:

1.     I am a principal of plaintiff Terwin Warehouse Management LLC ("TWM"). My responsibilities include the matters that are the subject of this declaration. Except as may otherwise be indicated, I have first-hand knowledge of the matters set forth herein.

2.     I submit this declaration in support of the motion of TWM, as Program Administrator for and Assignee of Terwin Mortgage Warehouse Trust II, Series VI (the "Trust") for an order requiring defendant Financial Mortgage, Inc. ("FMI") to immediately transfer the servicing rights, files and documents for certain mortgage loans to the Trust or its designee.

3.     TWM is the Program Administrator for the Trust pursuant to an Amended and Restated Seller's Purchase, Warranties and Servicing Agreement dated as of March 18, 2005 (the "Agreement"), between the Trust as Purchaser and defendant FMI, as Seller.  A copy of the Agreement is annexed as Exhibit A.  Hereafter, capitalized terms not otherwise defined are used with the meanings set forth for them in the Agreement.

4.     As Program Administrator for the Trust, TWM performs and/or enforces the "duties, rights and obligations of the Purchaser [the Trust] . . . ."  Ex. A at 12, definition of "Purchaser."  Accordingly, TWM brings its claims in this action as Program Administrator and assignee of the Trust's claims against FMI, to enforce the rights of the Trust against FMI.

### FMI's Breach of Its Transfer Obligations Under the Agreement

5.     In the Agreement, the parties contracted for FMI to sell to the Trust certain Mortgage Loans, subject to the terms and conditions in the Agreement.

6.     Pursuant to the Agreement, the Trust purchased from FMI a substantial number of Mortgage Loans.  Upon each purchase, the Trust became the owner of the Mortgage Loans so purchased, including "all the right, title and interest of the Seller [FMI] in and to the Mortgage Loans."  Ex. A § 2.04.

7.     As a result of each purchase, the Trust also acquired "the right to service each such Mortgage Loan."  Id. § 2.03.

8.     The Agreement provided that FMI would remain on as Servicer only during the Interim Servicing Period.  Id. § 2.03.  FMI was to hold "all records or documents with respect to the Mortgage Loans....*in trust for the benefit of Purchaser* [the Trust]."  Id. § 2.04 (emphasis added).

9.      The Trust was and is entitled to direct FMI, through TWM, to transfer, assign and deliver to the Trust's designee the right to service the Mortgage Loans purchased by the Trust, including all loan and servicing files for each such Mortgage Loan. Id. § 2.04 ("Servicing files for the Mortgage Loans shall be delivered to the Purchaser [the Trust] or its designee on or before the Servicing Transfer Date").

10.     The Mortgage Loans that the Trust purchased from FMI pursuant to the Agreement included the Mortgage Loans listed on Exhibit B hereto (the "Required Transfer Mortgage Loans"). Thus, the Trust was and is entitled to direct FMI, through TWM, to transfer, assign and deliver to the Trust's designee the right to service the Required Transfer Mortgage Loans, and the related loan and servicing files and documents.

11.     The Trust and TWM have fully performed all their obligations under and relating to the Agreement.

12.     During October 2007, TWM, on behalf of the Trust, instructed FMI several times to release, transfer and deliver to the Trust's designee all servicing rights, files and documents related to the Required Transfer Mortgage Loans.

13.     On a conference call on November 2, 2007, and by e-mail, TWM repeated its demand that FMI transfer the files for the Required Mortgage Transfer Loans to the Trust's designee. A copy of my November 2, 2007 e-mail to FMI is attached hereto as Exhibit C.

14.     On November 2, 2007, I received a letter from an attorney representing FMI stating that FMI refused to release the files for the Required Mortgage Transfer Loans. No explanation was given for FMI's refusal. A copy of the letter is attached hereto as Exhibit D.

3

15.    By letter dated November 6, 2007, TWM repeated its demand for all files and documents relating to the Required Mortgage Transfer Loans. A copy of the letter is attached hereto as Exhibit E.[1]

16.    In response to TWM's November 6, 2007 letter, FMI delivered one file for one of the Required Mortgage Transfer Loans.

17.    In breach of the Agreement, FMI has failed to release, transfer and deliver to the Trust all servicing rights, files and documents related to the Required Transfer Mortgage Loans.

## FMI's Failure to Transfer the Servicing Rights, Files and Documents Will Cause Irreparable Harm

18.    As shown, under the Agreement FMI is required to transfer the loan servicing rights, files and documents relating to the Required Transfer Mortgage Loans per the Trust's instructions, but has failed to do so.

19.    Servicing of mortgage loans involves, among other things, collecting, processing and recording homeowners' mortgage payments, transmitting such payments to the mortgage holder, processing a homeowner's satisfaction of a mortgage (including through the homeowner's sale of the property to a new borrower or refinancing of the mortgage through a new lender), and ensuring that any required insurance and tax payments are timely made on behalf of the homeowner. Mortgage servicing also requires care of confidential borrower credit information.

20.    Thus, the servicing process involves the rights of both the owner of the Required Transfer Mortgage Loans (the Trust) and third parties (the homeowners). These rights are subject to waiver, modification, loss, error and other impairments and are

---

[1] Exhibit E has been redacted to protect confidential borrower information.

currently subject to FMI's unauthorized control when they should be subject to the control of the Trust or its designee.

21.    The interests at risk by FMI's unlawful exercise of control over the Required Transfer Mortgage Loans are interests in real property, and as such, unique. Any impairment of the Trust's ability to deal with its own real property interests and its contractual and legal obligations as the owner of the Required Transfer Mortgage Loans constitutes inherent irreparable harm. There is no substitute performance nor amount of damages that can make the Trust whole for FMI's failure to transfer the servicing rights, files and documents for the Required Transfer Mortgage Loans. There is also risk of irreparable harm to the homeowners because of FMI's wrongful actions.

22.    Time is of the essence and this matter is urgent. The Required Transfer Mortgage Loans have declined in value under current market conditions. Because of the decline in market value, TWM has made margin calls pursuant to the Agreement. Ex. A, § 12.03. FMI has failed to meet TWM's margin calls.

23.    TWM needs to address this situation immediately, but it cannot do so until and unless FMI honors its obligation to transfer the servicing rights, files and documents for the Required Transfer Mortgage Loans.

24.    The Trust has chosen Specialized Loan Servicing, LLC ("SLS") to service the Required Transfer Mortgage Loans. However, the Trust cannot transfer the loans to SLS without the mortgage and servicing files.

25.    The Trust seeks delivery of the mortgage and servicing files for the Required Transfer Mortgage Loans to: Records Management, Specialized Loan Servicing, LLC, 8742 Lucent Blvd., Suite 150, Highlands Ranch, CO 80129, C/O Blake McMurtrey.[2]

26.    Accordingly, TWM respectfully requests that FMI be ordered to transfer to the Trust's designee immediately the servicing rights, files and documents for the Required Sale Mortgage Loans.

27.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 13, 2007

_____
BARBARA CHELL

---

[2] The Trust originally instructed FMI to deliver the files for the Requested Mortgage Transfer Loans to EDMS, SLS' due diligence services provider, which is located at the same address as SLS, just in a different suite. See Ex. C.

# EXHIBIT A
## Part 1

**Terwin Warehouse Management LLC**
as Program Administrator,

**Terwin Mortgage Warehouse Trust II, Series VI,**
**a series of Terwin Mortgage Warehouse Trust II,**
**a Delaware statutory trust**
as Purchaser

and

**Financial Mortgage, Inc.**
as Seller and Servicer

AMENDED AND RESTATED
SELLER'S PURCHASE, WARRANTIES AND SERVICING AGREEMENT
Dated as of March 18, 2005

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ............................................................................................ 2

     Section 1.01    Defined Terms. ........................................................................... 2

ARTICLE II SERVICING OF MORTGAGE LOANS; RECORD TITLE AND POSSESSION
     OF MORTGAGE FILES; BOOKS AND RECORDS; CUSTODIAL AGREEMENT;
DELIVERY OF MORTGAGE LOAN DOCUMENTS ............................................................ 17

     Section 2.01    Agreement to Purchase. ............................................................. 17
     Section 2.02    Purchase Price. ......................................................................... 19
     Section 2.03    Servicing of Mortgage Loans. ................................................... 19
     Section 2.04    Record Title and Possession of Mortgage Files; Maintenance of Servicing
                   Files. ....................................................................................... 20
     Section 2.05    Books and Records. .................................................................. 20
     Section 2.06    Transfer of Mortgage Loans. ..................................................... 21
     Section 2.07    Delivery of Mortgage Loan Documents. .................................... 21
     Section 2.08    Quality Control Procedures. ..................................................... 22
     Section 2.09    Closing. .................................................................................. 22
     Section 2.10    Delivery of Documents; Initial Purchase of Mortgage Loans. ..... 23
     Section 2.11    Fees. ....................................................................................... 25
     Section 2.12    Duties with Respect to Forward Commitments. ........................... 25

ARTICLE III REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SELLER
AND THE SERVICER; REPURCHASE; REVIEW OF MORTGAGE LOANS ...................... 27

     Section 3.01    Representations and Warranties of the Seller and the Servicer. ....... 27
     Section 3.02    Representations and Warranties as to Individual Mortgage Loans. ... 30
     Section 3.03    Repurchase. ............................................................................. 41
     Section 3.04    RESERVED. ............................................................................ 43
     Section 3.05    Repurchase of Mortgage Loans With Early Payment Defaults. ....... 43
     Section 3.06    RESERVED. ............................................................................ 43
     Section 3.07    Covenants of Seller. ................................................................. 43
     Section 3.08    Payment. ................................................................................. 48
     Section 3.09    Seller Resolutions. ................................................................... 49
     Section 3.10    Remedies. ............................................................................... 49

ARTICLE IV SERVICING OF THE MORTGAGE LOANS DURING THE INTERIM
SERVICING PERIOD .................................................................................................. 50

     Section 4.01    RESERVED ............................................................................ 50
     Section 4.02    Custodial Account. .................................................................. 50
     Section 4.03    Establishment of Escrow Accounts; Deposits in Accounts. ............ 51
     Section 4.04    Permitted Withdrawals From the Escrow Account. ....................... 52

i

ARTICLE V ACCOUNTS ................................................................................................ 53

Section 5.01    Funding. ......................................................................................... 53
Section 5.02    Top-Up Account. ............................................................................ 53
Section 5.03    Withdrawals From the Top-Up Account. ...................................... 54
Section 5.04    Seller Funding Account. ................................................................ 54
Section 5.05    Withdrawals From the Seller Funding Account. ........................... 55
Section 5.06    Seller Settlement Account. ............................................................ 55
Section 5.07    Withdrawals From the Seller Settlement Account. ....................... 56
Section 5.08    Security Interest. ............................................................................ 56

ARTICLE VI PAYMENTS TO THE PURCHASER ................................................... 58

Section 6.01    Distributions. ................................................................................. 58
Section 6.02    Statements to the Purchaser. ......................................................... 58
Section 6.03    [RESERVED]. ................................................................................ 59
Section 6.04    Liquidation Reports. ...................................................................... 59

ARTICLE VII RESERVED .......................................................................................... 60

ARTICLE VIII SELLER TRIGGER EVENT ............................................................. 61

Section 8.01    Seller Trigger Events .................................................................... 61

ARTICLE IX THE SELLER AND THE SERVICER ................................................. 63

Section 9.01    Indemnification; Third Party Claims. ........................................... 63
Section 9.02    Merger or Consolidation of the Seller or the Servicer. ................. 63
Section 9.03    Limitation on Liability of the Seller and Others. .......................... 64

ARTICLE X DEFAULT ................................................................................................ 65

Section 10.01   Events of Default. .......................................................................... 65
Section 10.02   Waiver of Defaults. ........................................................................ 67

ARTICLE XI TERMINATION ..................................................................................... 68

Section 11.01   Termination. ................................................................................... 68
Section 11.02   Termination. ................................................................................... 68

ARTICLE XII RECONSTITUTION AND RESALE OF MORTGAGE LOANS; VALUATION
DEFICIENCY .................................................................................................................. 69

Section 12.01   RESERVED ..................................................................................... 69
Section 12.02   Sale of Mortgage Loans to Takeout Investors. .............................. 69
Section 12.03   Market Value. ................................................................................. 70
Section 12.04   Required Sale Event. ...................................................................... 70
Section 12.05   RESERVED. .................................................................................... 71

ii

Section 12.06  Intent of Parties; Security Interest. ......................................................... 71

ARTICLE XIII MISCELLANEOUS PROVISIONS .......................................................... 73

Section 13.01  Successor to the Servicer. ........................................................................ 73
Section 13.02  Amendment. ............................................................................................. 74
Section 13.03  Recordation of Agreement. ...................................................................... 74
Section 13.04  Governing Law. ....................................................................................... 74
Section 13.05  Notices. .................................................................................................... 74
Section 13.06  Severability of Provisions. ...................................................................... 74
Section 13.07  Exhibits. ................................................................................................... 75
Section 13.08  General Interpretive Principles. .............................................................. 75
Section 13.09  Reproduction of Documents. ................................................................... 76
Section 13.10  Confidentiality of Information. ............................................................... 76
Section 13.11  Authority of Program Administrator to Direct. ....................................... 76
Section 13.12  Assignment by Purchaser. ....................................................................... 76
Section 13.13  No Partnership. ........................................................................................ 77
Section 13.14  Execution; Successors and Assigns. ........................................................ 77
Section 13.15  Entire Agreement. .................................................................................... 77
Section 13.16  No Solicitation. ........................................................................................ 77
Section 13.17  MERS. ...................................................................................................... 77
Section 13.18  Time of the Essence.  . ............................................................................. 78
Section 13.19  Power of Attorney.  . ................................................................................ 78

EXHIBITS
| | |
|---|---|
| A | Contents of Mortgage File |
| B | Required Data Fields |
| C | Reserved |
| D | Reserved |
| E | Form of Monthly Servicing Report |
| F | Reserved |
| G | Closing Agent Agreement |
| H | Servicing Provisions |
| I | Seller Specific Provisions |
| J | Administrative Costs |
| K | Submission Package Documents |
| L | Escrow Instruction Letter |
| M | Insured Closing Protection Letter |
| N | Warehouse Lender Release |
| O | Authorized Representatives of Seller |

This is a Seller's Purchase, Warranties and Servicing Agreement, dated as of March 18, 2005 between Terwin Mortgage Warehouse Trust II, Series VI, a series of Terwin Mortgage Warehouse Trust II, a Delaware statutory trust, ("Purchaser"), Terwin Warehouse Management LLC, a Delaware limited liability company, ("Program Administrator"), and Financial Mortgage, Inc., a Virginia corporation ("Seller") and as servicer (in such capacity, the "Servicer").

## W I T N E S S E T H :

WHEREAS, the Purchaser agrees to purchase from the Seller and the Seller agrees to sell to the Purchaser certain Mortgage Loans, together with the servicing rights associated with such Mortgage Loans, from time to time, pursuant to the terms of this Agreement.

WHEREAS, each of the Mortgage Loans is secured by a mortgage, deed of trust or other security instrument creating a first or second lien on a residential dwelling located in the jurisdiction indicated on the Mortgage Loan Schedule, which is, or will be, annexed hereto as Exhibit F.  The Mortgage Loans as described herein shall be delivered as single loans or in groups of whole loans (each delivery, a "Mortgage Loan Package") on various dates as provided herein (each, a "Closing Date"); and

WHEREAS, the parties wish to prescribe the representations and warranties of the Seller with respect to itself and the Mortgage Loans and the management, interim servicing, transfer and control of the Mortgage Loans by the Servicer; and

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

ARTICLE I
DEFINITIONS

Section 1.01            Defined Terms.

Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the following meaning specified in this Article.

Accepted Servicing Practices:    With respect to any Mortgage Loan, those mortgage servicing practices (including collection procedures) of prudent mortgage banking institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located, and which are in accordance with Fannie Mae servicing practices and procedures, for MBS pool mortgages, as defined in the Fannie Mae Guides (which by their terms incorporate future updates).

Additional Mortgage Loans:  Has the meaning set forth in Section 12.03.

Adjustable Rate Mortgage Loan:    Any Mortgage Loan as to which the related Mortgage Note provides for periodic adjustments of the Mortgage Rate applicable thereto.

Adjusted Purchase Price:    As of any date of determination in respect of any Purchase, the excess of (i) the Purchase Price with respect thereto over (ii) all payments of principal actually received by Purchaser in respect of the related Mortgage Loans on or prior to such date (which shall not include any scheduled principal payments on the related Mortgage Loans that are retained by the Seller hereunder).

Adjusted Takeout Proceeds:    With respect to any Mortgage Loan, means the Takeout Proceeds less any Administrative Costs incurred in connection with such Mortgage Loan.

Adjustment Date:   With respect to each Adjustable Rate Mortgage Loan, the date set forth in the related Mortgage Note on which the Mortgage Interest Rate on such Mortgage Loan is adjusted in accordance with the terms of such Mortgage Note.

Administrative Costs:  The fees, charges and expenses listed on Exhibit J.

Advance Submission Documents:    With respect to any Mortgage Loan, the Closing Instruction Letter, the Data File, the Insured Closing Protection Letter, evidence of closing attorney errors and omissions insurance, the Closing Agent Agreement (Exhibit G), the Forward Commitment and any other documents the Program Administrator may request in its sole discretion.

Affiliate:   With respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly,

2

whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Aggregate Adjusted Purchase Price:   As of any date of determination, the aggregate of the Adjusted Purchase Prices of Mortgage Loans currently held by Purchaser hereunder.

Agreement:   This Seller's Purchase, Warranties and Servicing Agreement including all exhibits hereto, amendments hereof and supplements hereto.

Applicable Percentage:  Has the meaning set forth on Exhibit I.

Applicable Rate:   With respect to any Mortgage Loan and any date of determination, the Applicable Rate shall equal LIBOR plus the amount set forth on Exhibit I hereto.

Appraised Value:  With respect to any Mortgaged Property, the lesser of (i) the value thereof as determined by an appraisal made for the originator of the Mortgage Loan at the time of origination of the Mortgage Loan by an appraiser meeting the standards set forth in the applicable Underwriting Standards, and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan, provided, however, in the case of a Refinanced Mortgage Loan, such value of the Mortgaged Property is based solely upon the value determined by an appraisal made for the originator of such Refinanced Mortgage Loan at the time of origination of such Refinanced Mortgage Loan by an appraiser meeting the standards set forth in the applicable Underwriting Standards.

Approved Closing Agent:   A closing agent on a list approved by the Program Administrator for closing Mortgage Loans, as such list may be modified from time to time by the Program Administrator.

Approved Takeout Investor:   A party that has executed a Forward Commitment, which party is on the list of Takeout Investors set forth on Exhibit I hereto.

Assignment:   An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the transfer of the Mortgage.

Available Amount:   As of any date of determination, the Available Amount set forth on Exhibit I hereto, less the Aggregate Adjusted Purchase Price on such date.

BIF:  The Bank Insurance Fund, or any successor thereto.

Business Day:   Any day other than (i) a Saturday or a Sunday, or (ii) a legal holiday in the States of Maryland, Delaware or New York, or (iii) a day on which banks in the States of Maryland, Delaware or New York are authorized or obligated by law or executive order to be closed.

Closing Agent Funding:   A Mortgage Loan that is being closed with the wire

3

being sent directly to the related Approved Closing Agent. The percentage of Closing Agent Funding Mortgage Loans permitted to be purchased pursuant to this Agreement is set forth on Exhibit I hereto.

Closing Date: With respect to the Mortgage Loans listed on the related Mortgage Loan Schedule with respect to the related Mortgage Loan Package, means the date of payment by Purchaser to Seller of the Purchase Price.

Code: The Internal Revenue Code of 1986, as the same may be amended from time to time (or any successor statute thereto).

Commitment Fee: The amount set forth on Exhibit I.

Condemnation Proceeds: All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan Documents.

Convertible Mortgage Loan: Any Adjustable Rate Mortgage Loan as to which the related Mortgage Note permits the Mortgagor to convert the Mortgage Interest Rate on such Mortgage Loan to a fixed Mortgage Interest Rate.

Co-op Lease: With respect to a Co-op Loan, the lease with respect to a dwelling unit occupied by the Mortgagor and relating to the stock allocated to the related dwelling unit.

Co-op Loan: A Mortgage Loan secured by the pledge of stock allocated to a dwelling unit in a residential cooperative housing corporation and a collateral assignment of the related Co-op Lease.

Co-op Stock: With respect to a Co-op Loan, the single outstanding class of stock, partnership interest or other ownership instrument in the related residential cooperative housing corporation.

Correspondent: A Person who has agreed to sell Mortgage Loans to the Series Trust or any series thereof under a Correspondent Purchase Agreement.

Correspondent Purchase Agreement: Any of the Seller's Purchase, Warranties and Servicing Agreements entered into among the Program Administrator, the Series Trust or the applicable series thereof and the related Correspondent, as the same may be amended, supplemented, restated or otherwise modified from time to time.

Correspondent Ramp up Period: As defined in Exhibit I.

Credit Score: The credit score for each Mortgage Loan shall be calculated using a minimum of two credit bureau scores obtained at origination or such other time by the Seller. If two credit bureau scores are obtained, the Credit Score will be the lower score. If three credit bureau scores are obtained, the Credit Score will be the middle of the three. When there is more

4

than one applicant, the lowest of the applicants' Credit Scores will be used. There is only one (1) score for any loan regardless of the number of borrowers and/or applicants.

Custodial Account: Each separate demand account or accounts created and maintained pursuant to Section 4.02 which shall be established as an Eligible Account.

Custodian: Wachovia Bank, National Association.

Cut-off Date: With respect to each Mortgage Loan Package, the date set forth in Exhibit I.

Data File: The numbered items set forth in the definition of Mortgage Loan Schedule.

Defective Mortgage Loan: A Mortgage Loan as to which any representation or warranty contained herein is inaccurate or incomplete.

Delivery Period: With respect to a Wet Funding Mortgage Loan, no later than 2:30 p.m. (New York City Time) five (5) Business Days after the Closing Date.

Determination Date: The 10th day (or if such 10th day is not a Business Day, the Business Day immediately preceding such 10th day) of the month of the related Remittance Date.

Dry Funding: A Mortgage Loan as to which all Submission Package Documents have been received by the Custodian (on behalf of the Purchaser) as set forth in Section 2.01. The percentage of Dry Funding Mortgage Loans permitted to be purchased pursuant to this Agreement is set forth on Exhibit I hereto.

Due Date: The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Due Period: With respect to any Remittance Date, the period commencing on the opening of business on the second day of the month preceding the month of such Remittance Date and ending at the close of business on the first day of the month of the Remittance Date.

Eligible Account: An account established and maintained: (a) within FDIC insured accounts (or other accounts with comparable insurance coverage) created, maintained and monitored by the Servicer so that all funds deposited therein are fully insured, (b) with the corporate trust department of a financial institution assigned a long-term debt rating of not less than Baa3, and a short term debt rating of P2, from Moody's Investors Services, Inc., and held such that the rights of the Purchaser shall be fully protected against the claims of any creditors of the Seller and of any creditors or depositors of the institution in which such account is maintained, or (c) in a separate non-trust account without FDIC or other insurance in an Eligible Institution. In the event that a Custodial Account is established pursuant to clause (b) or (c) of the preceding sentence, the Servicer shall provide the Purchaser with written notice on the Business Day following the date on which the applicable institution fails to meet the applicable ratings requirements.

Eligible Institution:  An institution having (i) the highest short-term debt rating, and one of the two highest long-term debt ratings of the Rating Agencies; or (ii) with respect to any Custodial Account, an unsecured long-term debt rating of at least one of the two highest unsecured long-term debt ratings of the Rating Agencies.

Equity:  With respect to any second lien Mortgage Loan and as of any date of determination, the Appraised Value, less the unpaid principal balance of the related First Lien as of such date.

Equity Loan-to-Value or Equity LTV:  With respect to any second lien Mortgage Loan and as of any date of determination, the original principal balance of such Mortgage Loan, divided by the Equity as of such date.

Escrow Account:  Each separate trust account or accounts created and maintained pursuant to Section 4.03 and shall be established as an Eligible Account.

Escrow Instruction Letter:  A document substantially in the form of Exhibit L hereto.

Escrow Payments:  With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the Mortgage, applicable law or any other related document.

Event of Default:  Any one of the conditions or circumstances enumerated in Section 10.01.

Fannie Mae:  Fannie Mae, or any successor thereto.

Fannie Mae Guides:  The Fannie Mae Sellers' Guide and the Fannie Mae Servicers' Guide and all amendments or additions thereto, including, but not limited to, future updates thereof.

FDIC:  The Federal Deposit Insurance Corporation, or any successor thereto.

FIRREA:  The Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

First Lien:  With respect to any second lien Mortgage Loan, the mortgage loan relating to the corresponding Mortgaged Property having a first priority lien.

Fixed Rate Mortgage Loan:  A Mortgage Loan purchased pursuant to this Agreement which bears a fixed Mortgage Interest Rate during the life of the loan.

Forward Commitment:  A commitment from an Approved Takeout Investor to purchase a Mortgage Loan at a fixed price on a date certain.

6

Freddie Mac:  The Federal Home Loan Mortgage Corporation, or any successor thereto.

Freddie Mac Guides:  The Freddie Mac Sellers' Guide and the Freddie Mac Servicers' Guide and all amendments or additions thereto, including, but not limited to, any future updates thereof.

GAAP:  Generally accepted accounting procedures in the United States of America, consistently applied.

Gross Margin:  With respect to any Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note and the related Mortgage Loan Schedule that is added to the Index on each Adjustment Date in accordance with the terms of the related Mortgage Note to determine the new Mortgage Interest Rate for such Mortgage Loan.

HUD:  The United States Department of Housing and Urban Development or any successor thereto.

Imputed Interest Amount:  With respect to any Mortgage Loan which has been sold by the Purchaser, the aggregate amount obtained by the daily application of the Applicable Rate to the Adjusted Purchase Price for such Mortgage Loan on a 360-day-per-year basis for the actual number of days in the period from and including the Closing Date to and excluding the Settlement Date for such Mortgage Loan, or the date on which such Mortgage Loan is re-purchased by the Seller pursuant to Section 3.03, as the case may be; provided, however, that no provision of this Agreement shall require the payment or permit the collection of any Imputed Interest Amount in excess of the maximum permitted by applicable law; and provided further, that Imputed Interest Amount shall not be considered paid if at any time payment is rescinded or must be returned for any reason.

Indebtedness: With respect to any Person, shall mean all indebtedness, obligations and liabilities of such Person, contingent or otherwise, direct or indirect and howsoever evidenced or incurred, that should be reflected as a liability on the balance sheet of such Person prepared in accordance with GAAP

Index:  With respect to any Adjustable Rate Mortgage Loan, the index identified on the Mortgage Loan Schedule and set forth in the related Mortgage Note for the purpose of calculating the Mortgage Interest Rate thereon.

Insurance Proceeds:  With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

Insured Closing Protection Letter:  A document substantially in the form of Exhibit M hereto.

Interim Servicing Period: As to each Mortgage Loan, the period of time from and including the related Cut-off Date to the related Servicing Transfer Date.

Interest Only Loan:  A Mortgage Loan purchased pursuant to this Agreement as to which the related Mortgage Note provides for the payment of interest only during the life of the loan, and a payment of the full amount of the principal upon the maturity of the Mortgage Loan.

Lender Paid Mortgage Insurance Policy Program or LPMI Policies:  A program or policy in which, for any Mortgage Loan underwritten with an LTV greater than 80% and less than 100%, the owner or servicer of such Mortgage Loan is responsible for the premiums associated with the mortgage insurance policy.

Leverage Ratio:  The ratio of Total Indebtedness divided by Tangible Net Worth.

LIBOR:  For each day, the rate of interest per annum for dollar deposits with a duration of one month on Bloomberg page BTMM at about 11:00 A.M. (London time) on such day (or, if such day is not a LIBOR Business Day, on the next preceding LIBOR business day) or, if that page ceases to display the necessary information, then whatever page replaces it on that service for the purpose of displaying that information (the "Bloomberg Rate").  If the Bloomberg Rate cannot be determined then the LIBOR Rate means the arithmetic average of the rates of interest offered by two prime banks in the London interbank market (selected by Program Administrator on behalf of the Purchaser) for dollar deposits with a duration of one month at about 11:00 A.M. (London time) on the LIBOR Business Day prior to such day.

LIBOR Business Day:  Any day on which banks in London and The City of New York are open and conducting transactions in foreign currency and exchange.

Liquidation Proceeds:  Amounts received in connection with the partial or complete liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise.

Losses:  Any and all losses, claims, damages, liabilities or expenses (including reasonable attorneys' fees and disbursements) incurred by any person specified in this Agreement for principal, interest or otherwise, resulting from transactions entered into under this Agreement (other than liability for taxes).  Losses must be accounted for and documented in reasonable detail when presented for reimbursement.

Loan Quarter:  Each consecutive three (3) month period commencing on the date hereof.

Loan-to-Value Ratio or LTV:  With respect to any Mortgage Loan, the ratio of the original outstanding principal amount of the Mortgage Loan plus, with respect to any second lien Mortgage Loan, the outstanding principal amount of any related First Lien as of the date of origination of such mortgage loan, to (i) with respect to a Refinanced Mortgage Loan, the Appraised Value of the related Mortgaged Property at origination, and (ii) with respect to all other Mortgage Loans, the lesser of the Appraised Value of the related Mortgaged Property at origination and the purchase price of the related Mortgaged Property.

Margin Call:  Has the meaning set forth in Section 12.03.

Margin Deficit: Has the meaning set forth in Section 12.03.

Market Value: With respect to any Uncovered Mortgage Loans as of any date, the whole-loan servicing released fair market value of such Uncovered Mortgage Loans on such date as determined by Program Administrator in its sole discretion.

Material Adverse Effect: Means (i) a judgment or decree is entered against the Seller involving claims not fully covered by insurance and such judgment or decree shall not have been vacated, discharged, or stayed or bonded pending appeal within ten (10) days from entry thereof; or (ii) any governmental license, authorization or permit held by Seller which is necessary for the lawful conduct of Seller's business is revoked, suspended, not renewed or subjected to any restriction or condition limiting the conduct of Seller's business as now, or as proposed to be conducted; or (iii) any agency, or private investor, or any other party shall seize or take control of Seller's servicing, owned or pipeline portfolio for breach of any agreement applicable to such portfolio, or for any other reason whatsoever; or (iv) any other event occurs which could have a material adverse effect upon the validity, performance or enforceability of this Agreement, or upon the properties, business or condition, financial or otherwise, of Seller.

Maximum Mortgage Interest Rate: With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth in the related Mortgage Note and is the maximum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be increased.

Maximum Purchase Amount: That limit set forth on Exhibit I.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

Minimum Mortgage Interest Rate: With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth in the related Mortgage Note and is the minimum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be decreased.

Monthly Payment: The scheduled monthly payment on a Mortgage Loan due on any Due Date allocable to principal and/or interest on such Mortgage Loan pursuant to the terms of the related Mortgage Note.

Mortgage: With respect to a Mortgage Loan that is not a Co-op Loan, the mortgage, deed of trust or other instrument securing a Mortgage Note which creates a first or second lien on an unsubordinated estate in fee simple in real property securing the Mortgage Note; except that with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, the mortgage, deed of trust or other instrument securing the Mortgage Note may secure and create a first or second lien upon a leasehold estate of the Mortgagor. With respect to a Co-op Loan, the related Security Agreement.

Mortgage File: With respect to each Mortgage Loan, the documents pertaining thereto specified in Exhibit A (including the Forward Commitment, except with respect to each Uncovered Mortgage Loan) and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

9

**Mortgage Interest Rate**: The annual rate at which interest accrues on any Mortgage Loan in accordance with the provisions of the related Mortgage Note.

**Mortgage Loan**: An individual Mortgage Loan which is the subject of this Agreement, each Mortgage Loan originally sold and subject to this Agreement being identified on the Mortgage Loan Schedule, which Mortgage Loan includes without limitation the Mortgage File, the Monthly Payments, Principal Prepayments, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, REO Disposition Proceeds, any escrow accounts related to the Mortgage Loan, and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan, excluding mortgage loans replaced or repurchased in accordance herewith.

**Mortgage Loan Documents**: The documents required to be contained in a Mortgage File as set forth in Exhibit A hereto.

**Mortgage Loan Package**: As defined in the Recitals to this Agreement.

**Mortgage Loan Remittance Rate**: With respect to each Mortgage Loan, the Mortgage Interest Rate less the rate at which the premium for any LPMI Policy accrues, as applicable.

**Mortgage Loan Schedule**: A computer-readable transmission in a standardized text format delivered by the Seller to (x) the Program Administrator on behalf of the Purchaser and (y) the Custodian incorporating the Required Data Fields identified on Exhibit B hereto with respect to each Mortgage Loan in the related Mortgage Loan Package.

**Mortgage Note**: The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

**Mortgaged Property**: With respect to a Mortgage Loan that is not a Co-op Loan, the underlying real property securing repayment of a Mortgage Note, consisting of a fee simple parcel of real estate or a leasehold estate, the term of which is equal to or longer than the term of the related Mortgage Note. With respect to a Co-op Loan, the related Co-op Stock and Co-op Lease securing the indebtedness of the Mortgagor under the related Mortgage Loan.

**Mortgagor**: The obligor on a Mortgage Note.

**OCC**: Office of the Comptroller of the Currency, and any successor thereto.

**Officers' Certificate**: A certificate signed by the Chairman of the Board, the Vice Chairman of the Board, the President, a Senior Vice President or a Vice President and by the Treasurer or the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Seller, and delivered to the Purchaser or its designee as required by this Agreement.

**Opinion of Counsel**: A written opinion of counsel, who may be an employee of the party on behalf of whom the opinion is being given, reasonably acceptable to the Program Administrator on behalf of the Purchaser.

OTS:  Office of Thrift Supervision, and any successor thereto.

Periodic Rate Cap:  With respect to each Adjustable Rate Mortgage Loan and any Adjustment Date therefor, a number of percentage points per annum that is set forth in the related Mortgage Note, which is the maximum amount by which the Mortgage Interest Rate for such Mortgage Loan may increase (without regard to the Maximum Mortgage Interest Rate) or decrease (without regard to the Minimum Mortgage Interest Rate) on such Adjustment Date from the Mortgage Interest Rate in effect immediately prior to such Adjustment Date, which may be a different amount with respect to the first Adjustment Date.

Person:  Any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Prepayment Penalty:  With respect to each Mortgage Loan, the penalty if the Mortgagor prepays such Mortgage Loan as provided in the related Mortgage Note or Mortgage.

Primary Mortgage Insurance Policy:  Each policy of primary mortgage insurance represented to be in effect pursuant to Section 3.02(aa), or any replacement policy therefor obtained by the Servicer.

Prime Rate:  The prime rate announced to be in effect from time to time as published as the average rate in The Wall Street Journal (Northeast Edition) (or, if more than one such rate is published, the average of such rates).

Principal:  Means any Person owning 10% of more of Seller's equity and any executive officer of Seller.

Principal Prepayment:  Any full or partial payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any Prepayment Penalty or premium thereon and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Projected Loss:  As defined in Section 8.01.

Purchase:  Any purchase of Mortgage Loans pursuant to Section 2.01.

Purchase Price:  As defined in Section 2.02.

Purchase Price Percentage:  With respect to any Purchase, 98%.

Purchase Request:  An electronic request in a format acceptable to the Program Administrator by the Seller for the Purchase of Mortgage Loans submitted to the Program Administrator which request shall include the Mortgage Loan Schedule to be included in the Mortgage Loan Package, the related Data Files and the proposed Closing Date.

11

Purchaser: Terwin Mortgage Warehouse Trust II, Series VI, a series of Terwin Mortgage Warehouse Trust II, a Delaware statutory trust, its successors in interest and assigns. The duties, rights and obligations of the Purchaser hereunder shall from time to time be performed or enforced, as applicable, by the Program Administrator or other parties designated by the Purchaser, in each case without the requirement of notice to the Seller of such designation.

Put Back Loan: Any Mortgage Loan that has been put back to the Seller after the Settlement Date for any reason, including, without limitation, a violation of any covenant, representation or warranty set forth in this Agreement, the related Forward Commitment or the related mortgage loan purchase agreement with the Takeout Investor, and which has not been cured to the satisfaction of the Approved Takeout Investor or the Program Administrator if applicable.

Put Back Loan Ratio: The ratio, calculated on a monthly basis, the numerator of which is the sum of the unpaid principal balances of all Mortgage Loans that were put back by all Approved Takeout Investors to the Seller during such month and the denominator of which is the sum of the unpaid principal balances of all Mortgage Loans that were purchased by and delivered to or have received Forward Commitments from all Approved Takeout Investors during such month.

Qualified Appraiser: With respect to each Mortgage Loan, an appraiser, duly appointed by the Seller, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan, and such appraiser and the appraisal made by such appraiser both satisfy the requirements of Fannie Mae and Freddie Mac and Title XI of FIRREA and the regulations promulgated thereunder, all as in effect on the date the Mortgage Loan was originated.

Qualified Insurer: An insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance provided by the insurance policy issued by it, approved as an insurer by Fannie Mae and Freddie Mac.

Rating Agencies: Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and Moody's Investors Service, Inc.

Refinanced Mortgage Loan: A Mortgage Loan which was made to a Mortgagor who owned the Mortgaged Property prior to the origination of such Mortgage Loan and the proceeds of which were used in whole or part to satisfy an existing mortgage.

Regulatory Authority: With respect to any Person means any governmental or quasi-governmental department, commission, board, regulatory authority, bureau, agency or instrumentality, domestic, foreign, federal, state or municipal (including, without limitation, the OTS, FDIC, SEC or the NASD), any court or arbitration panel, or any private body having regulatory jurisdiction over such Person or its business or assets (including any insurance company or underwriter through whom such Person has obtained insurance coverage).

REMIC:  A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

Remittance Date:  With respect to all scheduled principal and interest payments received, the 15th day of each month, (or if such day is not a Business Day, the first Business Day thereafter), (except as otherwise provided herein).  With respect to all unscheduled principal payments received, each Business Day (except as otherwise provided herein).

REO Disposition:  The final sale by the Servicer of any REO Property.

REO Disposition Proceeds:  Amounts received by the Servicer in connection with an REO Disposition.

REO Property:  A Mortgaged Property acquired by or on behalf of the Purchaser in full or partial satisfaction of the related Mortgage.

Repurchase Price:  With respect to any Mortgage Loan and as of any date of determination, (i) the Imputed Interest Amount; plus (ii) the Adjusted Purchase Price; plus (iii) third party fees and expenses incurred in connection with the transfer of the Mortgage Loan being repurchased or the enforcement of the obligations of the Seller under Sections 3.03, 3.04 and 3.05 in each case as of such date.

Required Insurance Amount:  Has the meaning set forth on Exhibit I.

Required Sale Event:  As defined in Section 12.04 hereof.

Requirement of Law:  With respect to any Person means any law, ordinance, requirement, order, direction, rule, regulation, decision, ruling, writ, injunction, instruction, resolution, decree, or other similar document, instrument or directive, whether currently existing or promulgated hereafter, of any Regulatory Authority, or any requirement of the organizational documents of such Person.

SAIF:  The Savings Association Insurance Fund, or any successor thereto.

Scheduled Principal Balance:  As to each Mortgage Loan, (i) the principal balance of such Mortgage Loan at the Cut-off Date after giving effect to payments of principal due on or before such date, whether or not received, minus (ii) all amounts previously distributed to the Purchaser with respect to the Mortgage Loan representing payments or recoveries of principal or advances in lieu thereof.

Security Agreement:  With respect to a Co-op Loan, the agreement or mortgage creating a security interest in favor of the originator of the Co-op Loan in the related Co-op Stock.

Security Deposit Amount:  Has the meaning set forth in Section 5.01 hereof.

Seller Concentration Sublimits:    The eligibility requirements established by Program Administrator on behalf of the Purchaser with respect to its willingness to acquire

13

categories of Mortgage Loans from the Seller, as the same shall be set forth on Exhibit I, as amended from time to time.

Seller Funding Account:  Each separate trust account or accounts created and maintained by Purchaser's designee in furtherance of the terms hereof.

Seller Settlement Account:  Each separate trust account or accounts created and maintained by Purchaser's designee in furtherance of the terms hereof.

Seller Trigger Event:  Any one of the conditions or circumstances enumerated in Section 8.01.

Servicer:  With respect to each Mortgage Loan, the Seller or another entity designated as servicer and approved by the Purchaser and Program Administrator.

Servicing Advances:  All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Servicer of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of a Mortgaged Property, (b) any enforcement, administrative or judicial proceedings, or any legal work or advice specifically related to servicing the Mortgage Loans, including but not limited to, foreclosures, bankruptcies, condemnations, drug seizures, elections, foreclosures by subordinate or superior lienholders, and other legal actions incidental to the servicing of the Mortgage Loans (provided that such expenses are reasonable and that the Servicer specifies the Mortgage Loan(s) to which such expenses relate, and provided further that any such enforcement, administrative or judicial proceeding does not arise out of a breach of any representation, warranty or covenant of the Seller hereunder), (c) the management and liquidation of any REO Property, (d) taxes, assessments, water rates, sewer rates and other charges which are or may become a lien upon the Mortgaged Property, and Primary Mortgage Insurance Policy premiums and fire and hazard insurance coverage, and (e) any expenses reasonably sustained by the Servicer, with respect to the liquidation of the Mortgaged Property in accordance with the terms of this Agreement.

Servicing Officer:  Any officer of the Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name appears on a list of servicing officers furnished by the Servicer to the Purchaser or its designee upon request, as such list may from time to time be amended.

Servicing Transfer Date:  The date on which the responsibility for the servicing of the Mortgage Loans transfers from the Servicer to the Purchaser or its designee.

Settlement Date:  With respect to any Mortgage Loan, means the Business Day following the day on which the applicable Takeout Proceeds are received by Purchaser (or its designee) from a Takeout Investor as confirmed by receipt of the related Settlement Information.

Settlement Information:  A written advice or group of written advices which shall identify each Mortgage Loan (by the Mortgagor's surname) that the Takeout Investor acquires on a certain Business Day and confirming the amount of Takeout Proceeds allocable to each such Mortgage Loan.

Shortfall Premium:  The fee set forth on Exhibit I calculated on the daily average Available Amount.

Submission Package Documents:  With respect to any Mortgage Loan, the applicable documents designated on Exhibit K, each in form and substance satisfactory to the Program Administrator on behalf of the Purchaser in its sole discretion.

Takeout Commitment Ratio:  The ratio, calculated monthly on all Mortgage Loans, the numerator of which is the outstanding principal balance of all Mortgage Loans which had a Forward Commitment which was delivered during such month and the denominator of which is the outstanding principal balance of all Mortgage Loans purchased or held during such month which had a Forward Commitment.

Takeout Investor Relationship:  As defined in Section 3.07(m).

Takeout Proceeds:  The amount of funds a purchaser (either an Approved Takeout Investor or other purchaser identified by the Program Administrator) pays the Purchaser with respect to a Mortgage Loan.

Tangible Net Worth:  At the time of such determination, the excess of total assets over total liabilities, each to be determined in accordance with GAAP, excluding, however, from the determination of total assets, all assets which would be classified as intangible assets under GAAP, including, without limitation, goodwill, licenses, patents, trademarks, copyrights and franchises and any non-acceptable assets as determined by HUD, and including in the determination of total liabilities the Aggregate Adjusted Purchase Price.

Termination Date:  The earlier of (i) 364 days from the date of the first Purchase hereunder and (ii) the occurrence of an Event of Default hereunder.

Top-Up Account:  Each separate trust account or accounts created and maintained by Purchaser's designee in furtherance of the terms hereof.

Total Indebtedness:  At any date, means all items (other than capital stock, capital surplus, retained earnings, deferred taxes and deferred credits) of Indebtedness as at the date on which Total Indebtedness is to be determined.

Uncommitted Availability:  That portion of the Available Amount that may be held by Purchaser hereunder as Uncovered Mortgage Loans, not to exceed the amount set forth on Exhibit I hereto.

Uncovered Mortgage Loan:  Any Mortgage Loan with respect to which the Seller does not have a Forward Commitment.

Underwriting Standards:  As to each Mortgage Loan with respect to which a Forward Commitment exists, the applicable Takeout Investor's written seller and underwriting guidelines in effect as of the origination date of the Mortgage Loan(s).  As to each Uncovered Mortgage Loan, The Winter Group's written seller and underwriting guidelines in effect as of the origination date of the Mortgage Loan(s).

15

**Warehouse Funding**: A Purchase of a closed Mortgage Loan which involves the payoff of the related Warehouse Lender. The percentage of Warehouse Funding Mortgage Loans permitted to be purchased pursuant to this Agreement is set forth on Exhibit I hereto.

**Warehouse Lender**: Any lender providing financing to Seller for the purpose of originating or purchasing Mortgage Loans, which lender, prior to the related Closing Date, has a security interest in such Mortgage Loans as collateral for the obligations of Seller to such lender.

**Warehouse Lender Release**: A letter in the form of Exhibit N from a Warehouse Lender to Purchaser.

**Wet Funding**: A Mortgage Loan that is being closed with the Mortgagor on the Closing Date therefor and accordingly, as to which Advance Submission Documents are sent to Custodian prior to 2:30 p.m. (New York City time) on the related Closing Date. The percentage of Wet Funding Mortgage Loans permitted to be purchased pursuant to this Agreement is set forth on Exhibit I hereto.

## ARTICLE II

### SERVICING OF MORTGAGE LOANS;
### RECORD TITLE AND POSSESSION OF MORTGAGE FILES;
### BOOKS AND RECORDS; CUSTODIAL AGREEMENT;
### DELIVERY OF MORTGAGE LOAN DOCUMENTS

Section 2.01          Agreement to Purchase.

(a) The Seller may sell and the Purchaser may agree to purchase (under the terms and conditions and subject to the limitations set forth herein) on each requested Closing Date (or the following Business Day if all Submission Package Documents, or Advance Submission Documents, as the case may be, are not received prior to 2:30 PM (New York City time)) pursuant to this Agreement at the Purchase Price the Mortgage Loans being sold by the Seller and listed on the Mortgage Loan Schedule, together, in some cases, with the servicing rights associated therewith, having an aggregate Scheduled Principal Balance in an amount as set forth in the Purchase Request, or in such other amount as agreed by the Program Administrator on behalf of the Purchaser and the Seller as evidenced by the actual aggregate principal balance of the Mortgage Loans accepted by the Program Administrator on behalf of the Purchaser on such Closing Date; provided that immediately following such purchase the Available Amount would not be less than zero. Each Purchase Request shall contain in an electronic format the Mortgage Loan Schedule for the Mortgage Loans to be purchased on such Closing Date.

(b) On any Business Day, Seller may initiate a request for purchase pursuant to this Agreement by delivering to the Program Administrator on behalf of Purchaser and to the Custodian a Purchase Request on the proposed Closing Date which Purchase Request must be received by the Program Administrator and by the Custodian on or prior to 2:30 p.m. (New York City time) on the requested Closing Date. The Program Administrator on behalf of Purchaser shall indicate its acceptance or declination of each Mortgage Loan included in each Purchase Request electronically, as well as confirm the Purchase Price of each purchased Mortgage Loan. Notwithstanding anything contained herein to the contrary, Purchaser is under no obligation to purchase any Mortgage Loans or accept any Purchase Request pursuant to this Agreement.

(c) If Program Administrator on behalf of Purchaser does not indicate its acceptance of a Purchase Request electronically prior to 4:00 p.m. (New York City time) on the proposed Closing Date, Purchaser shall be deemed to have declined such Purchase Request. Notwithstanding the foregoing, at no time will the Purchaser purchase a Mortgage Loan if it would cause the Available Amount to be reduced below zero, or any applicable Seller Concentration Sublimit, to be exceeded or otherwise to fail to be satisfied by Seller.

(d) Each accepted Purchase Request shall be irrevocable and binding on Purchaser and Seller. If Seller shall fail to timely deliver the Mortgage Loans in accordance with the provisions set forth below, then Seller shall return or cause the related Approved Closing Agent to return to the Purchaser the Purchase Price plus interest thereon at the Applicable Rate.

(e) The Purchaser shall pay the Purchase Price for the Mortgage Loans to be purchased by it hereunder on each Closing Date by wire transfer, according to instructions listed

17

on the related Purchase Request, in immediately available funds to the related Approved Closing Agent's or the related Warehouse Lender's account, as appropriate, not later than 6:00 p.m. (New York City time) on the Closing Date, of an amount in Dollars equal to the aggregate Purchase Price for the Mortgage Loans to be purchased and any additional closing expenses related to such Mortgage Loans on such Closing Date.  With respect to each Dry Funding Mortgage Loan:

> (i)     If the funding of any Dry Funding Mortgage Loan involves a payment to a Warehouse Lender, the Seller shall furnish to the Purchaser or its designee a Warehouse Lender Release, together with wire instructions for the payoff of the Warehouse Lender.  If any Dry Funding Mortgage Loan is a MERS Designated Loan, the Seller shall furnish a MERS report reflecting the Approved Closing Agent, as "Interim Funder" or "Warehouse Gestation Lender" for each such Mortgage Loan.

> (ii)    The Seller shall deliver to the Custodian, no later than 2:30 p.m. (New York City time), on the requested Closing Date, the Submission Package Documents pertaining to each Dry Funding Mortgage Loan to be sold to the Purchaser.

With respect to each Wet Funding Mortgage Loan funded on a Closing Date, the Seller shall deliver the Submission Package Documents for receipt by the Custodian within the Delivery Period.

(f)  Pursuant to the terms herein, the Purchaser, from time to time, will deliver the Mortgage Loans, including the Submission Package Documents held by the Custodian, either (i) to an Approved Takeout Investor or (ii) to the Seller for repurchase for as required under this Agreement.  Delivery of the Mortgage Loans can only be authorized and requested by the Program Administrator on behalf of the Seller.

(g)  Any delivery request to be made in accordance with paragraph (f) above shall be made, in writing, by the Program Administrator on behalf of the Seller.  Upon receipt of such written request by the Program Administrator, the Custodian will utilize the following procedures:

> (i)  confirm via Electronic Transmission from the Program Administrator that the recipient that has been designated by the Seller is the proper recipient;

> (ii)  retain the original Assignment of Mortgage and a copy of the Mortgage Note, which documents shall be held by the Custodian on behalf of the Purchaser for 90 days following the Settlement Date or the day the Mortgage Loan was repurchased by the Seller; and

> (iii)  at the expense of the Seller, deliver to the party confirmed in paragraph (i) above the related Submission Package Documents by overnight delivery using a

18

nationally recognized overnight delivery service.

Section 2.02          Purchase Price.

The aggregate Purchase Price for the Mortgage Loans in a Mortgage Loan Package shall be equal to the Purchase Price Percentage, multiplied by the lesser of (i) the aggregate Scheduled Principal Balance of the Mortgage Loans listed on the related Mortgage Loan Schedule, as of the related Cut-off Date, and (ii) (A) with respect to any Mortgage Loans listed on the related Mortgage Loan Schedule which are subject to a Forward Commitment, the aggregate Adjusted Takeout Proceeds of such Mortgage Loans or (B) with respect to any Uncovered Mortgage Loans listed on the related Mortgage Loan Schedule, the aggregate Market Value of such Mortgage Loans (the "Purchase Price").

The Purchase Price as set forth in the preceding paragraph for the Mortgage Loans in a Mortgage Loan Package shall be paid on the Closing Date by wire transfer of immediately available funds as provided in Section 2.01.

With respect to each Mortgage Loan, the Purchaser shall be entitled to (i) the principal portion of all Monthly Payments due after the Cut-off Date, (ii) all other recoveries of principal collected on or after the Cut-off Date (provided, however, that the principal portion of all Monthly Payments due on or before the Cut-off Date and collected by the Servicer or any successor servicer after the Cut-off Date shall belong to the Seller), (iii) the Takeout Proceeds, and (iv) all payments of interest on the Mortgage Loans (minus that portion of any such payment which is allocable to the period prior to the Cut-off Date). The Scheduled Principal Balance of each Mortgage Loan as of the Cut-off Date is determined after application of payments of principal due on or before the Cut-off Date whether or not collected, together with any unscheduled Principal Prepayments collected prior to the Cut-off Date; provided, however, that Monthly Payments for a Due Date beyond the Cut-off Date shall not be applied to the principal balance as of the Cut-off Date, such Monthly Payments shall be the property of the Purchaser. The Seller shall deposit any such Monthly Payments into the Custodial Account.

The Purchaser may at its discretion at any time without any notice to the Seller deduct from and offset against the Purchase Price any amounts, including escrows, owed by the Seller to the Purchaser in connection with a particular purchase or other transaction. All such amounts are, shall be, and shall at all times be deemed, and shall remain the sole property of the Purchaser, and the Seller waives, and shall not have, any right, claim or interest whatsoever in such amounts, and the Seller irrevocably and unconditionally discharges, releases and indemnifies and holds harmless the Purchaser and its affiliates, successors, and assigns from and against any and all claims, demands, liabilities and obligations whatsoever.

Section 2.03          Servicing of Mortgage Loans.

On each Closing Date, the Mortgage Loans in the related Mortgage Loan Package will be sold by the Seller to the Purchaser on a servicing released basis. Subject to, and upon the terms and conditions of this Agreement, the Seller hereby transfers, assigns and delivers to the Purchaser or its designee the right to service each such Mortgage Loan sold by it as of such Closing Date.

19

Simultaneously with the execution and delivery of this Agreement, for each Mortgage Loan Package, the Servicer hereby agrees to service the Mortgage Loans listed on the Mortgage Loan Schedule, during the Interim Servicing Period in accordance with Exhibit H, Accepted Servicing Practices and this Agreement.

Section 2.04          Record Title and Possession of Mortgage Files;
                      Maintenance of Servicing Files.

As of each Closing Date, the Seller will have sold, transferred, assigned, set over and conveyed to the Purchaser, without recourse, and the Seller hereby acknowledges that the Purchaser will have, all the right, title and interest of the Seller in and to, the Mortgage Loans. In accordance with Section 2.07, the Seller shall deliver at its own expense, the Submission Package Documents or for a Wet Funding, the Advance Submission Documents for the related Mortgage Loans to the Custodian. The possession of each servicing file by the Servicer is at the will of the Purchaser, for the sole purpose of servicing the related Mortgage Loan during the Interim Servicing Period, and such retention and possession by the Servicer is in a custodial capacity only. From each Closing Date, the ownership of each related Mortgage Loan, including the Mortgage Note, the Mortgage, the contents of the related Mortgage File and all rights, benefits, proceeds and obligations arising therefrom or in connection therewith, has been vested in the Purchaser. All rights arising out of the Mortgage Loans including, but not limited to, all funds received on or in connection with the Mortgage Loans and all records or documents with respect to the Mortgage Loans prepared by or which come into the possession of the Seller shall be received and held by the Seller in trust for the benefit of the Purchaser as the owner of the Mortgage Loans. Any portion of the Mortgage Files retained by the Seller shall be appropriately identified in the Seller's computer system to clearly reflect the ownership of the Mortgage Loans by the Purchaser. The Servicer shall release its custody of the contents of the servicing files only in accordance with written instructions of the Program Administrator on behalf of the Purchaser, except when such release is required as incidental to the Servicer's servicing of the Mortgage Loans or is in connection with a repurchase of any Mortgage Loan or Loans with respect thereto pursuant to this Agreement, such written instructions shall not be required. Servicing files for the Mortgage Loans shall be delivered to the Purchaser or its designee on or before the Servicing Transfer Date.

Section 2.05          Books and Records.

The sale of each Mortgage Loan will be reflected on the Seller's balance sheet and other financial statements as a sale of assets by the Seller. The Seller shall maintain a complete set of books and records for the Mortgage Loans sold by it which shall be appropriately identified in the Seller's computer system to clearly reflect the ownership of the Mortgage Loans by the Purchaser. In particular, the Seller shall maintain in its possession, available for inspection by the Purchaser, or its designee and shall deliver to the Purchaser upon demand, evidence of compliance with all federal, state and local laws, rules and regulations, and requirements of Fannie Mae or Freddie Mac, as applicable, including but not limited to documentation as to the method used in determining the applicability of the provisions of the Flood Disaster Protection Act of 1973, as amended, to the Mortgaged Property, documentation evidencing insurance coverage and eligibility of any condominium project for approval by Seller and periodic inspection reports. To the extent that original documents are not required for

20

purposes of realization of Liquidation Proceeds or Insurance Proceeds, documents maintained by the Seller may be in the form of microfilm or microfiche or such other reliable means of recreating original documents, including but not limited to, optical imagery techniques so long as the Seller complies with the requirements of the Fannie Mae Guides.

In addition to the foregoing, the Seller shall provide to any supervisory agents or examiners that regulate the Purchaser, including but not limited to, the OTS, the FDIC and other similar entities, access, during normal business hours, upon reasonable advance notice to the Seller and at Seller's expense and without charge to the Purchaser or such supervisory agents or examiners, any documentation regarding the Mortgage Loans that may be required by any applicable regulator.

Section 2.06        Transfer of Mortgage Loans.

The Seller and Servicer shall keep at its office books and records in which, subject to such reasonable regulations as it may prescribe, the Seller and Servicer shall note transfers of Mortgage Loans. No transfer of a Mortgage Loan may be made unless such transfer is in compliance with the terms of Section 13.12. Upon receipt of notice of the transfer, the Seller and Servicer shall mark its books and records to reflect the ownership of the Mortgage Loans by such assignee as of the date of purchase or assignment of such Mortgage Loans to the assignee.

Section 2.07        Delivery of Mortgage Loan Documents.

In the case of a Dry Funding, the Seller shall deliver and release to the Custodian all Submission Package Documents no later than 2:30 p.m. (New York City time) on the Closing Date. In the case of a Wet Funding, Seller shall deliver and release to the Custodian all Advance Submission Documents no later than 2:30 p.m. (New York City time) on the Closing Date, and shall deliver and release to the Custodian all Submission Package Documents within the Delivery Period. Failure to deliver Submission Package Documents with respect to a Wet Funding within the Delivery Period shall be a Seller Trigger Event hereunder. From and after the Closing Date, the Seller shall hold a copy of each Mortgage Note, together with any part of the Mortgage File, that is in, or may thereafter come into, its possession, for the benefit of Purchaser. The Mortgage File shall be appropriately identified in the Seller's computer system to clearly reflect the ownership of the related Mortgage Loan by the Purchaser.

The Seller shall pay any fees in connection with the transfer of the Mortgage Loan Documents to the Purchaser or its designee.

Any review by the Purchaser or its designee of the Mortgage Files shall in no way alter or reduce the Seller's obligations hereunder.

If the Purchaser or its designee discovers any defect with respect to any document constituting part of a Mortgage File, the Purchaser shall, or shall cause its designee to, give written specification of such defect to the Seller and the Seller shall cure or repurchase such Mortgage Loan in accordance with Section 3.03.

21

With respect to any documents which have been delivered or are being delivered to recording offices for recording and have not been returned to the Seller in time to permit their delivery hereunder at the time required, in lieu of delivering such original documents, the Seller is required to deliver to the Custodian a copy thereof certified by an Approved Closing Agent, title company or escrow closing company as a true, correct and complete copy of the original which has been transmitted for recordation. The Seller is required to deliver such original documents to the Custodian promptly when they are received.

The Servicer shall forward to the Purchaser, or its designee, original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan entered into in accordance with Section 1.01 or 2.01 of Exhibit H hereto within one week of their execution and shall also provide the original of any document submitted for recordation or a copy of such document certified by the appropriate public recording office to be a true and complete copy of the original within five (5) days of its return from the appropriate public recording office.

Section 2.08          Quality Control Procedures.

The Seller must have an internal quality control program that verifies, on a regular basis, the existence and accuracy of the legal documents, credit documents, property appraisals, and underwriting decisions. The program must be capable of evaluating and monitoring the overall quality of its loan production and servicing activities. The program is to ensure that the Mortgage Loans are originated and serviced in accordance with prudent mortgage banking practices and accounting principles and Accepted Servicing Practices, and to guard against dishonest, fraudulent, or negligent acts and to guard against errors and omissions by officers, employees, or other authorized persons.

Section 2.09          Closing.

The closing for the purchase and sale of the Mortgage Loans shall take place on a Closing Date. The closing shall be either: by telephone, confirmed electronically, or by letter or wire as the parties shall agree, or conducted in person, at such place as the parties shall agree.

The closing for the Mortgage Loans to be purchased on each Closing Date shall be subject to each of the following conditions:

(a)     By 2:30 p.m. (New York City time) on the Closing Date, the Seller shall deliver to the Program Administrator on behalf of the Purchaser a magnetic diskette, or transmit by modem or e-mail, a listing on a loan-level basis of the information contained in the Mortgage Loan Schedule;

(b)     all of the representations and warranties of the Seller and the Servicer under this Agreement shall be materially true and correct as of such Closing Date or, with respect to representations and warranties made as of a date other than such Closing Date, as of such date, and no event shall have occurred which, with notice or the passage of time, would constitute an Event of Default or other material default under this Agreement;

22

(c)     the Purchaser shall have received, or the Purchaser's designee shall have received in escrow, all documents required by and at the times required by Section 2.01, in such forms as are agreed upon and acceptable to the Program Administrator on behalf of the Purchaser, duly executed by all signatories other than the Purchaser as required pursuant to the terms hereof;

(d)     the Seller and the Servicer shall have delivered and released to the Purchaser (or its designee) on or prior to the Closing Date all documents required pursuant to the terms of this Agreement; and

(e)     all other terms and conditions of this Agreement shall have been materially complied with.

Subject to the foregoing conditions, the Purchaser shall pay to the Seller on the Closing Date the Purchase Price pursuant to Section 2.01 of this Agreement.

Section 2.10       <u>Delivery of Documents; Initial Purchase of Mortgage Loans.</u>

Seller acknowledges that the information provided by it hereunder may be provided to other parties, including the Purchaser's designee, at the Program Administrator's discretion, in order to evaluate the Seller.  Prior to the initial Purchase of Mortgage Loans:

(a)     Purchaser or its designee shall have received a copy of the resolutions of the Board of Directors of Seller certified by its Secretary or Assistant Secretary approving this Agreement and the sale, from time to time, of the Mortgage Loans as contemplated hereby.

(b)     Purchaser or its designee shall have received the related organizational documents of Seller certified by the Secretary of State (or other applicable authority) in the related jurisdiction where Seller was formed.

(c)     Purchaser or its designee shall have received a certificate of the Secretary or Assistant Secretary of Seller certifying (i) the names and signatures of the officers authorized on its behalf to execute this Agreement, and any other documents to be delivered by it hereunder or thereunder (on which Purchaser may conclusively rely until such time as Purchaser shall receive from Seller a revised certificate meeting the requirements of this item (c)) and (ii) that attached to such certificate is a true and correct copy of Seller's by-laws.

(d)     Purchaser or its designee shall have received an opinion of counsel to Seller, in a form acceptable to Purchaser.

(e)     All Accounts required pursuant to this Agreement shall have been established by the required party.

23

(f)     Purchaser or its designee shall have received (i) the documents required by Section 3.01(n), (ii) payment of any fees due by Seller at the time of execution of this Agreement, and (iii) evidence of existence of all required insurance and licenses of Seller.

Prior to every purchase of Mortgage Loans:

(a)     Seller shall have delivered to Purchaser or its designee evidence, satisfactory to Purchaser, of the transfer of the ownership of the related Mortgage Loans from Seller to Purchaser or its designee.

(b)     Purchaser or its designee shall have completed such investigation as they may reasonably require with respect to each Mortgage Loan which is the subject of such purchase and the results of such investigation (and all other legal and documentary matters with respect to such Mortgage Loan) shall be satisfactory to Purchaser; *provided, however*, no such investigation will be deemed a waiver of any right of Purchaser.

(c)     Seller shall have delivered the related Mortgage Note, Mortgage and Assignment of Mortgage, endorsed to Purchaser or its designee, if any, and shall have acknowledged, in a manner satisfactory to Purchaser, that it is holding each such note, mortgage and assignment for Purchaser as its bailee.

(d)     Purchaser or its designee shall have received the most recent available payment statements, servicing reports or like reports, if any, with respect to the Mortgage Loans.

(e)     Purchaser or its designee shall have received such other documents, certificates or information, including, without limitation, lien searches with respect to the Mortgage Loans, as it has reasonably requested and all of the documents delivered to Purchaser or its designee pursuant to this Section 2.10 shall be in form and substance satisfactory to Purchaser and its counsel.

(f)     The note and mortgage for the related Mortgage Loan shall be endorsed by appropriate officers of the Seller.

(g)     As to each Mortgage Loan (other than an Uncovered Mortgage Loan) Seller shall have delivered to Purchaser or its designee the applicable Forward Commitment.

(g)     Seller shall have delivered to Purchaser or its designee such other additional documents requested by Purchaser in connection with such purchase.

24

Section 2.11          Fees.

(a) After the first one hundred eighty (180) days of the term of this Agreement, if the average daily aggregate Purchase Price of all Mortgage Loans paid for by the Purchaser in any Loan Quarter is less than the Applicable Percentage of the Maximum Purchase Amount, Seller shall pay to Purchaser a Shortfall Premium with respect to Purchaser's agreement hereunder to hold funds available to acquire from Seller Mortgage Loans. It is understood that subject to the provisions of subsection 2.11(c), Mortgage Loans rejected by Purchaser or repurchased by Seller shall not be included for the purpose of the imposition or calculation of any Shortfall Premium. If any Mortgage Loans are discovered to be Defective Mortgage Loans, then Purchaser may retroactively re-calculate Seller's liability for any Shortfall Premium.

(b) On the initial Closing Date, the Seller shall pay to the Purchaser the Commitment Fee.

(c) During the continuance of any Event of Default described in paragraphs (ii), (vi), (viii), (ix) or (xi) Section 10.01, Program Administrator on behalf of the Purchaser reserves the right, in its sole discretion, to either reject Mortgage Loans, or increase the percentage of Mortgage Loans required to be purchased by the Purchaser under subsection 2.11(a); if an Event of Default described in any other clause of Section 10.01 occurs, the Purchaser will immediately cease purchasing Mortgage Loans.

(d) Seller shall pay to Purchaser, within ten (10) days after receipt of a statement therefore, any outstanding Administrative Costs.

(e) Purchaser reserves the right, and Seller expressly authorizes Purchaser or its designee, to withdraw any amounts owed by Seller to Purchaser, including but not limited to, any Shortfall Premiums, the Commitment Fee and Administrative Costs owed pursuant to this section from any funds in the Top-Up Account.

Section 2.12          Duties with Respect to Forward Commitments.

(a) Provided no Event of Default shall have occurred and be continuing, Seller shall have full power and authority, acting alone, to do or cause to be done, to the extent necessary, any and all things that it may deem necessary and desirable in connection with arranging for and executing the sale of Mortgage Loans pursuant to a Forward Commitment.

(b) With respect to each sale to an Approved Takeout Investor, the Seller agrees:

(i)          to cooperate fully with the Purchaser, the Program Administrator, the Takeout Investor or any party to any agreement executed in connection with such sale, with respect to all reasonable requests and due diligence procedures and to use commercially reasonable efforts to facilitate such sale, as the case may be;

(ii)          to promptly deliver to the Takeout Investor any and all additional documents requested by such Takeout Investor to enable

25

such Takeout Investor to make payment of the Takeout Proceeds; and

(iii)        to cause all Takeout Proceeds paid by the Takeout Investor to be paid to the Purchaser or its designee in accordance with the Purchaser's wire instructions.

26

# ARTICLE III

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF
## THE SELLER AND THE SERVICER; REPURCHASE; REVIEW OF MORTGAGE LOANS

Section 3.01          Representations and Warranties of the Seller and the
Servicer.

The party named as Seller in the introduction hereto, in its capacity as Seller and Servicer, represents, warrants and covenants to the Purchaser that as of each Closing Date or as of such date specifically provided herein:

(a) The Seller is a [corporation] duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all licenses necessary to carry out its business as now being conducted, and is licensed and qualified to transact business in and is in good standing under the laws of each state in which any Mortgaged Property is located or is otherwise exempt under applicable law from such licensing or qualification or is otherwise not required under applicable law to effect such licensing or qualification and no demand for such licensing or qualification has been made upon the Seller by any such state, and in any event the Seller is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of each Mortgage Loan and the servicing of the Mortgage Loans in accordance with the terms of this Agreement;

(b) The Seller has the full power and authority and legal right to hold, transfer and convey each Mortgage Loan, to sell each Mortgage Loan and to execute, deliver and perform, and to enter into and consummate all transactions contemplated by this Agreement and to conduct its business as presently conducted; the Seller has duly authorized the execution, delivery and performance of this Agreement and any agreements contemplated hereby, has duly executed and delivered this Agreement, and any agreements contemplated hereby, and this Agreement and each Assignment of Mortgage to the Purchaser and any agreements contemplated hereby, constitute the legal, valid and binding obligations of the Seller, enforceable against it in accordance with their respective terms , except as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization and similar laws, and by equitable principles affecting the enforceability of the rights of creditors; and all requisite corporate action has been taken by the Seller to make this Agreement and all agreements contemplated hereby valid and binding upon the Seller in accordance with their terms;

(c) Neither the execution and delivery of this Agreement, the sale of the Mortgage Loans to the Purchaser, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with any of the terms, conditions or provisions of the Seller's charter or by-laws or materially conflict with or result in a material breach of any of the terms, conditions or provisions of any legal restriction or any agreement or instrument to which the Seller is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the material violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject or impair the ability of the Purchaser to realize on the Mortgage Loans, or impair the value of the Mortgage Loans;

27

(d) There is no litigation, suit, proceeding or investigation pending or threatened, or any order or decree outstanding, which is reasonably likely to have a material adverse effect on the sale of the Mortgage Loans, the execution, delivery, performance or enforceability of this Agreement, or which is reasonably likely to have a Material Adverse Effect on the Seller. The Seller shall immediately notify the Purchaser and the Program Administrator of any litigation, suit, proceeding or investigation pending or threatened, or any order or decree outstanding, which is reasonably likely to have a material adverse effect on the sale or value of the Mortgage Loans, the execution, delivery, performance or enforceability of this Agreement, or which is reasonably likely to have a Material Adverse Effect on the Seller;

(e) No consent, approval, authorization or order of any Regulatory Authority is required for the execution, delivery and performance by the Seller of or compliance by the Seller with this Agreement, except for consents, approvals, authorizations and orders which have been obtained;

(f) The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Seller pursuant to this Agreement are not subject to bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction;

(g) The origination and servicing practices with respect to each Mortgage Note and Mortgage have been legal and in accordance with applicable laws and regulations, and in all material respects proper and prudent in the mortgage origination and servicing business. With respect to escrow deposits and payments that the Seller is entitled to collect, all such payments are in the possession of, or under the control of, the Seller, and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. All escrow payments have been collected and are being maintained in full compliance with applicable state and federal law and the provisions of the related Mortgage Note and Mortgage. As to any Mortgage Loan that is the subject of an escrow, escrow of funds is not prohibited by applicable law and has been established in an amount sufficient to pay for every escrowed item that remains unpaid and has been assessed but is not yet due and payable. No escrow deposits or other charges or payments due under the Mortgage Note have been capitalized under any Mortgage or the related Mortgage Note. All Mortgage Interest Rate adjustments have been made in strict compliance with state and federal law and the terms of the related Mortgage Note. Any interest required to be paid pursuant to state and local law has been properly paid and credited;

(h) The Seller has not used selection procedures that identified the Mortgage Loans as being less desirable or valuable than other comparable mortgage loans in the Seller's portfolio at the Cut-off Date;

(i) The Seller is an approved seller or seller/servicer of residential mortgage loans for Fannie Mae or Freddie Mac or HUD, with such facilities, procedures and personnel necessary for the sound servicing of such mortgage loans. The Seller is duly qualified, licensed, registered and otherwise authorized under all applicable federal, state and local laws, and regulations, meets the minimum capital requirements, if applicable, set forth by any applicable Regulatory Authority, and is in good standing to sell mortgage loans to and service mortgage loans for

28

Fannie Mae or Freddie Mac and no event has occurred which would make the Seller unable to comply with eligibility requirements or which would require notification to either Fannie Mae or Freddie Mac;

(j) The Seller does not believe, nor does it have any cause or reason to believe, that it cannot perform each and every covenant contained in this Agreement. The Seller is solvent and the sale of the Mortgage Loans will not cause the Seller to become insolvent. The sale of the Mortgage Loans is not undertaken with the intent to hinder, delay or defraud any of the Seller's creditors;

(k) No statement, tape, diskette, form, report or other document prepared by, or on behalf of, the Seller pursuant to this Agreement or in connection with the transactions contemplated hereby, contains or will contain any statement that is or will be inaccurate or misleading in any material respect. The Seller has prudently originated and underwritten each Mortgage Loan;

(l) [Reserved];

(m) The Seller has delivered to the Purchaser or its designee financial statements as to its last two complete fiscal years. All such financial statements (i) are as of the dates and for the periods referenced to therein, complete and correct in all material respects, (ii) fairly present the pertinent results of operations and changes in financial position for each of such periods and the financial position at the end of each such period of the Seller and its subsidiaries and (iii) have been prepared in accordance with GAAP consistently applied throughout the periods involved, except as set forth in the notes thereto. There has been no change in the business, operations, financial condition, properties or assets of the Seller since the date of the Seller's financial statements that would have a Material Adverse Effect on its ability to perform its obligations under this Agreement. Additionally, except as disclosed on such financial statements, the Seller is not subject to any contingent liabilities or commitments that, individually or in the aggregate, have the possibility of having a Material Adverse Affect on the Seller;

(n) The Seller has not dealt with any broker, investment banker, agent or other person that may be entitled to any commission or compensation in connection with the sale of the Mortgage Loans;

(o) No Event of Default, an event or condition that, upon the giving of notice or the passage of time, or both, would become an Event of Default, has occurred and is continuing;

(p) The sale of the Mortgage Loans referred to thereon is being entered into by Seller voluntarily, and in the absence of any omission of fact, undue influence, duress, coercion or similar constraint and is intended to be a sale in which Seller shall receive new value and consideration constituting reasonably equivalent value and fair consideration for such Mortgage Loans; Seller has been advised by, or has confirmed with, its independent public accountants that such transaction can be reported as a sale under GAAP;

# EXHIBIT A
## Part 2

(q) The Seller is either (a) approved by HUD, Fannie Mae or Freddie Mac (such approval must permit the lender to buy, sell, hold or originate mortgage loans) or (b) a bank or Savings and Loans Association with deposits insured by FDIC;

(r) The Seller has been in business for at least two consecutive years prior to the date hereof;

(s) The Seller is in good standing with all Approved Takeout Investors;

(t) There are no actions, suits or proceedings pending against any Principal of Seller or any Affiliate of Seller;

(u) The Seller has complied with all applicable credit and consumer protection laws, rules and regulations, including but not limited to the Fair and Accurate Credit Transactions Act; and

(y) The Seller has and at all times shall have on and following the date of sale of Mortgage Loans to the Purchaser sufficient and adequate financial resources to perform and honor its obligations as required under this Agreement, including without limitation, the Seller's repurchase obligations under Article III and the Seller's (in its capacity as Seller and Servicer) indemnification obligations under Article IX of this Agreement.

(z) The Seller is not an "affiliate" (as defined in Section 101 of the U.S. Bankruptcy Code) of the Custodian.

Section 3.02          Representations and Warranties as to Individual Mortgage Loans.

The Seller hereby represents and warrants to the Purchaser, as to each Mortgage Loan, as of the applicable Closing Date as follows:

(a) The information set forth in the Mortgage Loan Schedule, including any diskette or other related data tapes sent to the Purchaser or its designee, is complete, true and correct in all material respects as of the Cut-off Date;

(b) The date listed on the Mortgage Note for the Mortgage Loan occurred not more than 30 days prior to the Closing Date;

(c) All taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing have been paid, or escrow funds have been established in an amount sufficient to pay for every such escrowed item which remains unpaid and which has been assessed but is not yet due and payable;

(d) The terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments which have been recorded to the extent any such recordation is required by law, or, necessary to protect the interest of the Purchaser. No instrument of waiver, alteration or modification has been executed,

and no Mortgagor has been released, in whole or in part, from the terms thereof except in connection with an assumption agreement and which assumption agreement is part of the Mortgage File and the terms of which are reflected in the Mortgage Loan Schedule; the substance of any such waiver, alteration or modification has been approved by the issuer of any related Primary Mortgage Insurance Policy and title insurance policy, to the extent required by the related policies;

(e) The Mortgage Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including, without limitation, the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render the Mortgage Note or Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto; and the Mortgagor was not a debtor in any state or federal bankruptcy or insolvency proceeding at the time the Mortgage Loan was originated;

(f) All buildings or other customarily insured improvements upon the Mortgaged Property are insured by an insurer acceptable under the Fannie Mae Guides, against loss by fire, hazards of extended coverage and such other hazards as are provided for in the Fannie Mae Guides or by Freddie Mac. All such standard hazard policies are in full force and effect and on the date of origination contained a standard mortgagee clause naming the Seller and its successors in interest and assigns as loss payee and such clause is still in effect and all premiums due thereon have been paid. If required by the Flood Disaster Protection Act of 1973, as amended, the Mortgage Loan is covered by a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration which policy conforms to Fannie Mae and Freddie Mac requirements. Such policy was issued by an insurer acceptable under Fannie Mae or Freddie Mac guidelines. The Mortgage obligates the Mortgagor thereunder to maintain all such insurance at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor;

(g) Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity or disclosure laws applicable to the Mortgage Loan have been complied with in all material respects, and the Seller shall maintain in its possession, available for the Purchaser's (or its designee's) inspection, and shall deliver to the Purchaser or its designee on the related Servicing Transfer Date, evidence of compliance with all such applicable requirements;

(h) The Mortgage has not been satisfied, canceled or subordinated, in whole or in part, or rescinded, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission. The Seller has not waived the performance by the Mortgagor of any action, if the Mortgagor's failure to perform such action would cause the Mortgage Loan to be in default, nor has the Seller waived any default resulting from any action or inaction by the Mortgagor;

31

(i)  With respect to any first lien Mortgage Loan, the related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Mortgaged Property and, with respect to any second lien Mortgage Loan, the related Mortgage is a valid, subsisting, enforceable and perfected second lien on the Mortgaged Property, including for Mortgage Loans that are not Co-op Loans, all buildings on the Mortgaged Property and all installations and mechanical, electrical, plumbing, heating and air conditioning systems affixed to such buildings, and all additions, alterations and replacements made at any time with respect to the foregoing securing the Mortgage Note's original principal balance.  The Mortgage and the Mortgage Note do not contain any evidence of any adverse security interest or other interest or right thereto.  Such lien is free and clear of all adverse claims, liens and encumbrances having priority over the first or second lien, as applicable, of the Mortgage subject only to (1) with respect to any second lien Mortgage Loan, the related First Lien, (2) the lien of non-delinquent current real property taxes and assessments not yet due and payable, (3) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording which are acceptable to mortgage lending institutions generally and either (A) which are referred to or otherwise considered in the appraisal made for the originator of the Mortgage Loan, or (B) which do not adversely affect the appraised value of the Mortgaged Property as set forth in such appraisal, and (4) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property.  Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates (1) with respect to any first lien Mortgage Loan, a valid, subsisting, enforceable and perfected first lien and first priority security interest and (2) with respect to any second lien Mortgage Loan, a valid, subsisting, enforceable and perfected second lien and second priority security interest, in each case, on the property described therein, and the Seller has the full right to sell and assign the same to the Purchaser;

(j)  The Mortgage Note and the related Mortgage are original and genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in all respects in accordance with its terms subject to bankruptcy, insolvency, moratorium, reorganization and other laws of general application affecting the rights of creditors and by general equitable principles and the Seller has taken all action necessary to transfer such rights of enforceability to the Purchaser. All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage. The Mortgage Note and the Mortgage have been duly and properly executed by such parties. No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of Seller or the Mortgagor, or, on the part of any other party involved in the origination of the Mortgage Loan. The proceeds of the Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid or are in the process of being paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(k)  The Seller or its affiliate is the sole owner of record and holder of the Mortgage Loan and the indebtedness evidenced by the Mortgage Note, and the Purchaser or its

designee will be the owner of record of the Mortgage and the indebtedness evidenced by the Mortgage Note, and upon the sale of the Mortgage Loan to the Purchaser, the Servicer will retain the servicing file in trust for the Purchaser only for the purpose of servicing and supervising the servicing of the Mortgage Loan.  Immediately prior to the transfer and assignment to the Purchaser on the Closing Date, the Mortgage Loan, including the Mortgage Note and the Mortgage, were not subject to an assignment or pledge, and the Seller had good and marketable title to and was the sole owner thereof and had full right to transfer and sell the Mortgage Loan to the Purchaser free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest and has the full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign the Mortgage Loan pursuant to this Agreement and following the sale of the Mortgage Loan, the Purchaser will own such Mortgage Loan free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest.  The Seller intends to relinquish all rights to possess, control and monitor the Mortgage Loan, except for the purposes of servicing the Mortgage Loan as set forth in this Agreement;

(l)  Each Mortgage Loan that is not a Co-op Loan is covered by an ALTA lender's title insurance policy or other generally acceptable form of policy or insurance acceptable to Fannie Mae or Freddie Mac, issued by a title insurer acceptable to Fannie Mae or Freddie Mac and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in (i)(1), (2), (3) and (4) above) the Seller, its successors and assigns, as to the first or second, as applicable, priority lien of the Mortgage in the original principal amount of the Mortgage Loan.  Where required by applicable state law or regulation, the Mortgagor has been given the opportunity to choose the carrier of the required mortgage title insurance.  The Seller, its successors and assigns, are the sole insureds of such lender's title insurance policy, such title insurance policy has been duly and validly endorsed to the Purchaser or the assignment to the Purchaser of the Seller's interest therein does not require the consent of or notification to the insurer and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement.  Additionally, such lender's title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Mortgaged Property or any interest therein.  No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy;

(m) There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event permitting acceleration; and neither the Seller nor any prior mortgagee has waived any default, breach, violation or event permitting acceleration.  With respect to each second lien Mortgage Loan, (i) the First Lien is in full force and effect, (ii) there is no default, breach, violation or event of acceleration existing under such prior mortgage or the related mortgage note, (iii) no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration thereunder, and either (A) the prior mortgage contains a provision which allows or (B) applicable law requires, the mortgagee under the second lien Mortgage Loan to receive notice of, and

33

affords such mortgagee an opportunity to cure any default by payment in full or otherwise under the prior mortgage;

(n) There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such liens) affecting the related Mortgaged Property which are or may be liens prior to or equal to the lien of the related Mortgage;

(o) All improvements subject to the Mortgage which were considered in determining the Appraised Value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of the Mortgaged Property (and wholly within the project with respect to a condominium unit) and no improvements on adjoining properties encroach upon the Mortgaged Property except those which are insured against by the title insurance policy referred to in clause (n) above and all improvements on the property comply with all applicable zoning and subdivision laws and ordinances;

(p) The Mortgage Loan was originated by or for the Seller. The Mortgage Loan complies with all the terms, conditions and requirements of the related Underwriting Standards in effect at the time of origination of such Mortgage Loan. The Mortgage Notes and Mortgages (exclusive of any riders) are on forms generally acceptable to Fannie Mae or Freddie Mac. Seller is currently selling loans to Fannie Mae and/or Freddie Mac which are the same document forms as the Mortgage Notes and Mortgages (inclusive of any riders). The Mortgage Loan bears interest at the Mortgage Interest Rate set forth in the Mortgage Loan Schedule, and Monthly Payments under the Mortgage Note are due and payable on the first day of each month. The Mortgage contains the usual and enforceable provisions of the originator at the time of origination for the acceleration of the payment of the unpaid principal amount of the Mortgage Loan if the related Mortgaged Property is sold without the prior consent of the mortgagee thereunder;

(q) The Mortgaged Property is not subject to any material damage by waste, fire, earthquake, windstorm, flood or other casualty. At origination of the Mortgage Loan there was, and there currently is, no proceeding pending for the total or partial condemnation of the Mortgaged Property. There have not been any condemnation proceedings with respect to the Mortgaged Property and there are no such proceedings scheduled to commence at a future date;

(r) The related Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby. There is no homestead or other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage subject to applicable federal and state laws and judicial precedent with respect to bankruptcy and right of redemption;

(s) If the Mortgage constitutes a deed of trust, a trustee, authorized and duly qualified if required under applicable law to act as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses, except as may be required by local law, are or will become payable by the Purchaser to the trustee under the deed

34

of trust, except in connection with a trustee's sale or attempted sale after default by the Mortgagor;

(t)  The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the final approval of the mortgage loan application by a Qualified Appraiser, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan, and the appraisal and appraiser both satisfy the requirements of Fannie Mae or Freddie Mac and Title XI of FIRREA and the regulations promulgated thereunder, all as in effect on the date the Mortgage Loan was originated.  The appraisal is in a form acceptable to Fannie Mae or Freddie Mac;

(u)  All parties which have had any interest in the Mortgage, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (A) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (B) (1) organized under the laws of such state, or (2) qualified to do business in such state, or (3) federal savings and loan associations or national banks or a Federal Home Loan Bank or savings bank having principal offices in such state, or (4) not doing business in such state;

(v)  The related Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage and the security interest of any applicable security agreement or chattel mortgage referred to above and such collateral does not serve as security for any other obligation;

(w) The Mortgagor has received all disclosure materials required by applicable law with respect to the making of such mortgage loans;

(x)  The Mortgage Loan does not contain "graduated payment" features; to the extent any Mortgage Loan contains any buydown provision, such buydown funds have been maintained and administered in accordance with, and such Mortgage Loan otherwise complies with, Fannie Mae/Freddie Mac requirements relating to buydown loans;

(y)  The Mortgagor is not insolvent or in bankruptcy and the Seller has no knowledge of any circumstances or condition with respect to the Mortgage, the Mortgaged Property, the Mortgagor or the Mortgagor's credit standing that could reasonably be expected to cause investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or materially adversely affect the value or marketability of the Mortgage Loan;

(z)  The Mortgage Loans have an original term to maturity of not more than 30 years, with interest payable in arrears on the first day of each month.  With the exception of Interest Only Loans, each Mortgage Note requires a monthly payment which is sufficient to fully amortize the original principal balance over the original term thereof and to pay interest at the related Mortgage Interest Rate; provided, however, in the case of a balloon Mortgage Loan, the Mortgage Loan matures at least five (5) years after the first payment date thereby requiring a final payment of the outstanding principal balance prior to the full amortization of the Mortgage

Loan. With the exception of Interest Only Loans, no Mortgage Loan contains terms or provisions which would result in negative amortization.

(aa)    Except for Mortgage Loans so noted in the Mortgage Loan Schedule or which are underwritten in accordance with the Lender Paid Mortgage Insurance Policy Program, if a Mortgage Loan has an LTV greater than 80%, the excess of the principal balance of the Mortgage Loan over 80% of the Appraised Value, with respect to a Refinanced Mortgage Loan, or the lesser of the Appraised Value or the purchase price of the Mortgaged Property, with respect to a purchase money Mortgage Loan, is and will be insured as to payment defaults by a Primary Mortgage Insurance Policy issued by a Qualified Insurer. All provisions of such Primary Mortgage Insurance Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. No action, inaction, or event has occurred and no state of facts exists that has, or will result in the exclusion from, denial of, or defense to coverage. Any Mortgage Loan subject to a Primary Mortgage Insurance Policy obligates the Mortgagor thereunder to maintain the Primary Mortgage Insurance Policy and to pay all premiums and charges in connection therewith. The mortgage interest rate for the Mortgage Loan as set forth on the Mortgage Loan Schedule is net of any such insurance premium;

(bb)    The Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located;

(cc)    As to Mortgage Loans that are not Co-op Loans and that are not secured by an interest in a leasehold estate, the Mortgaged Property is located in the state identified in the Mortgage Loan Schedule and consists of a single parcel of real property with a detached single family residence erected thereon, or a townhouse, or a two-to four-family dwelling, or an individual condominium unit in a condominium project, or an individual unit in a planned unit development or a de minimis planned unit development, provided, however, that no residence or dwelling is a single parcel of real property with a cooperative housing corporation erected thereon, or a mobile home. As of the date of origination, no portion of the Mortgaged Property was used for commercial purposes, and since the date of origination no portion of the Mortgaged Property has been used for commercial purposes;

(dd)    Payments on each Mortgage Loan will commence no more than sixty (60) days after the funds were disbursed in connection with the Mortgage Loan;

(ee)    With respect to each Mortgage Loan that contains a Prepayment Penalty, such Prepayment Penalty is enforceable and will be enforced by the Seller, and such Prepayment Penalty is permitted pursuant to federal, state and local law. No Mortgage Loan will impose a prepayment penalty for a term in excess of three years from the date such Mortgage Loan was originated. Except as otherwise set forth on the Mortgage Loan Schedule, with respect to each Mortgage Loan that contains a Prepayment Penalty, such Prepayment Penalty is at least equal to the lesser of (A) the maximum amount permitted under applicable law and (B) six months interest at the related Mortgage Interest Rate on the amount prepaid in excess of 20% of the original principal balance of such Mortgage Loan;

36

(ff) As of the date of origination of the Mortgage Loan, the Mortgaged Property was lawfully occupied under applicable law, and all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities;

(gg)    If the Mortgaged Property is a condominium unit or a planned unit development (other than a de minimis planned unit development), or stock in a cooperative housing corporation, such condominium, cooperative or planned unit development project meets the Seller's eligibility requirements as set forth in Seller's underwriting guidelines;

(hh)    There is no pending action or proceeding directly involving the Mortgaged Property in which compliance with any environmental law, rule or regulation is an issue; there is no violation of any environmental law, rule or regulation with respect to the Mortgaged Property; and nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to use and enjoyment of said property;

(ii) The Mortgagor has not notified the Seller, and the Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Servicemembers Civil Relief Act;

(jj) No Mortgage Loan was made in connection with the construction or rehabilitation of a Mortgaged Property or facilitating the trade-in or exchange of a Mortgaged Property;

(kk)    No action has been taken or failed to be taken by the Seller on or prior to the Closing Date which has resulted or will result in an exclusion from, denial of, or defense to coverage under any Primary Mortgage Insurance Policy (including, without limitation, any exclusions, denials or defenses which would limit or reduce the availability of the timely payment of the full amount of the loss otherwise due thereunder to the insured) whether arising out of actions, representations, errors, omissions, negligence, or fraud of the Seller, or for any other reason under such coverage;

(ll) Each Mortgage Loan has been serviced in all material respects in compliance with Accepted Servicing Practices;

(mm)  With respect to each Co-op Loan, the related Mortgage is a valid, enforceable and subsisting first security interest on the related cooperative shares securing the related cooperative note, subject only to (a) liens of the cooperative for unpaid assessments representing the Mortgagor's pro rata share of the cooperative's payments for its blanket mortgage, current and future real property taxes, insurance premiums, maintenance fees and other assessments to which like collateral is commonly subject and (b) other matters to which like collateral is commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Security Agreement.  There are no liens against or security interest in the cooperative shares relating to each Co-op Loan (except for unpaid maintenance, assessments and other amounts owed to the related cooperative which individually

37

or in the aggregate will not have a material adverse effect on such Co-op Loan), which have priority over the Seller's security interest in such cooperative shares;

(nn)    With respect to each Co-op Loan, a search for filings of financing statements has been made by a company competent to make the same, which company is acceptable to Fannie Mae and qualified to do business in the jurisdiction where the cooperative unit is located, and such search has not found anything which would materially and adversely affect the Co-op Loan;

(oo)    With respect to each Co-op Loan, the related cooperative corporation that owns title to the related cooperative apartment building is a "cooperative housing corporation" within the meaning of Section 216 of the Code, and is in material compliance with applicable federal, state and local laws which, if not complied with, could have a material adverse effect on the Mortgaged Property;

(pp)    With respect to each Co-op Loan, there is no prohibition against pledging the shares of the cooperative corporation or assigning the Co-op Lease;

(qq)    Each Mortgage Loan was originated by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the National Housing Act, a savings and loan association, a savings bank, a commercial bank, credit union, insurance company or similar institution which is supervised and examined by a federal or state authority;

(rr) With respect to any ground lease to which a Mortgaged Property may be subject: (i) a true, correct and complete copy of the ground lease and all amendments, modifications and supplements thereto is included in the servicing file, and the Mortgagor is the owner of a valid and subsisting leasehold interest under such ground lease; (ii) such ground lease is in full force and effect, unmodified and not supplemented by any writing or otherwise except as contained in the Mortgage File; (iii) all rent, additional rent and other charges reserved therein have been fully paid to the extent payable as of the Closing Date; (iv) the Mortgagor enjoys the quiet and peaceful possession of the leasehold estate, subject to any sublease; (v) the Mortgagor is not in default under any of the terms of such ground lease, and there are no circumstances which, with the passage of time or the giving of notice, or both, would result in a default under such ground lease; (vi) the lessor under such ground lease is not in default under any of the terms or provisions of such ground lease on the part of the lessor to be observed or performed; (vii) the lessor under such ground lease has satisfied any repair or construction obligations due as of the Closing Date pursuant to the terms of such ground lease; (viii) the execution, delivery and performance of the Mortgage do not require the consent (other than those consents which have been obtained and are in full force and effect) under, and will not contravene any provision of or cause a default under, such ground lease; (ix) the ground lease term extends, or is automatically renewable, for at least five years beyond the maturity date of the related Mortgage Loan; and (x) the Purchaser has the right to cure defaults on the ground lease;

(ss) With respect to any broker fees collected and paid on any of the Mortgage Loans, all broker fees have been properly assessed to the borrower and no claims will arise as to

38

broker fees that are double charged and for which the borrower would be entitled to reimbursement;

(tt)    With respect to any Mortgage Loan as to which an affidavit has been delivered to the Purchaser certifying that the original Mortgage Note has been lost or destroyed and not been replaced, if such Mortgage Loan is subsequently in default, the enforcement of such Mortgage Loan will not be materially adversely affected by the absence of the original Mortgage Note;

(uu)    Each Mortgage Loan constitutes a qualified mortgage under Section 860G(a)(3)(A) of the Code and Treasury Regulations Section 1.860G-2(a)(1);

(vv)    Except as provided in Section 2.07, the Mortgage Note, the Mortgage, the Assignment of Mortgage and the other documents set forth in Exhibit A and required to be delivered on the related Closing Date have been delivered to the Purchaser or its designee;

(ww)    All information supplied by, on behalf of, or concerning the Mortgagor is true, accurate and complete and does not contain any statement that is or will be inaccurate or misleading in any material respect;

(xx)    There does not exist on the related Mortgage Property any hazardous substances, hazardous wastes or solid wastes, as such terms are defined in the Comprehensive Environmental Response Compensation and Liability Act, the Resource Conservation and Recovery Act of 1976, or other federal, state or local environmental legislation;

(yy)    The Mortgagor has executed a statement to the effect that the Mortgagor has received all disclosure materials required by applicable law with respect to the making of adjustable rate mortgage loans.  The Servicer shall maintain such statement in the servicing file;

(zz)    No second lien Mortgage Loan has an LTV in excess of 100%.  No second lien Mortgage Loan has an Equity LTV in excess of 100%;

(aaa)    Either (a) no consent for the second lien Mortgage Loan is required by the holder of the related first lien or (b) such consent has been obtained and is contained in the Mortgage File;

(bbb)    With respect to any second lien Mortgage Loan, the Seller has not received notice of:  (1) any proceeding for the total or partial condemnation of any Mortgaged Property, (2) any subsequent, intervening mortgage, lien, attachment, lis pendens or other encumbrance affecting any Mortgaged Property or (3) any default under any mortgage, lien or other encumbrance senior to each Mortgage;

(ccc)    With respect to any second lien Mortgage Loan, where required or customary in the jurisdiction in which the Mortgaged Property is located, the original lender has filed for record a request for notice of any action by the senior lienholder under the related First Lien, and the original lender has notified any senior lienholder in writing of the existence of the second lien Mortgage Loan and requested notification of any action to be taken against the Mortgagor by the senior lienholder;

39

(ddd)   No Mortgage Loan had a Loan-to-Value Ratio at the time of origination of more than 100%;

(eee)   As of the Closing Date, the Seller has not received a notice of default of a First Lien which has not been cured;

(fff)   No Mortgage Loan is subject to, covered by or in violation of the provisions of the Homeownership and Equity Protection Act of 1994 as amended or is considered or classified as a "covered," "high cost," "high-cost home," "high-risk home," "threshold," "predatory" or "abusive" loan (or similarly classified loans using different terminology under a law imposing heightened scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees) under any other state, federal, county or municipal laws or ordinances, statutes or regulations providing for "assignee" or "originator" liability to holders of such mortgage loans. No Mortgage Loan is a "High Cost Loan" or "Covered Loan", as applicable, as such terms are defined in the Standard & Poor's LEVELS® Glossary, Appendix E and no Mortgage Loan was originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act;

(ggg)   None of the proceeds of the Mortgage Loan were used to finance single-premium credit insurance policies;

(hhh)   With respect to any Mortgage Loan which is a Texas Home Equity Loan, any and all requirements of Section 50, Article XVI of the Texas Constitution applicable to Texas Home Equity Loans which were in effect at the time of the origination of the Mortgage Loan have been complied with.  Specifically, without limiting the generality of the foregoing,

> (i)    all fees paid by the owner of the Mortgaged Property or such owner's spouse, to any person, that were necessary to originate, evaluate, maintain, record, insure or service the Mortgage Loan are reflected in the closing statement for such Mortgage Loan;

> (ii)    the Mortgage Loan was closed only at the office of the mortgage lender, an attorney at law, or a title company;

> (iii)    the mortgagee has not been found by a federal regulatory agency to have engaged in the practice of refusing to make loans because the applicants for the loans reside or the property proposed to secure the loans is located in a certain area;

> (iv)    the owner of the Mortgaged Property was not required to apply the proceeds of the Mortgage Loan to repay another debt except debt secured by the Mortgaged Property or debt to a lender other than the mortgagee;

> (v)    the owner of the Mortgaged Property did not sign any documents or instruments relating to the Loan in which blanks were left to be filled in; and

(vi)     if discussions between the mortgagee and the Mortgagor were conducted primarily in a language other than English, the mortgagee provided to the owner of the Mortgaged Property, prior to closing, a copy of the notice required by Section 50(g), Article XVI of the Texas Constitution translated into the written language in which the discussions were conducted.

All notices, acknowledgments and disclosure statements required by Section 50, Article XVI of the Texas Constitution applicable to Texas Home Equity Loans are contained in the Mortgage File for each such Mortgage Loan;

(iii)With respect to each Mortgage Loan, the Seller shall have obtained either (i) a life of loan transferable real estate tax service contract with a company reasonably acceptable to the Purchaser and shall assign such contract to the Purchaser or its designee or (ii) the Seller shall reimburse to the Purchaser or its designee the cost of obtaining such contract;

(jjj)The Servicer for each Mortgage Loan shall fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information on its borrower credit files to Equifax, Experian and Trans Union Credit Information Company, on a monthly basis;

(kkk)    The Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"). The Seller has established an adequate anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by such Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws;

(lll)     The Mortgage File contains all required Mortgage Loan Documents and all such documents are complete and accurate;

(mmm) No Mortgage Loan provides for the accrual of interest on a simple interest basis;

(nnn)    No second lien Mortgage Loan has a FICO score less than 600; and

(ooo)    No Mortgage Loan is a Convertible Mortgage Loan.

Section 3.03          Repurchase.

It is understood and agreed that the representations and warranties set forth in Sections 3.01 and 3.02 shall survive the sale of the Mortgage Loans, delivery of the Mortgage File to the Purchaser, or its designee, and transfer of the servicing rights associated with such Mortgage Loans, and shall inure to the benefit of the Purchaser, its successors and assigns and assignees thereof, notwithstanding any restrictive or qualified endorsement on any Mortgage

41

Note or Assignment or the examination, or lack of examination, of any Mortgage Loan Document.

The sales of Mortgage Loans described herein are not *Caveat Emptor*, it being understood that the Purchaser is expressly relying on the representations contained in Section 3.02 as to each transaction. Accordingly, if, after Purchaser purchases a Mortgage Loan, Purchaser or its designee determines or receives notice (whether from Seller, Takeout Investor or otherwise) that a Mortgage Loan is a Defective Mortgage Loan, Purchaser or its designee, shall promptly notify Seller and Seller shall, within one (1) Business Day, repurchase such Mortgage Loan pursuant to this Section.

Upon discovery by the Seller, the Servicer or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of the Mortgage Loans or the interest of the Purchaser in any Mortgage Loan, the party discovering such breach shall give prompt notice to the others. With respect to the representations and warranties which are made to the best of the Seller's knowledge, if it is discovered by the Seller, the Servicer or the Purchaser that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interests of the Purchaser therein, notwithstanding such Seller's lack of knowledge with respect to the substance of such representation or warranty, such inaccuracy shall be deemed a breach of the applicable representation or warranty. The Seller shall have a period of one (1) Business Day from the earlier of its discovery or its receipt of notice of any such breach within which to correct or cure such breach. The Seller hereby covenants and agrees that if any such breach is not corrected or cured within such one (1) Business Day period, the Seller shall, at the Program Administrator's (on behalf of the Purchaser) option repurchase such Mortgage Loan at the Repurchase Price. In the event that any such breach shall involve any representation or warranty set forth in Section 3.01, and such breach is not cured within one (1) Business Day of the earlier of either discovery by or notice to the Seller of such breach, all Mortgage Loans shall, at the option of the Program Administrator on behalf of the Purchaser, be repurchased by the Seller at the Repurchase Price. Any such repurchase shall be accomplished by deposit in the Seller Settlement Account of the amount of the Repurchase Price.

It is understood and agreed that the obligation of the Seller set forth in this Section 3.03 to cure or repurchase for a Defective Mortgage Loan, and to indemnify Purchaser pursuant to Section 9.01, constitutes the sole remedies of the Purchaser respecting a breach of the foregoing representations and warranties. If the Seller fails to repurchase a Defective Mortgage Loan in accordance with this Section 3.03, or fails to cure a Defective Mortgage Loan to the Program Administrator's (on behalf of the Purchaser) reasonable satisfaction in accordance with this Section 3.03, or to indemnify Purchaser pursuant to Section 9.01, that failure shall, upon compliance by the Purchaser with the last paragraph of this Section 3.03, be an Event of Default and the Purchaser shall be entitled to pursue all available remedies. No provision of this paragraph shall affect the rights of the Purchaser to terminate this Agreement for cause, as set forth in Sections 10.01, 11.01 and 11.02.

Any cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Sections 3.01 and 3.02 shall accrue as to any Mortgage Loan upon (i) the earlier of discovery of such breach by the Seller or notice thereof by

42

the Purchaser to the Seller, (ii) failure by the Seller to cure such breach or repurchase such Mortgage Loan as specified above, and (iii) demand upon the Seller by the Purchaser or the Program Administrator for compliance with this Agreement.

In the event that a Mortgage Loan is repurchased pursuant to this Section 3.03 and the Repurchase Price is paid by withdrawing funds from the Top-Up Account pursuant to Section 5.03, ownership shall be deemed transferred by the Purchaser or its designee to the Seller upon such withdrawal. The Purchaser or its designee shall have the right to execute all documents required in connection with such repurchase pursuant to the limited power of attorney provided under Section 13.19. The Seller shall cooperate with all instructions and demands of the Purchaser or its designee in connection with such repurchase

Section 3.04        RESERVED.

Section 3.05        Repurchase of Mortgage Loans With Early Payment Defaults.

If (a) a Mortgagor is thirty (30) days or more delinquent with respect to any of the first three (3) Monthly Payments due on the related Mortgage Loan immediately following the applicable Closing Date or (b) a Mortgagor or a Mortgage Loan is in bankruptcy or litigation within the first three (3) months immediately following the applicable Closing Date, the Mortgage Loan shall be deemed to be not of sufficient investment quality so as to qualify for the applicable underwriting standards to which it was written and Seller, at the Program Administrator's (on behalf of the Purchaser) option, shall promptly repurchase such Mortgage Loan from the Purchaser at the Repurchase Price within one Business Day of receipt of written notice from the Purchaser, in accordance with the procedures set forth in Section 3.03 hereof.

Section 3.06        RESERVED.

Section 3.07        Covenants of Seller.

So long as the Agreement remains in effect or Seller shall have any obligations hereunder, Seller hereby covenants and agrees with Purchaser as follows:

(a) Financial Statements. Promptly upon preparation, but in no event later than (i) 45 days following the end of each of Seller's fiscal quarters, Seller shall deliver to Program Administrator and Purchaser the Seller's first three unaudited financial statements in form and in sufficient detail to satisfy the Purchaser as of the end of such fiscal quarter and (ii) 60 days following the end of each of Seller's fiscal years, Seller shall deliver to Program Administrator and Purchaser the Seller's audited financial statements as of the end of such year prepared in accordance with GAAP.

(b) Reports. Seller shall deliver or cause to be delivered to Program Administrator and Purchaser monthly a report, setting forth payment activity, defaults and delinquencies with respect to the each Mortgage Loan acquired by Purchaser and shall prepare and deliver reports each month in substance and in a form approved by the Purchaser, detailing, with respect to all Purchases, such information as the Purchaser may from time to time reasonably request which reports shall be rendered within 15 days of the month to which they

43

pertain. Seller shall deliver such other reports to Program Administrator as Program Administrator may reasonably request.

(c) Compliance With Laws. Seller will comply in all material respects with all Requirements of Law to which it is or may become subject.

(d) Conduct of Business. Seller will, and will cause each of its subsidiaries to, carry on and conduct its business in substantially the same manner, as it is presently conducted relating to the business purposes for which this Agreement is being entered into and to do all things necessary to remain duly incorporated, validly existing and in good standing under the laws of the State where Seller was formed and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted.

(e) Ownership. The entity listed on Exhibit I hereto shall at all times own at least 50% of the capital stock of Seller.

(f) Notifications. Seller will notify Purchaser in writing of any of the following promptly upon learning of the occurrence thereof, describing the same and, if applicable, any remedial steps being taken with respect thereto.

(i)        The occurrence or likelihood of occurrence of an Event of Default hereunder;

(ii)        The institution of any litigation, suit, proceeding or investigation pending or threatened, or any order or decree outstanding, which is reasonably likely to have a material adverse effect on the sale or value of the Mortgage Loans, the execution, delivery, performance or enforceability of this Agreement, or which is reasonably likely to have a Material Adverse Effect on the Seller; or

(iii)        The entry of any judgment or decree against Seller or if the aggregate amount of all judgments and decrees then outstanding against Seller exceeds $25,000.

(g) Interim Servicing. In the event servicing of a Mortgage Loan has not been transferred prior to the related Closing Date, Seller shall service the Mortgage Loans pursuant to the requirements set forth in Exhibit H hereto.

(h) Uncommitted Availability. Immediately after the purchase of any Mortgage Loans hereunder, the aggregate principal balance of Uncovered Mortgage Loans held by Purchaser hereunder shall not exceed the Uncommitted Availability.

(i) Tangible Net Worth. Seller shall not permit its Tangible Net Worth to fall below the amount set forth on Exhibit I hereto.

(j) Leverage Ratio. Seller shall maintain a Leverage Ratio of not more than that set forth on Exhibit I hereto.

44

(k) <u>Put Back Loan Ratio</u>.  The Seller shall maintain a rolling six month average Put Back Loan Ratio which is less than the amount set forth on <u>Exhibit I</u> during the Takeout Investor Relationship.

(l) <u>Fidelity Bonds</u>.  Seller shall maintain fidelity bonds and policies of insurance in form and substance satisfactory to Purchaser insuring itself and Purchaser and the principals, successors, and heirs and assigns of Purchaser, in the greater of (a) the Required Insurance Amount, or (b) that amount required by Fannie Mae in Section 1.01 of the Fannie Mae Guide, or (c) that amount required by any other agency guidelines, against loss or damage from any breach of fidelity by Seller or any officer, director, employee or agent of Seller, and against any loss or damage from loss or destruction of documents, fraud, theft, misappropriation, or errors or omissions. Such insurance may not be part of a blanket policy against which other parties may claim so as to reduce Purchaser's coverage below the Required Insurance Amount.

(m)<u>Takeout Investor Relationship</u>.  The Seller must have previously executed a correspondent purchase agreement that is standard for the secondary mortgage market generally and have at least a six month relationship with an Approved Takeout Investor (the "Takeout Investor Relationship"). The Seller must have sold a minimum of $2 million of Mortgage Loans to the Approved Takeout Investor during the Takeout Investor Relationship.

(n) <u>Change of Name/Address</u>.  Seller will notify Purchaser not less than sixty (60) days prior to (i) any change of its name or use of any trade names, or (ii) any change in the address of the chief executive office and/or chief place of business of Seller, or (iii) any change in the location of any part of the Mortgage Loans being held by Seller pursuant to the terms hereof, or any records pertaining thereto.

(o) <u>Title Insurance</u>.  The Seller will use title insurance companies approved by the Program Administrator.

(p) <u>Appraisers</u>.  The Seller will use appraisers that are (i) licensed or certified as a residential appraiser by the state, (ii) in good standing with the Appraiser Qualifications Board of the Appraisal Foundation, approved by the Federal Financial Institutions Examinations Council and the applicable state appraisal-licensing agency, and (iii) independent of the Seller, the Program Administrator or any Approved Takeout Provider.

(q) <u>Defense of Title</u>.  Seller warrants and will defend the right, title and interest of Purchaser in and to all Collateral against all adverse claims and demands.

(r) <u>No Amendment or Compromise</u>.  Without Purchaser's prior written consent, neither Seller, the Servicer nor those acting on Seller's behalf shall amend or modify, or waive any term or condition of, or settle or compromise any claim in respect of, any item of the Mortgage Loans or any related rights, provided that any such party may amend or modify a Mortgage Loan if such amendment or modification does not affect the amount or timing of any payment of principal or interest, extend its scheduled maturity date, modify its interest rate, or constitute a cancellation or discharge of its outstanding principal balance and does not materially and adversely affect the security afforded by the real property, furnishings, fixtures, or equipment securing the Mortgage Loan.

45

(s)     No Assignment.  Except as permitted herein, neither Seller nor Servicer or any other servicer shall sell, assign, transfer or otherwise dispose of, or grant any option with respect to, or pledge, hypothecate or grant a security interest in or lien on or otherwise encumber (except pursuant to this Agreement), any of the Mortgage Loans or any interest therein, provided that this Section shall not prevent any of the following:  any transfer of Mortgage Loans in accordance with this Agreement; any servicing arrangement between the Servicer and Seller or its Affiliates; and any Forward Commitment or other type of take out commitment for the Mortgage Loans.

(t)     Preservation of Collateral; Collateral Value.  Seller shall do all things necessary to preserve the Collateral so that it remains subject to no liens, interests or encumbrances other than those created hereby.  Without limiting the foregoing, Seller will comply with all applicable laws, rules, regulations and other laws of any Governmental Authority applicable to Seller relating to the Collateral and cause the Collateral to comply with all applicable laws, rules, regulations and other laws of any such Governmental Authority.  Seller will not allow any default for which Seller is responsible to occur under any Collateral and Seller shall fully perform or cause to be performed when due all of its obligations under any Collateral.

(u)     Financial Statements; Other Information.  Seller shall keep or cause to be kept in reasonable detail books and records of account of its assets and business and shall clearly reflect therein the transfer of Mortgage Loans to Purchaser.  Seller shall furnish or cause to be furnished to Purchaser from time to time, with reasonable promptness, such information regarding the business, operations, properties or financial condition of Seller as Purchaser may reasonably request.

(v)     Change of Fiscal Year.  Seller will not at any time, directly or indirectly, except upon ninety (90) days' prior written notice to Purchaser, change the date on which Seller's fiscal year begins.

(w)     Underwriting Standards.  If a Forward Commitment does not exist, Seller shall not permit any material modifications to be made to the Underwriting Standards that will impact either the Purchaser or the Mortgage Loans without the prior consent of Purchaser (such consent not to be unreasonably withheld).  Seller agrees to deliver to Purchaser copies of such Underwriting Standards in the event that any changes are made to such Underwriting Standards following the date of this Agreement.

(x)     Processing Agent.  If so required by Purchaser, Seller shall retain and use the services of Persons experienced in the processing of transactions in the secondary mortgage market to facilitate the transactions contemplated hereunder.  Each such Person shall be acceptable to Purchaser in its sole discretion.

(y)     Taxes, etc.  The Seller shall pay and discharge or cause to be paid and discharged when due all taxes, assessments and governmental charges or levies imposed upon Seller or upon its income and profits, or upon any of its property, real, personal or mixed, or upon any part thereof, as well as all lawful claims which, if unpaid, might become a Lien or charge upon such properties or any part thereof; provided, however, that Seller shall not be required to pay taxes, assessments or governmental charges or levies or claims for labor,

materials or supplies for which Seller shall have obtained an adequate bond or adequate insurance or that are being contested in good faith and by proper proceedings reasonably and diligently pursued. The Seller shall file on a timely basis all federal, state and local tax and information returns, reports and any other information statements or schedules required to be filed by or in respect of it.

(z)     Other Loan Obligations.  Perform all obligations under the terms of each loan agreement, note, mortgage, security agreement or debt instrument by which Seller is bound or to which any of its property is subject, and will promptly notify Purchaser in writing of the cancellation or reduction of any of its mortgage warehousing lines of credit or agreements with any other lender.

(aa)     No Other Liens.  Seller agrees that so long as any obligation of Seller to be paid or performed hereunder shall remain outstanding, Seller shall not, either directly or indirectly, without the prior written consent of Purchaser:

(i)     Create, incur, assume or suffer to exist, any Lien upon the Collateral except as contemplated by this Agreement or create, incur, assume or suffer to exist any Lien upon any of its other property and assets except:

(a)     Liens or charges for current taxes, assessments or other governmental charges which are not delinquent or which remain payable without penalty, or the validity of which are contested in good faith and by proper proceedings upon stay of execution of the enforcement thereof, provided Seller shall have set aside on its books and shall maintain adequate reserves for the payment of same in conformity with GAAP;

(b)     Liens, deposits or pledges made to secure statutory obligations, surety or appeal bonds, or bonds for the release of attachments or for stay of execution, or to secure the performance of bids, tenders, contracts (other than for the payment of borrowed money), leases or for purposes of like general nature in the ordinary course of Seller's business;

(c)     Reserved; and

(d)     Liens secured by Indebtedness disclosed in the financial statements provided by Seller pursuant to this Section.

(ii)     Create, incur, assume or suffer to exist, or otherwise become or be liable in respect of any Indebtedness except:

(a)     Indebtedness existing on the date hereof and reflected in the financial statements provided by Seller pursuant to this Section, except to the extent new Indebtedness is undertaken on no materially less favorable terms (as determined by Purchaser) to replace existing Indebtedness; and

(b)     Indebtedness incurred in the ordinary course of business up to $10,000 total outstanding at any one time paid within thirty (30) days after the same has become due and payable or which is being contested in good faith, provided provision is made to

47

the satisfaction of Purchaser for the eventual payment thereof in the event it is found that such contested trade debt is payable by Seller.

In this regard, Seller shall not establish any additional mortgage warehousing lines of credit, repurchase agreements or other methods of financing the making, purchase or servicing of Loans without the prior approval of Purchaser, which approval shall not be unreasonably withheld.

(iii)     Purchase or acquire or incur liability for the purchase or acquisition of any or all of the assets or business of any Person, other than in the normal course of business as presently conducted (it being expressly agreed and understood that the acquisition of loans in process, closed loans and servicing is a normal course of business activity).

(iv)     Make or commit to make any advance, loan or extension of credit (other than Loans made in the ordinary course of Seller's business) or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of, or make any other investment in, any Person, except investments in certificates of deposit issued by a bank or in short-term obligations of the United States.

(v)     Sell, lease, assign, transfer or otherwise dispose of any of its assets (other than obsolete or worn out property), whether now owned or hereafter acquired, other than in the ordinary course of business as presently conducted and at fair market value (it being expressly agreed and understood that the sale or other disposition of Loans with or without servicing released is in the ordinary course of business).

(vi)     Enter into any contracts, leases or other agreements except pursuant to the ordinary course of its business as now conducted by Seller.

(vii)     Cause or permit any amendment of its organizational documents in effect as of the date hereof.

(bb)     No Unsatisfied Put Backs. The Seller must have repurchased or cured any prior Put Back Loans.

(cc)     Total Indebtedness to Tangible Net Worth Ratio.  The ratio of the Seller's Total Indebtedness to its Tangible Net Worth does not exceed 15:1.

Section 3.08          Payment.

Any payment due under this Agreement shall be made promptly and by wire transfer of immediately available funds.

Any late payments shall bear interest at the Prime Rate, plus three percentage points, but in no event greater than the maximum amount permitted by applicable law.

48

Section 3.09          <u>Seller Resolutions.</u>

Upon execution and delivery of this Agreement, Seller shall deliver resolutions of its Board of Directors, certified by the Secretary of Seller, approving this Agreement and authorizing Purchaser to enter into, from time to time, the transactions contemplated hereby.

Section 3.10          <u>Remedies.</u>

If an Event of Default occurs and is continuing, Purchaser may, at the direction of Program Administrator to the extent provided or permitted by applicable law and this Agreement, pursue any available legal remedy including the sale or other disposition of some or all of the Mortgage Loans and related Collateral in accordance with the provisions hereof. Following an Event of Default or the occurrence of an event which, with giving of notice or the passage of time, would constitute an Event of Default, no further Purchase hereunder shall occur unless such Event of Default shall have been waived by the Purchaser at the direction of Program Administrator.

49

ARTICLE IV

SERVICING OF THE MORTGAGE LOANS DURING THE INTERIM SERVICING PERIOD

Section 4.01          RESERVED

Section 4.02          Custodial Account.

(a) Servicer shall establish and maintain a segregated trust account for the benefit of Purchaser (the "Custodial Account"), which account shall be an Eligible Account and shall promptly deposit into such Custodial Account, any interest and/or principal payments received with respect to each Mortgage Loan (but not any interest accrued on such Mortgage Loan up to but not including the Closing Date for such Mortgage Loan), and all other receipts in respect of each Mortgage Loan that are payable for the benefit of the owner of each such Mortgage Loan. Under no circumstances shall Servicer deposit any funds belonging to it into the Custodial Account, or otherwise commingle its own funds with the funds belonging to Purchaser as owner of any Mortgage Loans; subject to Seller's right to principal and interest that will be payable to the Seller pursuant to Section 6.01.

(b) Any interest and/or principal payments, and other amounts received with respect to each Mortgage Loan following the Cut-off Date (not including the portion accrued before the Cut-off Date) for such Mortgage Loan, whether or not deposited in the Custodial Account, shall be held in trust for the exclusive benefit of Purchaser as the owner of such Mortgage Loan and shall be released only as follows:

(i)       to make payments to the Purchaser and the Seller in the amounts and in the manner provided for in Section 6.01;

(ii)      to reimburse the Servicer for unreimbursed Servicing Advances, the Servicer's right to reimbursement pursuant to this subclause (ii) with respect to any Mortgage Loan being limited to related Liquidation Proceeds, Condemnation Proceeds and Insurance Proceeds (in accordance with the relevant provisions of the Fannie Mae Guides) or Takeout Proceeds or as otherwise set forth in this Agreement;

(iii)     to pay to the Servicer any interest earned on funds in the Custodial Account (all such interest to be withdrawn monthly not later than each Remittance Date);

(iv)     to pay to the Servicer with respect to each Mortgage Loan that has been repurchased pursuant to Section 3.03 all amounts received thereon and not distributed as of the date on which the related Repurchase Price is determined;

(v)      reserved;

50

(vi)    to make payments in respect of the premiums due, if any, on the LPMI Policies, if applicable;

(vii)    to remove funds inadvertently placed in the Custodial Account by the Servicer; and

(viii)    to clear and terminate the Custodial Account upon the termination of this Agreement.

(c) The terms of the Custodial Account shall specifically provide that the funds therein contained shall be released only at the direction of Program Administrator following the occurrence of any Event of Default hereunder.

(d) Servicer shall not change the identity or location of the Custodial Account without thirty (30) days prior written notice to Purchaser and the Program Administrator. Servicer shall from time to time, at its own cost and expense, execute such financing statements pursuant to the UCC, directions to the applicable Eligible Bank and other papers, documents or instruments, as may be reasonably requested by the Program Administrator or the Purchaser to reflect Purchaser's ownership interest in the Custodial Account, and Seller hereby authorizes Purchaser to execute and file at any time and from time to time precautionary financing statements or copies thereof with respect to the Custodial Account signed only by Purchaser.

(e) Servicer shall promptly deliver to Purchaser or the Program Administrator copies of all bank statements and other records relating to the Custodial Account as the Program Administrator or Purchaser may from time to time request.

Section 4.03        Establishment of Escrow Accounts; Deposits in Accounts.

The Servicer shall segregate and hold all funds collected and received pursuant to each Mortgage Loan which constitute Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts. Each Escrow Account shall be an Eligible Account. Funds deposited in the Escrow Account may be drawn on by the Servicer in accordance with Section 4.04. The Servicer shall deposit in the Escrow Account or Accounts on a daily basis, and retain therein:

(i)    all Escrow Payments collected on account of the Mortgage Loans, for the purpose of effecting timely payment of any such items as required under the terms of this Agreement;

(ii)    all Insurance Proceeds which are to be applied to the restoration or repair of any Mortgaged Property; and

(iii)    all Servicing Advances for Mortgagors whose Escrow Payments are insufficient to cover escrow disbursements.

The Servicer shall make withdrawals from the Escrow Account only to effect such payments as are required under this Agreement, and for such other purposes as shall be as set forth or in accordance with Section 4.04. The Servicer shall be entitled to retain any interest

51

paid on funds deposited in an Escrow Account by the depository institution other than interest on escrowed funds required by law to be paid to the Mortgagor and, to the extent required by law, the Servicer shall pay from the Servicer's own funds interest on escrowed funds to the Mortgagor notwithstanding that such Escrow Account is non-interest bearing or that interest paid thereon is insufficient for such purposes.

        Section 4.04        <u>Permitted Withdrawals From the Escrow Account.</u>

Withdrawals from the Escrow Account may be made by the Servicer only:

        (i)        to effect timely payments of ground rents, taxes, assessments, water rates, Primary Mortgage Insurance Policy premiums, if applicable, fire and hazard insurance premiums, condominium assessments and comparable items;

        (ii)        to reimburse the Servicer for any Servicing Advance made by the Servicer with respect to a related Mortgage Loan but only from amounts received on the related Mortgage Loan which represent late payments or collections of Escrow Payments thereunder;

        (iii)        to refund to the Mortgagor any funds as may be determined to be overages;

        (iv)        for transfer to the Custodial Account in accordance with the terms of this Agreement;

        (v)        for application to restoration or repair of the Mortgaged Property;

        (vi)        to pay to the Servicer, or to the Mortgagor to the extent required by law, any interest paid on the funds deposited in the Escrow Account;

        (vii)        to clear and terminate the Escrow Account on the termination of this Agreement;

        (viii)    to pay to the Mortgagors or other parties Insurance Proceeds deposited in accordance with Section 4.03; and

        (ix)        to remove funds inadvertently placed in the Escrow Account by the Servicer.

ARTICLE V

ACCOUNTS

Section 5.01                          Security Deposit.

Simultaneously herewith, and/or from time to time hereafter, Seller will be required to deposit with Purchaser's designee for deposit into the Top-Up Account the amount set forth on Exhibit I hereto (the "Security Deposit Amount"). At any time that the amount of funds on deposit in the Top-Up Account is less than the Security Deposit Amount, Seller shall be required to deposit with the Purchaser's designee an amount sufficient to increase such funds to the required amount (which amounts shall be held in the Top-Up Account).

Section 5.02                          Top-Up Account.

The Purchaser's designee shall maintain the Security Deposit Amount as well as any amounts released from the Seller Settlement Account pursuant to Section 5.07 in the Top-Up Account and shall hold the same on behalf of the Purchaser (or the Purchaser's designee) upon the following terms:

(a) Funds deposited in the Top-Up Account may not be commingled with other funds being held by the Purchaser's designee and no interest shall be paid to Seller on any funds on deposit in the Top-Up Account.

(b) The Purchaser's designee may invest the funds on deposit in the Top-Up Account on such terms as the Program Administrator shall determine appropriate without any obligation to account to Seller for the proceeds (or loss) of such investment. Any proceeds of such investment will be the property of the Purchaser or its designee.

(c) The Purchaser's designee and the Program Administrator shall have no duties or obligations (including those of trustee or fiduciary) other than those specifically set forth herein, or as may be subsequently agreed to in writing between the parties, the Purchaser's designee has all right, title and interest in all funds on deposit in the Top-Up Account and shall exercise the same care with respect to funds in the Top-Up Account as it exercises with respect to its other funds. The Purchaser's designee and the Program Administrator shall not, nor shall any of their officers, directors or agents, be liable for any error of judgment, or any action taken or omitted to be taken, in good faith and believed by it or them to be within the purview of this Agreement, except for gross negligence or willful misconduct. In no event shall the Purchaser's designee or the Program Administrator, their officers, directors or agents be held liable for any special, punitive, indirect or consequential damages resulting from any action taken, or omitted to be taken, by it or them with respect to the funds in the Top-Up Account even if advised of the possibility of such damages.

(d) The Purchaser's designee or the Program Administrator shall, upon the request of the Seller, furnish to Seller a statement of the funds on deposit in the Top-Up Account. Seller shall promptly review such statement and advise the Program Administrator of any error,

53

omission or inaccuracy of which it becomes aware. Such notification by the Seller is not conclusive of any such error, omission or inaccuracy.

Section 5.03                    Withdrawals From the Top-Up Account.

(a) Provided that no Event of Default or Seller Trigger Event, or event which, with notice or the passage of time, would constitute an Event of Default or Seller Trigger Event, has occurred and is continuing, Seller may request the Program Administrator to direct the Purchaser's designee to release any funds on deposit in the Top-Up Account in excess of the Security Deposit Amount. The Purchaser or the Program Administrator on its behalf may at its discretion direct the Purchaser's designee to wire such funds to Seller net of any Projected Loss.

(b) In connection with a Purchase Request which has been accepted by the Program Administrator, the Purchaser or the Program Administrator on its behalf shall direct the Purchaser's designee to release, from amounts on deposit in the Top-Up Account to the Seller Funding Account, the amount set forth on the related Purchase Request which represents the portion of the related Mortgage Loan which is not being funded by the Purchase Price; provided, however, that any time the amount of funds on deposit in the Top-Up Account, after application of this Section 5.03(b) are less than the Security Deposit Amount required in Section 5.01, they will be replenished in accordance with Section 5.03(e).

(c) The Security Deposit Amount will not be paid to the Seller, unless and until this Agreement shall have been terminated and the Settlement Date shall have occurred with respect to all Mortgage Loans.

(d) If Seller fails to (i) repurchase a Defective Mortgage Loan in the time or for the amount required hereunder, or (ii) pay the Shortfall Premium, any Administrative Costs, any Projected Loss or any other amount required to be paid by Seller to Purchaser hereunder then, in either such event, the Purchaser or the Program Administrator on its behalf may, in its sole discretion, direct the Purchaser's designee to apply the funds in the Top-Up Account to any such purposes.

(e) Seller agrees to replenish any part of the Security Deposit Amount taken from the Top-Up Account as required by Section 5.01 by the close of business on the day of application of such funds.

Section 5.04                    Seller Funding Account.

The Purchaser's designee shall maintain the amounts released from the Top-Up Account pursuant to Section 5.03(b) as well as the Purchase Price hereunder in the Seller Funding Account and shall hold the same on behalf of the Purchaser (or the Purchaser's designee) to be applied in connection with the Purchase of the Mortgage Loans in accordance with the procedures set forth in Section 2.01 upon the following terms:

(a) Funds deposited in the Seller Funding Account may not be commingled with other funds being held by the Purchaser's designee and no interest shall be paid to the Seller on any funds on deposit in the Seller Funding Account.

54

(b) The Purchaser's designee and the Program Administrator shall have no duties or obligations (including those of trustee or fiduciary) other than those specifically set forth herein, or as may be subsequently agreed to in writing between the parties, the Purchaser's designee's and the Program Administrator's sole obligation being to exercise the same care with respect to funds in the Seller Funding Account as it exercises with respect to its own funds. The Purchaser's designee and the Program Administrator shall not, nor shall any of its officers, directors or agents, be liable for any error of judgment, or any action taken or omitted to be taken, in good faith and believed by it or them to be within the purview of this Agreement, except for gross negligence or willful misconduct. In no event shall the Purchaser's designee or the Program Administrator, their officers, directors or agents be held liable for any special, punitive, indirect or consequential damages resulting from any action taken, or omitted to be taken, by it or them with respect to the funds in the Seller Funding Account even if advised of the possibility of such damages.

(c) The Purchaser's designee shall, on demand, furnish to Seller a statement of the funds on deposit in the Seller Funding Account. Seller shall promptly review such statement and advise the Program Administrator of any error, omission or inaccuracy of which it becomes aware.

Section 5.05          Withdrawals From the Seller Funding Account.

Provided that no Event of Default or Seller Trigger Event, or event which, with notice or the passage of time, would constitute an Event of Default or Seller Trigger Event, has occurred and is continuing, the Purchaser will release funds on deposit in the Seller Funding Account and promptly wire such funds in accordance with the procedures set forth in Section 2.01 in connection with the completion of a Purchase Request and the origination of the Mortgage Loans.

Section 5.06          Seller Settlement Account.

The Purchaser's designee shall maintain all Takeout Proceeds received on any Settlement Date in the Seller Settlement Account and shall hold the same on behalf of the Purchaser (or the Purchaser's designee) upon the following terms:

(a) Funds deposited in the Seller Settlement Account may not be commingled with other funds being held by the Purchaser's designee and no interest shall be paid to the Seller on any funds on deposit in the Seller Settlement Account.

(b) The Purchaser's designee and the Program Administrator shall have no duties or obligations (including those of trustee or fiduciary) other than those specifically set forth herein, or as may be subsequently agreed to in writing between the parties, the Purchaser's designee's and the Program Administrator's sole obligation being to exercise the same care with respect to funds in the Seller Settlement Account as it exercises with respect to its own funds. The Purchaser's designee and the Program Administrator shall not, nor shall any of their officers, directors or agents, be liable for any error of judgment, or any action taken or omitted to be taken, in good faith and believed by it or them to be within the purview of this Agreement, except for gross negligence or willful misconduct. In no event shall the Purchaser's designee or

the Program Administrator, their officers, directors or agents be held liable for any special, punitive, indirect or consequential damages resulting from any action taken, or omitted to be taken, by it or them with respect to the funds in the Seller Settlement Account even if advised of the possibility of such damages.

Section 5.07    Withdrawals From the Seller Settlement Account.

Provided that no Event of Default or Seller Trigger Event, or event which, with notice or the passage of time, would constitute an Event of Default or Seller Trigger Event, has occurred and is continuing, the Purchaser's designee will withdraw an amount equal to the aggregate Adjusted Takeout Proceeds for the related Mortgage Loans on deposit in the Seller Settlement Account as of the close of business on the preceding Determination Date and deposit such amount in the Top-Up Account.

Section 5.08    Security Interest.

(a) As collateral security for the performance of any and all of its obligations, and to the extent that the Purchaser is not deemed to itself own such property, Seller hereby assigns, pledges, transfers and sets over unto the Purchaser, and grants to the Purchaser a first lien on and security interest in, all of Seller's right, title and interest, power, privileges, and other benefits in, to and under any funds in the Top-Up Account, the Seller Settlement Account and the Seller Funding Account. The rights, powers and privileges granted hereby shall include, without limitation, the right to make all waivers and agreements, to give all notices, consents and releases, and to do any and all other things whatsoever which Seller is or may become entitled to do with respect to any funds in the Top-Up Account, the Seller Settlement Account or the Seller Funding Account.

(b) This Agreement shall constitute a security agreement. The holder of any Eligible Account hereunder shall be deemed to be an independent custodian for purposes of perfection of the security interest granted to the Purchaser, and the Purchaser shall have all of the rights of a secured party under applicable law. The Purchaser may file one or more UCC financing statements with respect to the Top-Up Account, the Seller Settlement Account and the Seller Funding Account and deliver a copy of this Agreement to the holder of any Eligible Account hereunder as notice of the Purchaser's ownership or first priority security interest in any of Seller's funds on deposit in the Top-Up Account, the Seller Settlement Account or the Seller Funding Account.

(c) To the extent any authorization of Seller is appropriate, Seller hereby irrevocably agrees to pay to, or at the direction of, the Program Administrator any and all of its funds contained in the Top-Up Account, the Seller Settlement Account or the Seller Funding Account.

(d) To the extent that the Purchaser becomes liable for the payment of taxes, including withholding taxes, in respect of any of Seller's funds on deposit in the Top-Up Account, the Seller Settlement Account or the Seller Funding Account or any payment made hereunder, the Purchaser may deduct such taxes from any of Seller's funds on deposit in the Top-Up Account and pay the same. Seller shall indemnify the Purchaser and the Program

56

# EXHIBIT A
# Part 3

Administrator against, and hold the Purchaser and the Program Administrator harmless from, any liability for taxes related to any of Seller's funds on deposit in the Top-Up Account, the Seller Settlement Account or the Seller Funding Account.

(e)  All the taxable events relating to any of Seller's funds on deposit in the Top-Up Account, the Seller Settlement Account or the Seller Funding Account will be reported to Seller on IRS Form 1099 in accordance with the Purchaser's standard practice.

(f)  There shall be no fees charged by the Purchaser for administering the Top-Up Account, the Seller Settlement Account or the Seller Funding Account, but if a designee of Purchaser holding any Eligible Accounts hereunder charges any fees in connection with the administration of Seller's funds in the Top-Up Account, the Seller Settlement Account or the Seller Funding Account, such fees shall be for the account of Seller and may be deducted from the Top-Up Account.

(g)  From time to time, on and after the date hereof, Seller shall deliver or cause to be delivered to the Purchaser or its designee such further documents and instruments and shall do and cause to be done such further acts as the Purchaser's designee or Program Administrator shall reasonably request (it being understood that the Purchaser's designee and Program Administrator shall have no obligation to make any such request) to carry out more effectively the provisions and purposes of this Agreement, to evidence compliance herewith, or to assure itself that it is protected in acting hereunder.

ARTICLE VI

PAYMENTS TO THE PURCHASER

Section 6.01          Distributions.

On each Business Day, the Servicer shall remit by wire transfer to the Seller Settlement Account all unscheduled payments of principal on the Mortgage Loans received by the Seller, as Servicer, as of the close of business on the preceding day.  Notwithstanding Section 2.02 and subject to the provisions of the next sentence, the Servicer initially shall retain all scheduled payments of principal and interest collected on the Mortgage Loans, which collections will be deemed to have been received by the Purchaser and then paid to the Seller by the Purchaser.  Notwithstanding the foregoing, on each Remittance Date, the Servicer, if directed by the Program Administrator, shall remit by wire transfer to the Purchaser for deposit in the Seller Settlement Account all scheduled and/or unscheduled payments of principal and interest on the Mortgage Loans received by the Seller, as Servicer, through the close of business on the preceding Determination Date, net of charges against or withdrawals from the Custodial Account pursuant to Section 4.02.

With respect to any remittance received by the Purchaser or its designee after the Business Day on which such payment was due, the Servicer shall pay to the Purchaser interest on any such late payment at an annual rate equal to the Prime Rate, adjusted as of the date of each change, plus three percentage points, but in no event greater than the maximum amount permitted by applicable law.  Such interest shall be deposited in the Custodial Account by the Servicer on the date such late payment is made and shall cover the period commencing with the day following the Business Day on which such payment was due and ending with the Business Day on which such payment is made, both inclusive.  Such interest shall be remitted along with the distribution payable on the next succeeding Remittance Date.  The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any Event of Default by the Servicer.

Section 6.02          Statements to the Purchaser.

The Servicer shall furnish to the Purchaser or its designee an individual loan accounting report, as of the last Business Day of each month, in the Servicer's assigned loan number order to document Mortgage Loan payment activity on an individual Mortgage Loan basis.  With respect to each month, the corresponding individual loan accounting report shall be received by the Purchaser or its designee no later than the fifth (5th) Business Day of the following month on a disk or tape or other computer-readable format in such format as may be mutually agreed upon by both the Program Administrator on behalf of the Purchaser and the Servicer and in hard copy, which report shall contain the following:

(i)          With respect to each Monthly Payment, the amount of such remittance allocable to principal (including a separate breakdown of any Principal Prepayment, including the date of such prepayment, and any Prepayment Penalties or premiums);

58

(ii)　　with respect to each Monthly Payment, the amount of such remittance allocable to interest;

(iii)　　the aggregate Scheduled Principal Balance of the Mortgage Loans;

(iv)　　the aggregate of any expenses reimbursed to the Servicer during the prior month pursuant to Section 4.02; and

(v)　　the number and aggregate outstanding principal balances of Mortgage Loans (a) delinquent (1) 30 to 59 days, (2) 60 to 89 days, and (3) 90 days or more; (b) as to which foreclosure has commenced; and (c) as to which REO Property has been acquired.

The Servicer shall also provide a monthly servicing report, sorted in the Purchaser's assigned loan number order, in the form of Exhibit E hereto, with each such report.

The Servicer shall prepare and file any and all information statements or other filings required to be delivered to any governmental taxing authority or to the Purchaser pursuant to any applicable law with respect to the Mortgage Loans and the transactions contemplated hereby. In addition, the Servicer shall provide the Purchaser or its designee with such information concerning the Mortgage Loans as is necessary for the Purchaser to prepare its federal income tax return as the Purchaser may reasonably request from time to time.

In addition, not more than sixty (60) days after the end of each calendar year, the Servicer shall furnish to the Purchaser or its designee at any time during such calendar year an annual statement in accordance with the requirements of applicable federal income tax law as to the aggregate of remittances for the applicable portion of such year.

Section 6.03　　　　[RESERVED]

Section 6.04　　　　Liquidation Reports.

Upon the foreclosure sale of any Mortgaged Property or the acquisition thereof by the Purchaser pursuant to a deed in lieu of foreclosure, the Servicer shall submit to the Purchaser or its designee a liquidation report with respect to such Mortgaged Property. The Servicer shall also provide reports on the status of REO Property containing such information as the Purchaser or its designee may reasonably require.

59

ARTICLE VII

RESERVED

60

## ARTICLE VIII

## SELLER TRIGGER EVENT

Section 8.01          <u>Seller Trigger Events</u>

The following events are Seller Trigger Events:

      (i)     The Settlement Date for a Mortgage Loan has not occurred within 45 days of the related Closing Date (or such later date as extended by the Program Administrator pursuant to Section 12.04).

      (ii)    A Forward Commitment is not provided with respect to an Uncovered Mortgage Loan within 10 days of the related Closing Date.

      (iii)   Failure of the Seller to deliver the Submission Package Documents with respect to a Wet Funding within the Delivery Period or any other error with respect to any Submission Package Documents, which is not cured within five (5) Business Days.

      (iv)   When the aggregate Purchase Price plus interest thereon at the Applicable Rate exceeds (a) with respect to any Mortgage Loans which are subject to a Forward Commitment, the aggregate Adjusted Takeout Proceeds of the Mortgage Loans listed on the related Mortgage Loan Schedule and (b) with respect to any Uncovered Mortgage Loans, the aggregate Market Value of the Mortgage Loans listed on the related Mortgage Loan Schedule, less any associated Administrative Costs (such excess, the "<u>Projected Loss</u>").

      (v)    The Seller has not repurchased a Put Back Loan from the applicable Approved Takeout Investor within two (2) Business Days of such a request by the Approved Takeout Investor.

      (vi)   Failure of the Seller to maintain a Takeout Commitment Ratio during any month which is more than the amount set forth in <u>Exhibit I</u>.

      (vii)  Failure of the Seller to satisfy a Margin Deficit.

      (viii)  At the close of business on any day, the amount on deposit in the Top-Up Account is less than the Security Deposit Amount.

      (ix)   An Event of Default has occurred and is continuing.

      (x)    Breach of a financial covenant set forth on <u>Exhibit I</u>, or any Seller Concentration Sublimit on <u>Exhibit I</u>.

In each and every such case, so long as a Seller Trigger Event shall not have been remedied, the Purchaser, by notice in writing to the Servicer may, in addition to whatever rights the Purchaser may have elsewhere under this Agreement and at law or equity or to damages, including injunctive relief and specific performance, (i) cease purchasing Mortgage Loans from the Seller, (ii) direct the Purchaser's designee to use any funds on deposit in the Top-Up Account to pay to the Purchaser in order to cover any Projected Loss, (iii) procure (through the Program Administrator) a Forward Commitment on any Uncovered Mortgage Loans and (iv) require any amounts otherwise distributable to the Seller to remain in the Top-Up Account until the Seller Trigger Event is cured.

ARTICLE IX

THE SELLER AND THE SERVICER

Section 9.01          Indemnification; Third Party Claims.

The Servicer agrees to indemnify on demand the Purchaser, the Program Administrator and their affiliates, trustees, agents, successors and assignees, and hold them harmless against any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that the Purchaser or such Person may sustain in any way related to the failure of the Servicer to observe and perform its duties, obligations, covenants, and agreements to service the Mortgage Loans during the Interim Servicing Period in strict compliance with the terms of this Agreement. The Seller agrees to indemnify on demand the Purchaser, the Program Administrator and their affiliates, trustees, agents, successors and assignees, and hold them harmless against any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that they may sustain in any way related to (i) the failure of the Seller to observe and perform its duties, obligations, and covenants in strict compliance with the terms of this Agreement, (ii) the breach of a representation or warranty set forth in Sections 3.01 or 3.02 of this Agreement, (iii) any act or omission on the part of the Seller or any other person or entity in the origination, receiving, processing, funding or servicing of any Mortgage Loan prior to the related Servicing Transfer Date or otherwise arising from the transfer of servicing of the Mortgage Loans provided for in this Agreement or (iv) the Seller's inability to effect or cause the transfer of the servicing of the Mortgage Loans to a successor servicer pursuant to Section 13.01 of this Agreement. An indemnifying party hereunder shall immediately notify the Purchaser if a claim is made by a third party with respect to this Agreement or a Mortgage Loan, assume (with the consent of the Purchaser) the defense of any such claim and pay all expenses in connection therewith, including counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it or the Purchaser in respect of such claim, but failure to so notify the Purchaser shall not limit its obligations hereunder. An indemnifying party hereunder shall follow any written instructions received from the Purchaser in connection with such claim. The Purchaser shall promptly reimburse an indemnifying party hereunder for all amounts advanced by it pursuant to the two preceding sentences except when the claim relates to the failure of the Servicer to service and administer the Mortgage Loans in strict compliance with the terms of this Agreement, the failure of the Seller to perform its duties and obligations pursuant to this Agreement, the breach of any representation or warranty set forth in Sections 3.01 or 3.02, or the gross negligence, bad faith or willful misconduct of either the Seller or the Servicer. The Seller, or the Servicer as the case may be, agrees that it will not enter into any settlement of any such claim without the consent of the Purchaser unless such settlement includes an unconditional release of the Purchaser from all liability that is the subject matter of such claim. The provisions of this Section 9.01 shall survive termination of this Agreement, the transfer of the servicing rights and the transfer of the Mortgage Loans.

Section 9.02          Merger or Consolidation of the Seller or the Servicer.

Each of the Seller and the Servicer shall keep in full effect its existence, rights and franchises as a corporation under the laws of the state of its incorporation except as permitted

63

herein, and shall obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, or any of the Mortgage Loans and to perform its duties under this Agreement.

Any Person into which either the Seller or the Servicer may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which either the Seller or the Servicer shall be a party, or any Person succeeding to the business of either the Seller or the Servicer whether or not related to loan servicing, shall be the successor of the Seller or of the Servicer, as applicable, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that the successor or surviving Person shall be an institution (i) having a GAAP net worth of not less than $10,000,000, (ii) the deposits of which are insured by the FDIC, SAIF and/or BIF, or which is a HUD-approved mortgagee whose primary business is in origination and servicing of first or second lien mortgage loans, and (iii) who is a Fannie Mae or Freddie Mac approved seller/servicer in good standing.  Notwithstanding the foregoing, if the successor or surviving Person is an institution with a GAAP net worth of less than $10,000,000, then the Program Administrator on behalf of the Purchaser may, in its sole discretion, waive such minimum GAAP net worth requirement.

Section 9.03          Limitation on Liability of the Servicer.

Neither the Servicer nor any of the officers, employees or agents of the Servicer shall be under any liability to the Purchaser for any servicing action taken or for refraining from the taking of any servicing action in good faith pursuant to this Agreement, or for errors in judgment made in good faith; provided, however, that this provision shall not protect the Servicer or any such person against any breach of warranties or representations made herein, or failure to perform its servicing obligations in strict compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reason of negligence, bad faith or willful misconduct, or any breach of the terms and conditions of this Agreement. The Servicer and any officer, employee or agent of the Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by the Purchaser respecting any servicing matters arising hereunder.  The Servicer shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage Loans in accordance with this Agreement and which in its reasonable opinion may involve it in any expenses or liability; provided, however, that the Servicer may, with the consent of the Program Administrator on behalf of the Purchaser, undertake any such action which it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto.

ARTICLE X

DEFAULT

Section 10.01            Events of Default.

All rights of the Seller and the Servicer under this Agreement shall terminate if one of the following Events of Default occurs and is continuing (for the purposes of this Section 10.01 only, the party named as the Seller and Servicer herein shall be referred to as, the "Seller"):

(i)    any failure by the Seller to remit to the Purchaser any payment required to be made by it under the terms of this Agreement which continues unremedied for a period of one (1) Business Day after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the Seller by the Purchaser; or

(ii)    failure on the part of the Seller duly to observe or perform in any material respect any of the other covenants or agreements on the part of the Seller set forth in this Agreement; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Seller and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

(iv)    the Seller shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Seller or of or relating to all or substantially all of its property; or

(v)    the Seller shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vi)    the Seller ceases to be approved by at least one of HUD, Fannie Mae or Freddie Mac as a mortgage loan seller and servicer for more than thirty (30) days; or

(vii)    the Seller attempts to assign its right to servicing compensation hereunder or the Seller attempts, without the consent of the

65

Purchaser, to sell or otherwise dispose of all or substantially all of its property or assets or to assign this Agreement or the servicing responsibilities hereunder or to delegate its duties hereunder or any portion thereof; or

(viii)    the Seller (a) ceases to be licensed to service residential mortgage loans in each jurisdiction in which a Mortgaged Property is located and such licensing is required, (b) ceases to be qualified to transact business in any jurisdiction where it is currently so qualified, but only to the extent such non-qualification materially and adversely affects the Seller's ability to perform its obligations hereunder or (c) has an investigation commenced against it or any Principal or Affiliate of the Seller relating to improper lending practices or securities law matters; or

(ix)    the Seller fails to meet the eligibility criteria set forth in the last paragraph of Section 9.02; or

(x)    the failure of Seller to deliver to Purchaser or its designee the relevant Mortgage Loans on the relevant Closing Date; or

(xi)    any of the representations and warranties made by the Seller herein, or in any certificate or other document delivered pursuant to or in connection with this Agreement or any transaction contemplated hereby, shall prove to be untrue in any material respect when made or deemed made and such failure is not cured by the Seller within three (3) Business Days of written notice by the Program Administrator; or

(xii)    default by the Seller, whether as principal, guarantor or surety, in the payment of any principal or interest on any indebtedness of the Seller; or

(xiii)    the occurrence and continuance of an "event of default" or of an "event of termination" on the part of the Seller under any other agreement between the Seller and Purchaser or Program Administrator or any of their affiliates, which has not been waived by the Purchaser or Program Administrator, as the case may be; or

(xiv)    any Material Adverse Effect occurs; or

(xv)    failure of the Seller to maintain a Takeout Commitment Ratio during any three month period which is more than the amount set forth in Exhibit I; or

(xvi)    failure of the Seller to cure a Seller Trigger Event within three (3) Business Days of written notice received by the Program Administrator; or

66

(xvii)   the Seller fails to repurchase any Mortgage Loan pursuant to Section 3.03, which failure is not waived by the Purchaser.

Upon the occurrence and continuation of any Event of Default or any event which, with notice or the passage of time, would constitute an Event of Default any amounts otherwise distributable to the Seller shall remain in the Top-Up Account, the Seller Funding Account and the Seller Settlement Account until such event is cured or waived.  In addition, in each and every such case, so long as an Event of Default shall not have been remedied, the Program Administrator on behalf of the Purchaser, by notice in writing to the Seller may, in addition to whatever rights the Purchaser may have under Sections 3.03, 9.01 and 12.04 and at law or equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Seller under this Agreement and in and to the Mortgage Loans and the proceeds thereof without compensating the Seller for the same.  On or after the receipt by the Seller of such written notice of termination, all authority and power of the Seller under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor appointed pursuant to Section 13.01.  Upon written request from the Program Administrator or the Purchaser, the Seller shall prepare, execute and deliver, any and all documents and other instruments, place in such successor's possession all servicing files, and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise, at the Seller's sole expense.  The Seller agrees to cooperate with the Purchaser and such successor in effecting the termination of the Seller's responsibilities and rights hereunder, including, without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Seller to the Custodial Account or Escrow Account or thereafter received with respect to the Mortgage Loans or any REO Property.

Section 10.02        Waiver of Defaults.

The Purchaser, or the Program Administrator on behalf of the Purchaser, may waive only by written notice any default by the Seller or the Servicer in the performance of its obligations hereunder and its consequences.  Upon any such waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived in writing.

ARTICLE XI

TERMINATION

Section 11.01          Servicer Termination.

Subject to the provisions of Sections 11.02 and 13.01, the respective obligations and responsibilities of the Servicer shall terminate upon: (i) the earlier of (A) the Servicing Transfer Date and (B) the later of (1) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or (2) the disposition of all REO Property and the remittance of all funds due hereunder; (ii) by mutual consent of the Servicer and the Program Administrator on behalf of the Purchaser in writing; or (iii) termination of the Servicer by the Program Administrator (on behalf of the Purchaser) with or without cause under the terms of this Agreement.

Section 11.02          Seller Termination.

(a) The Program Administrator on behalf of the Purchaser may, at its sole option, terminate any rights the Seller and/or the Servicer may have hereunder, without cause, upon thirty (30) days written notice. The Program Administrator on behalf of the Purchaser may, at its sole option, terminate any rights the Seller and/or the Servicer may have hereunder, with cause (as set forth in Section 10.01), immediately upon written notice. Any such notice of termination shall be in writing and delivered to the Servicer as provided in Section 13.05 of this Agreement.

(b) The Purchaser shall no longer purchase Mortgage Loans under this Agreement (except as provided in Section 8.01) on the earlier to occur of an Event of Default (that has not been waived by Program Administrator on behalf of Purchaser) and the Termination Date. In the event this Agreement expires on the Termination Date and at that time there exists no Event of Default, then, immediately prior to such Termination Date, as to all Mortgage Loans then owned by Purchaser, a Required Sale Event shall be deemed to occur unless this Agreement is extended. Any amounts distributable to the Seller shall remain in the Top-Up Account during the period between the Termination Date and the consummation of such a Required Sale Event.

ARTICLE XII

RECONSTITUTION AND RESALE OF MORTGAGE LOANS; VALUATION DEFICIENCY

Section 12.01    RESERVED

Section 12.02    Sale of Mortgage Loans to Takeout Investors.

(a)  The sale of each Mortgage Loan to Purchaser shall include, and Seller hereby assigns to Purchaser, free of any security interest, lien, claim or encumbrance of any kind, Seller's rights to deliver the Mortgage Loan to the Takeout Investor under the related Forward Commitment, if any, and to receive the Takeout Proceeds therefor from such Takeout Investor. Such sale shall be made pursuant to the provisions of such Forward Commitment. With respect to each Uncovered Mortgage Loan, and any Mortgage Loan as to which the Takeout Investor fails to honor its Forward Commitment, Program Administrator in its sole discretion and without the consent of Seller, shall direct Purchaser at any time to sell, any such Mortgage Loans to an investor designated by and pursuant to the terms specified by Program Administrator.

(b)  Purchaser shall permit Seller to substitute a different Forward Commitment with respect to a Mortgage Loan provided (i) such request is made in writing within twenty-one (21) days after the Closing Date, (ii) the Mortgage Loan is underwritten to the standards and guidelines of the new Takeout Investor and (iii) no liability to the original Takeout Investor attaches to Purchaser. After such twenty-one (21) day period Purchaser may withhold its consent to the substitution of the Forward Commitment in its sole discretion.

(c)  Seller shall cause each Takeout Investor to provide Settlement Information with respect to any Mortgage Loan as to which it has delivered a Forward Commitment.

(d)  The Settlement Date shall occur on the Business Day following the day upon which the applicable Takeout Proceeds are received by Purchaser (or its designee). Any Settlement Information and/or Takeout Proceeds received by Program Administrator (or its designee) after 12:00 p.m. (New York City time) on a Business Day (or at any time on a day which is not a Business Day) shall be deemed for all purposes to have been received on the next Business Day.

(e)  If a Takeout Investor delivers Takeout Proceeds but fails to provide the correct Settlement Information, the Program Administrator (or its designee) will notify the Seller and/or Takeout Investor. If the Takeout Investor fails to provide the correct Settlement Information within one (1) Business Day after receipt of such notification, the Program Administrator may, in its sole discretion:

(i)  return any Takeout Proceeds for which it has incomplete Settlement Information to the Takeout Investor; or

(ii)  place such Takeout Proceeds in a non-interest bearing account until the requisite Settlement Information and any additional Takeout Proceeds necessitated by the delay in settlement is provided.

69

Section 12.03  <u>Market Value.</u>

(a) On each Business Day, Program Administrator shall determine the Market Value of all the Uncovered Mortgage Loans that are held by Purchaser hereunder.  If the Market Value of the Uncovered Mortgage Loans relating to any Purchase at any time has declined from the Adjusted Purchase Price of the Uncovered Mortgage Loans as of the relevant Closing Date (a "<u>Margin Deficit</u>"), then Program Administrator on behalf of the Purchaser may by notice to Seller require Seller to transfer to Purchaser cash or, at the Program Administrator's (on behalf of the Purchaser) sole discretion, additional Mortgage Loans reasonably acceptable to the Program Administrator on behalf of the Purchaser ("<u>Additional Mortgage Loans</u>") having an aggregate Market Value at least equal to the Margin Deficit (such requirement, a "<u>Margin Call</u>").

(b) Notice delivered pursuant to (a) above may be given by any means.  Any notice given before 10:00 a.m. (New York City time) on a Business Day shall be met, and the related Margin Call satisfied, no later than 5:00 p.m. (New York City time) on such Business Day. Notice given on any Business Day after the applicable hour specified in the preceding sentence, shall be met, and the related Margin Call satisfied, no later than 5:00 p.m. (New York City time) on the following Business Day.  The failure of Purchaser, on any one or more occasions, to exercise its rights hereunder, shall not change or alter the terms and conditions to which this Agreement is subject or limit the right of Purchaser to do so at a later date.  Seller and Purchaser each agree that a failure or delay by Purchaser to exercise its rights hereunder shall not limit or waive Purchaser's rights under this Agreement or otherwise existing by law or in any way create additional rights for Seller.

(c) Any cash or Additional Mortgage Loans provided by Seller hereunder shall result in a reduction of the Adjusted Purchase Price of the related Uncovered Mortgage Loans.

Section 12.04          <u>Required Sale Event.</u>

If Seller fails to deliver such cash or Additional Mortgage Loans as provided in Section 12.03 (a) above, a "<u>Required Sale Event</u>" shall be deemed to have occurred with respect to such Uncovered Mortgage Loans.  In addition if the Settlement Date for any Mortgage Loan has not occurred within forty-five (45) days of the Closing Date (such time period to be extended by the Program Administrator, in its sole discretion in fifteen day intervals up to ninety (90) days) then a Required Sale Event shall be deemed to have occurred with respect to such Mortgage Loans. Furthermore, upon the occurrence and continuation of an Event of Default pursuant to Section 10.01, a Required Sale Event shall be deemed to have occurred with respect to all the Mortgage Loans covered by this Agreement.  Upon the occurrence of a Required Sale Event, Program Administrator may instruct Purchaser to forthwith sell, assign, give an option or options to purchase, contract to sell, or otherwise dispose of and deliver the related Mortgage Loans, or any part thereof, at such public or private sale or sales, at such place or places, at such price or prices and upon such other terms and conditions as Program Administrator may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Upon any sale, transfer or other disposition of the related Mortgage Loans pursuant hereto Purchaser shall have the right to deliver, assign and transfer to the transferee thereof the related Mortgage Loans so sold.  Each transferee upon any such transfer or other disposition shall hold the property thereby acquired by it absolutely free from any claim or right of any kind, including any equity

70

or rights of redemption, of Seller, who hereby specifically waives all rights of redemption, stay or appraisal which it has, or may have under any Requirement of Law whether now existing or hereafter adopted. Program Administrator and Purchaser shall incur no liability as a result of the sale of the related Mortgage Loans, or any part thereof, at any public or private sale. Seller hereby waives any claims against Program Administrator and Purchaser arising by reason of the fact that the price at which the related Mortgage Loans may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was such that the Purchaser sustained Losses, even if Program Administrator on behalf of Purchaser, accepts the first offer received and does not offer the related Mortgage Loans to more than one offeree. Seller acknowledges that the related Mortgage Loans may be sold in such manner to affiliates of Purchaser.

Section 12.05    RESERVED.

Section 12.06    Intent of Parties; Security Interest.

Purchaser and Seller confirm that the transactions contemplated hereby are intended to be true sales and absolute assignments of the Mortgage Loans by Seller to Purchaser rather than borrowings secured by the Mortgage Loans. Purchaser shall own the Mortgage Loans and have all rights and entitlements appurtenant thereto, including, without limitation, the right (subject only to any contractual obligations Purchaser may have assumed with respect to any Takeout Investor), to sell any Mortgage Loan to such third party, and on such terms, as it deems appropriate, to pledge its interest, to take over servicing any Mortgage Loan or replace Seller as the servicing agent with respect to any Mortgage Loan. Seller shall not take any action inconsistent with Purchaser's ownership of any Mortgage Loans and shall not claim any legal, beneficial or other interest in any Mortgage Loan. In the event that any Purchase hereunder is construed by any court or regulatory authority as a loan or other than a purchase and sale of the related Mortgage Loans, Seller shall be deemed to have hereby pledged to Purchaser as security for the performance by Seller of all of its obligations from time to time arising hereunder, and shall be deemed to have granted to Purchaser a first priority security interest in, the Mortgage Loans, the related records, all mortgage guaranties and insurance relating to such Mortgage Loans (issued by governmental agencies or otherwise) or the related Mortgaged Property and any mortgage insurance certificate or other document evidencing such mortgage guaranties or insurance relating to such Mortgage Loans and all claims and payments thereunder, any purchase agreements or other agreements or contracts relating to or constituting any or all of the foregoing, all "accounts" as defined in the Uniform Commercial Code relating to or constituting any or all of the foregoing, and any other contract rights, payment rights, rights to payment (including payment of interest or finance charges), and all instruments, chattel paper, securities, investment property and general intangibles and other assets comprising or relating to the Mortgage Loans, all other insurance policies and insurance proceeds relating to any Mortgage Loans or the related Mortgaged Property, any security account and all rights to income and the rights to enforce such payments arising from any of the Mortgage Loans, all servicing rights to the Mortgage Loans, all guarantees or other support for the Loans, and any and all replacements, substitutions, distributions on, or cash or non-cash proceeds with respect to, any of the foregoing (collectively, the "Collateral"). In furtherance of the foregoing, (i) this Agreement shall constitute a security agreement, (ii) Purchaser shall have all of the rights of a secured party with respect to the Collateral pursuant to applicable law and (iii) Seller shall execute all such

71

documents, including but not limited to financing statements under the Uniform Commercial Code as in effect in any applicable jurisdictions, as the Purchaser may reasonably require to effectively perfect and evidence Purchaser's first priority security interest in the Collateral. All filing fees incurred in connection with perfecting and evidencing Purchaser's first priority security interest in the Collateral shall be borne by Seller. If any such fees are advanced by Purchaser, they shall be reimbursed by Seller promptly upon presentation of an invoice and appropriate supporting documentation from Program Administrator. Seller shall indemnify and hold Purchaser harmless from any Losses that may arise in the event that the security interest referred in this Section 12.06 shall not be a security interest in the Collateral.

# EXHIBIT A
## Part 4

# ARTICLE XIII

## MISCELLANEOUS PROVISIONS

Section 13.01        Successor to the Servicer.

Prior to termination of Servicer's responsibilities and duties under this Agreement pursuant to Section 2.08 and 2.09 of Exhibit H, or 11.01 or 11.02 of this Agreement, the Purchaser or the Program Administrator shall (i) succeed to and assume all of the Servicer's responsibilities, rights, duties and obligations under this Agreement, or (ii) appoint a successor having the characteristics set forth in Section 9.02 hereof and which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of the Servicer under this Agreement prior to the termination of the Servicer's responsibilities, duties and liabilities under this Agreement. In connection with such appointment and assumption, the Purchaser may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as the Purchaser and such successor shall agree. In the event that the Servicer's duties, responsibilities and liabilities under this Agreement should be terminated pursuant to the aforementioned Sections, the Servicer shall discharge such duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof with the same degree of diligence and prudence which it is obligated to exercise under this Agreement, and shall take no action whatsoever that might impair or prejudice the rights or financial condition of its successor. The removal of the Servicer pursuant to the aforementioned Sections shall not become effective until a successor shall be appointed pursuant to this Section and shall in no event relieve the Servicer of the representations and warranties made pursuant to Section 3.01 and the indemnification obligations of the Servicer pursuant to Section 9.01.

Any successor appointed as provided herein shall execute, acknowledge and deliver to the Servicer and to the Purchaser or its designee an instrument accepting such appointment, whereupon such successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Servicer, with like effect as if originally named as a party to this Agreement. Any termination or resignation of the Servicer or this Agreement pursuant to Section 2.08 and 2.09 of Exhibit H, or 11.01 or 11.02 of this Agreement, shall not affect any claims that the Purchaser may have against the Servicer arising prior to any such termination or resignation.

The Servicer shall promptly deliver to the successor the funds in the Custodial Account and the Escrow Account and the Mortgage Files and related documents and statements held by it hereunder and the Servicer shall account for all funds. The Servicer shall execute and deliver such instruments and do such other things all as may reasonably be required to more fully and definitely vest and confirm in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Servicer. The successor shall make arrangements as it may deem appropriate to reimburse the Servicer for unrecovered Servicing Advances which the successor retains hereunder and which would otherwise have been recovered by the Servicer pursuant to this Agreement but for the appointment of the successor servicer.

Section 13.02          Amendment.

This Agreement may be amended or supplemented from time to time as follows: (a) with respect to Mortgage Loans not yet purchased by the Purchaser, by delivery of a written notification of amendment executed by the Purchaser and accepted in writing by the Program Administrator, which amendment shall be effective from and after the date delivered to the Purchaser for all subsequent Mortgage Loans purchased hereunder; and (b) with respect to Mortgage Loans previously purchased by the Purchaser, by written agreement executed by the Purchaser, the Seller and the Program Administrator.

Section 13.03          Recordation of Agreement.

To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any of all the Mortgaged Properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Seller at the Seller's expense on direction of the Program Administrator on behalf of the Purchaser.

Section 13.04          Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of law provisions, except to the extent preempted by Federal law. The obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 13.05          Notices.

Any demands, notices or other communications permitted or required hereunder shall be in writing and shall be deemed to have been given if personally delivered at or mailed by registered mail, postage prepaid, and return receipt requested or certified mail, return receipt requested, or transmitted by telex, telegraph or telecopier and confirmed by a similar mailed writing, to the address set forth below the related signature to this Agreement or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

Section 13.06          Severability of Provisions.

Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other

74

jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good faith, to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

Section 13.07    Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 13.08    General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(ii)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(iii)    references herein to "Articles," "Sections," Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(iv)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(v)    the words "herein," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(vi)    the term "include" or "including" shall mean without limitation by reason of enumeration; and

(vii)    headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

75

Section 13.09          <u>Reproduction of Documents.</u>

This Agreement and all documents relating thereto, including, without limitation, (i) consents, waivers and modifications which may hereafter be executed, (ii) documents received by any party at the closing, and (iii) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 13.10          <u>Confidentiality of Information.</u>

Each party recognizes that, in connection with this Agreement, it may become privy to non-public information regarding the financial condition, operations and prospects of the other party. Except as required by law, each party agrees to keep all non-public information regarding the other party strictly confidential, and to use all such information solely in order to effectuate the purpose of the Agreement, provided that each party may provide confidential information to its employees, agents and affiliates who have a need to know such information in order to effectuate the transaction, provided further that such information is identified as confidential non-public information. In addition, confidential information may be provided to a regulatory authority with supervisory power over the Purchaser, provided such information is identified as confidential non-public information.

Section 13.11          <u>Authority of Program Administrator to Direct.</u>

The Seller and Purchaser hereby grant to the Program Administrator the power to direct the custodian holding any Eligible Accounts to make transfers to and from such Eligible Accounts and to perform all of the Purchaser's duties and to act as Purchaser's designee for purposes of directing any actions needed to be taken by Purchaser to enforce Purchaser's rights under this Agreement.

Section 13.12          <u>Assignment by Purchaser.</u>

The Purchaser shall have the right, without the consent of the Seller or the Servicer hereof, to assign, in whole or in part, its interest under this Agreement with respect to some or all of the Mortgage Loans, and designate any person to exercise any rights of the Purchaser hereunder and the assignee or designee shall accede to the rights and obligations hereunder of the Purchaser with respect to such Mortgage Loans. The Seller agrees that all the representations and warranties set forth in Section 3.01 and Section 3.02 shall be automatically restated as of the date of the assignment or sale to the assignee without the need of any notice to or further action by the Purchaser, the Seller, the Servicer or any other party. All references to the Purchaser in this Agreement shall be deemed to include its assignee or designee.

Notwithstanding any provision in this Agreement to the contrary, the Purchaser may at its sole discretion without notice to or action by the Seller or the Servicer assign, delegate

76

or transfer to any third party the right to enforce any obligation of the Seller or the Servicer under this Agreement.

Section 13.13    No Partnership.

Nothing herein contained shall be deemed or construed to create a co-partnership or joint venture between the parties hereto and the services of the Servicer shall be rendered as an independent contractor and not as agent for Purchaser.

Section 13.14    Execution; Successors and Assigns.

This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement. Subject to Section 9.02, this Agreement shall inure to the benefit of and be binding upon the Seller, the Servicer and the Purchaser and their respective successors and assigns.

Section 13.15    Entire Agreement.

Each of the parties to this Agreement acknowledges that no representations, agreements or promises were made to any of the other parties to this Agreement or any of its employees other than those representations, agreements or promises specifically contained herein. This Agreement sets forth the entire understanding between the parties hereto and shall be binding upon all successors of all of the parties.

Section 13.16    No Solicitation.

From and after the Closing Date, the Seller agrees that it will not take any action or permit or cause any action to be taken by any of its agents or affiliates, or by any independent contractors on the Seller's behalf, to personally, by telephone, by mail, or electronically by e-mail or through the internet or otherwise, solicit the borrower or obligor under any Mortgage Loan to refinance the Mortgage Loan, in whole or in part, without the prior written consent of the Purchaser. It is understood and agreed that all rights and benefits relating to the solicitation of any Mortgagors to refinance any Mortgage Loans and the attendant rights, title and interest in and to the list of such Mortgagors and data relating to their Mortgages (including insurance renewal dates) shall be transferred to the Purchaser pursuant hereto on the Closing Date and the Seller shall take no action to undermine these rights and benefits. Notwithstanding the foregoing, it is understood and agreed that promotions undertaken by the Seller or any affiliate of the Seller which are directed to the general public at large, or segments thereof, provided that no segment shall consist primarily of the borrowers or obligors under the Mortgage Loans, including, without limitation, mass mailing based on commercially acquired mailing lists, newspaper, radio and television advertisements shall not constitute solicitation under this Section 13.16. This Section 13.16 shall not be deemed to preclude the Seller or any of its affiliates from soliciting any Mortgagor for any other financial products or services. The Seller shall use its best efforts to prevent the sale of the name of any Mortgagor to any Person who is not an affiliate of the Seller.

Section 13.17    MERS.

77

Purchaser reserves the right to require Seller to employ the Mortgage Electronic Registry System for the settlement of the acquisition and re-sale of Mortgage Loans hereunder.

Section 13.18    Time of the Essence.  Time is of the essence with regard to the performance of Seller's obligations under this Agreement.

Section 13.19    Power of Attorney.  By executing this Agreement, Seller is hereby granting to Purchaser a special power of attorney irrevocably making, constituting and appointing Purchaser as Seller's attorney-in-fact, with power and authority to act in Seller's name and on Seller's behalf to execute, acknowledge and swear to the execution, acknowledgment and filing of all instruments and documents governing the funding, transfer or assignment of any Mortgage Loans purchased by Purchaser hereunder, which shall include, but is not limited to, assignments of the Mortgage Notes, all documents required to execute repurchases of Mortgage Loans on behalf of the Purchaser in accordance with Article III and other provision hereunder and any other documents, or rights thereunder, transferred to Purchaser hereunder.  This power of attorney being granted by Seller is a special power of attorney coupled with an interest and is irrevocable.  It shall survive the dissolution of Seller and is limited to those matters herein set forth.  Seller is the payee on the Mortgage Note and the lender or creditor under applicable consumer credit law with respect to each Mortgage Loan.  If and to the extent, applicable consumer credit law disregards this characterization, Seller shall be deemed to be the exclusive agent for and on behalf of the Purchaser.

Section 13.20    Trustee Capacity of Owner Trustee.

Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered on behalf of the Purchaser by Delaware Trust Company, National Association, not individually or personally but solely in its trustee capacity, in the exercise of the powers and authority conferred and vested in it as "Owner Trustee" under the Amended and Restated Trust Instrument of the Terwin Mortgage Warehouse Trust II, dated as of March 3, 2005, between the Program Administrator and Delaware Trust Company, National Association, (b) each of the representations, undertakings and agreements herein made on the part of the Purchaser is made and intended not as personal representations, undertakings and agreements by the Owner Trustee but is made and intended for the purpose of binding only the Purchaser and (c) under no circumstances shall the Owner Trustee be personally liable for the payment of any indebtedness or expenses of the Purchaser or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Purchaser under this Agreement or the other related documents.

Section 13.21    Submission to Jurisdiction.

Each of the parties to this Agreement hereby irrevocably and unconditionally:

(a) submits for itself and its property in any legal action or proceeding relating to this Agreement or any amendment thereto, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York

sitting in the Borough of Manhattan, the federal courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

   (b) consents that any such action or proceeding may be brought in such courts and, to the extent permitted by law, waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

   (c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to its address set forth under the notice requirements in this Agreement; and

   (d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

IN WITNESS WHEREOF, the Seller, the Purchaser and the Program Administrator have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

TERWIN MORTGAGE WAREHOUSE TRUST II, SERIES VI, a series of Terwin Mortgage Warehouse Trust II, a Delaware statutory trust

By: Delaware Trust Company, National Association, not in its individual capacity, but solely as Owner Trustee

By_____

    Name:    Steven A. Finklea, CCTS
    Title:    Vice President

    Address:    300 Delaware Avenue, Suite 900
               Wilmington Delaware 19801
    Attention:    Steven Finklea

    Telephone:    (302) 552-3110
    Facsimile:    (302) 552-3129

FINANCIAL MORTGAGE, INC., AS SELLER

By_____

    Name:    Vijay Taneja
    Title:     President

    Address:    11211 Waples Mill Rd. #200
                   Fairfax, VA 22030
    Attention:

    Telephone:  (703) 691-0666 ext 304
    Facsimile:   (703) 691-2475


TERWIN WAREHOUSE MANAGEMENT LLC, AS
PROGRAM ADMINISTRATOR

By_____

    Name:    Thomas K. Guba
    Title:     President

    Address:    45 Rockefeller Plaza, Suite 420
                   New York, NY 10111
    Attention:  Chris Walcott

    Telephone:  (212) 218-5877
    Facsimile:   (212) 218-5875

Signature Page-2

## Exhibit A

Contents of Mortgage File

   With respect to each Mortgage Loan, the Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser, and which shall be retained by the Seller in the servicing file or delivered to the Purchaser or its designee pursuant to Sections 2.04 and 2.05 of the Seller's Purchase, Warranties and Servicing Agreement.

1. The original Mortgage Note endorsed "Pay to the order of _____ without recourse," and signed in the name of the Seller by an authorized officer, with all intervening endorsements showing a complete chain of title from the originator to the Seller.  If the Mortgage Loan was acquired by the Seller in a merger, the endorsement must be by "[Seller], successor by merger to the [name of predecessor]".  If the Mortgage Loan was acquired or originated by the Seller while doing business under another name, the endorsement must be by "[Seller] formerly known as [previous name]".  If the original note is unavailable, seller will provide an affidavit of lost note (in form acceptable to the Purchaser) stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note and indemnifying the Purchaser against any and all claims arising as a result of any person or entity claiming they are the holder of the note or that the note has been paid off and returned.

2. The original Mortgage, or a true certified copy.

3. The original or certified to be a true copy or if in electronic form identified on the Mortgage Loan Schedule, the certificate number, certified by the Seller, of the related Primary Mortgage Insurance Policy or LPMI Policy, if required.

4. In the case of each Mortgage Loan that is not a MERS Mortgage Loan, the original Assignment, from the Seller in accordance with Purchaser's instructions, which assignment shall, but for any blanks requested by the Purchaser, be in form and substance acceptable for recording.  If the Mortgage Loan was acquired or originated by the Seller while doing business under another name, the Assignment must be by "[Seller] formerly known as [previous name]".

5. With respect to Mortgage Loans that are not Co-op Loans, the original policy of title insurance, including riders and endorsements thereto, or if the policy has not yet been issued, a written commitment or interim binder or preliminary report of title issued by the title insurance or escrow company.

6. True certified copy of all intervening Assignments

7. True certified copy of each assumption, extension, modification, written assurance or substitution agreements, if applicable.

8. If the Mortgage Note or Mortgage or any other material document or instrument relating to the Mortgage Loan has been signed by a person on behalf of the Mortgagor, the original power of attorney or other instrument that authorized and empowered such person to sign bearing evidence that such instrument has been recorded, if so required in the appropriate

A-1

jurisdiction where the Mortgaged Property is located (or, in lieu thereof, a duplicate or conformed copy of such instrument, if applicable.

9. With respect to a Co-op Loan: (i) a copy of the Co-op Lease and the assignment of such Co-op Lease to the originator of the Mortgage Loan, with all intervening assignments showing a complete chain of title and an assignment thereof by Seller; (ii) the stock certificate together with an undated stock power relating to such stock certificate executed in blank; (iii) the recognition agreement in substantially the same form as standard a "AZTECH" form; (iv) copies of the financial statement filed by the originator as secured party and, if applicable, a filed UCC-3 Assignment of the subject security interest showing a complete chain of title, together with an executed UCC-3 Assignment of such security interest by the Seller in a form sufficient for filing if applicable.

10. The original of any guarantee executed in connection with the Mortgage Note if applicable.

11. The Forward Commitment, except with respect to each Uncovered Mortgage Loan.

12. Any other documents the Program Administrator may reasonably request at its sole discretion.

Notwithstanding anything to the contrary herein, the Seller may provide one certificate for all of the Mortgage Loans indicating that the requisite documents were delivered for recording.

With respect to each Mortgage Loan, the servicing file shall include each of the following items, which shall be available for inspection by the Purchaser:

1. Mortgage Loan closing statement (Form HUD-1) and any other truth-in-lending or real estate settlement procedure forms required by law.

2. Residential loan application.

3. Uniform underwriter and transmittal summary (Fannie Mae Form 1008) or reasonable equivalent.

4. Credit report on the mortgagor.

5. Business credit report, if applicable.

6. Residential appraisal report and attachments thereto.

7. Verification of employment and income except for Mortgage Loans originated under a Limited Documentation Program, all in accordance with Seller's Underwriting Standards.

8. Verification of acceptable evidence of source and amount of down payment, in accordance with Seller's underwriting guidelines.

A-2

9.      Photograph of the Mortgaged Property (may be part of appraisal).

10.     Survey of the Mortgaged Property, if any.

11.     Sales contract, if applicable.

12.     If available, termite report, structural engineer's report, water portability and septic certification.

13.     Any original security agreement, chattel mortgage or equivalent executed in connection with the Mortgage.

14.     Any ground lease, including all amendments, modifications and supplements thereto.

15.     Any other document required to service the Mortgage Loans.

A-3

## Exhibit B

Mortgage Schedule Required Data Fields

## Required Data Fields

| Data Field | Data Field |
|---|---|
| Originator Loan Number | Property Type (eg, SFR, 2nd) |
| Borrower Last Name | Documentation Type |
| Borrower First Name | Rate Type (eg, FX20) |
| Direct or Dry Funding | Amoritization Type (eg, Fixed, ARM) |
| Borrower Social Security Number | Balloon Note |
| Co-Borrower First Name | Piggy Back |
| Co-Borrower Last Name | Adjustable Rate Margin |
| Co-Borrower Social Security Number | Adjustment Frequency |
| Property Address | Payment Cap Annual |
| Property City | Rate Cap First |
| Property State | Rate Cap After First |
| Property Zip | Rate Max Lifetime |
| Property County | Negative Amoritization Limit |
| Note Amount | Appraiser Name |
| Funded Amount | Appraisal Type |
| Wire to Close Amount | Valuation Type |
| Top Off Amount | Valuation Date |
| Note Term | Refi Purpose |
| Note Rate | Prior Note Date |
| Note Date | Prior Sales Price |
| Wire Amount | Cash Out Amount |
| Takeout Investor | Gross Income |
| Takeout Price | Job Length |
| Takeout Commitment Expiration | Recurring Payment |
| Takeout Commitment Number | Debt Ratio 1 |
| Appraised Value | Mortgage Insurance Coverage |
| Sales Price | Closing Agent Name |

| | |
|---|---|
| Other Liens | Closing Agent Address |
| LTV | Closing Agent Account Number |
| CLTV | Closing Agent Account Name |
| Lien Position | Closing Agent Bank Name |
| Occupancy | Closing Agent Bank ABA |
| Credit Score | Closing Agent Further Credit Account Name |
| Seller | Closing Agent Further Credit Account Number |
| Builder | Closing Agent Further Credit Bank Name |
| Mortgage Insurance Co. | Closing Agent Further Credit Bank ABA |
| Mortgage Servicer | Wire Reference |
| Loan Type (eg, CCFIX20) | FHA/VA Case Number (if applicable) |
| Transaction Type (eg, P, R) | |

B-2

**Exhibit C**

RESERVED

**<u>Exhibit D</u>**

RESERVED

## **Exhibit E**

Form of Monthly Servicing Report

Servicer investor code
Servicer investor category
Servicer loan id
Sub-servicer loan id
Interest rate
Yield rate
Pending rate
Servicer fee rate
P&I payment amount
Scheduled beginning balance
Scheduled principal
Scheduled gross interest
Curtailment collected amount
Adjustment amount
Service fee amount
PIF principal
PIF Interest Difference
Scheduled net interest
Scheduled ending balance
_____ loan id
Actual beginning principal balance
Actual principal collected
Actual gross interest collected
Service fee collected
Actual net interest collected
Actual ending principal balance
Remittance amount
Pre-payment penalty amount
Due date
Actual paid date
PIF date
Last paid installment date
Next interest change date
Next P&I change date
Arm Index
Pend Index
Escrow balance
Escrow payment
Mortgage Insurance Certification Number
PMI Company Name

**<u>Exhibit F</u>**

Reserved

## Exhibit G

### Closing Agent Agreement

This agreement entered into by and between Terwin Mortgage Warehouse Trust II, Series VI, a series of Terwin Mortgage Warehouse Trust II, a Delaware statutory trust (the "Purchaser"),and _____ as ("Closing Agent") this _____ day of _____, 2004.

### RECITALS

     A.     Purchaser buys loans advanced for the purchase or refinance of real estate ("Loans") which Loans are to be secured by Mortgage/Deeds of Trust ("Mortgages") constituting first or second liens on the subject property and have been originated by _____ ("Originator").

     B.     Closing Agent closes the Loans, disburses Loan funds and delivers and records closing documents pursuant to written instructions. Closing Agent holds funds in trust for Purchaser pending the Loan closing, proper disbursement of Loan proceeds and proper delivery of closing documents. In the event a Loan closing does not occur, Loan proceeds must be immediately wired back to Purchaser and/or its custodian to the following account:

> Bank name: Wachovia
> Bank ABA: 053000219
> Account name: "Financial Mortgage Settlement Account"
> Account number: 2000021585531
> Reference: "Borrower Name, Loan Number, 'Funds returned from Closing Agent'"
>
> (The above reference MUST be attached to the wire in order to process the receipt of funds)

     NOW, THEREFORE, in consideration of the benefits accruing to Closing Agent hereunder, and as inducement to Purchaser to fund the Loans, Closing Agent agrees as follows:

     1)     Closing Agent shall close all of the Loans in compliance with applicable laws and regulations.

     2)     For all Mortgage Loans that are purchased by Purchaser, Closing Agent shall deliver the original Note, the original Allonge endorsed in blank, a fully executed original Assignment in recordable form, a copy of the Deed of Trust/Mortgage and the commitment for the Mortgage Title Policy (collectively, the "Initial Loan Documents"). All of the Submission Package Documents (as defined in the related Purchase Agreement) shall be delivered to Purchaser [within the Delivery Period or on the Closing Date, as applicable,] to:

> Wachovia Bank
> 4527 Metropolitan Court, Suite C
> Frederick, MD 21704
> ATTN: Edwin Aquino

Closing Agent shall hold the Initial Loan Documents, until delivered as set forth above, in trust for Purchaser.

3)    Any instructions given by the Originator which contradict the provisions of Paragraph 2 shall be disregarded unless the prior written consent of the Purchaser is obtained.

4)    This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed under the laws of the State of New York.  This Agreement shall insure to the benefit of and be binding on the respective successors and assignors of the parties hereto.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first above written.

PURCHASER:                              CLOSING AGENT:

Terwin Mortgage Warehouse Trust II,
Series VI, a series of Terwin Mortgage Warehouse
Trust II,  a Delaware statutory trust

By:_____            By:_____

Its:_____           Its:_____

G-2

**Exhibit H**

**Servicing Provisions**

**Attached**

# ARTICLE I

## ADMININISTRATION AND SERVICING OF THE MORTGAGE LOANS DURING THE INTERIM SERVICING PERIOD

Section 1.01          The Servicer to Act as Servicer.

The Servicer, as independent contract servicer, shall service and administer the Mortgage Loans in accordance with this Agreement and with Accepted Servicing Practices, and shall have full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable and consistent with the terms of this Agreement and with Accepted Servicing Practices. The Servicer shall service and administer the Mortgage Loans through the exercise of the same care that it customarily employs for its own account. Except as set forth in this Agreement, the Servicer shall service the Mortgage Loans in strict compliance with the servicing provisions of the Fannie Mae Guides (special servicing option), which include, but are not limited to, provisions regarding the liquidation of Mortgage Loans, the collection of Mortgage Loan payments, the payment of taxes, insurance and other charges, the maintenance of hazard insurance with a Qualified Insurer, the maintenance of mortgage impairment insurance, the maintenance of fidelity bond and errors and omissions insurance, inspections, the restoration of Mortgaged Property, the maintenance of Primary Mortgage Insurance Policies, insurance claims, the title, management of REO Property, permitted withdrawals with respect to REO Property, liquidation reports, and reports of foreclosures and abandonments of Mortgaged Property, the transfer of Mortgaged Property, the release of Mortgage Files, annual statements, and examination of records and facilities. In the event of any conflict, inconsistency or discrepancy between any of the servicing provisions of this Agreement and any of the servicing provisions of the Fannie Mae Guides, the provisions of this Agreement shall control and be binding upon the Purchaser and the Servicer.

Consistent with the terms of this Agreement, the Servicer may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of any such term or in any manner grant indulgence to any Mortgagor if in the Servicer's reasonable and prudent determination such waiver, modification, postponement or indulgence is not materially adverse to the Purchaser, provided, however, that unless the Servicer has obtained the prior written consent of the Purchaser, the Servicer shall not permit any modification with respect to any Mortgage Loan that would change the Mortgage Interest Rate, forgive the payment of principal or interest, reduce or increase the outstanding principal balance (except for actual payments of principal) or change the final maturity date on such Mortgage Loan. In the event of any such modification which has been agreed to in writing by the Purchaser and which permits the deferral of interest or principal payments on any Mortgage Loan, the Servicer shall, on the Business Day immediately preceding the Remittance Date in any month in which any such principal or interest payment has been deferred, deposit in the Custodial Account from its own funds, in accordance with Section 4.02, the difference between (a) the otherwise scheduled Monthly Payment and (b) the amount paid by the Mortgagor. The Servicer shall be entitled to reimbursement for such advances to the same extent as for all other advances pursuant to Section 4.02. Without limiting the generality of the foregoing, the Servicer shall continue, and is hereby

ARTICLE I-1

authorized and empowered, to prepare, execute and deliver, all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties. Notwithstanding anything herein to the contrary, the Servicer may not enter into a forbearance agreement or similar arrangement with respect to any Mortgage Loan which runs more than 180 days after the first delinquent Due Date. Any such agreement shall be approved by any applicable holder of a Primary Mortgage Insurance Policy, if required.

Unless a different time period is stated in this Agreement, the Purchaser shall be deemed to have given consent in connection with a particular matter if the Purchaser does not affirmatively grant or deny consent within five (5) Business Days from the date the Purchaser receives a second written request for consent for such matter from the Servicer.

The Servicer shall accurately and fully report its borrower credit files related to the Mortgage Loans to Equifax, Transunion and Experian in a timely manner.

Section 1.02    Collection of Mortgage Loan Payments.

Continuously from the date hereof until the date each Mortgage Loan ceases to be serviced subject to this Agreement, the Servicer will proceed diligently to collect all payments due under each Mortgage Loan when the same shall become due and payable and shall, to the extent such procedures shall be consistent with this Agreement, Accepted Servicing Practices, and the terms and provisions of related Primary Mortgage Insurance Policy or LPMI Policy, follow such collection procedures as it follows with respect to mortgage loans comparable to the Mortgage Loans and held for its own account. Further, the Servicer will take special care in ascertaining and estimating annual escrow payments, and all other charges that, as provided in the Mortgage, will become due and payable, so that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.

Section 1.03    Realization Upon Defaulted Mortgage Loans.

The Servicer shall use its best efforts, consistent with the procedures that the Servicer would use in servicing loans for its own account, consistent with Accepted Servicing Practices, any Primary Mortgage Insurance or LPMI Policies and the best interest of Purchaser, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 1.01 of this Exhibit. Foreclosure or comparable proceedings shall be initiated within one hundred twenty (120) days of default for Mortgaged Properties for which no satisfactory arrangements can be made for collection of delinquent payments. The Servicer shall use its best efforts to realize upon defaulted Mortgage Loans in such manner as will maximize the receipt of principal and interest by the Purchaser, taking into account, among other things, the timing of foreclosure proceedings. The foregoing is subject to the provisions that, in any case in which the Mortgaged Property shall have suffered damage, the Servicer shall not be required to expend its own funds toward the restoration of such property unless it shall determine in its discretion (i) that such restoration will increase the proceeds of liquidation of the related Mortgage Loan to the Purchaser after reimbursement to itself for such expenses, and (ii) that such expenses will be

ARTICLE I-2

recoverable by the Servicer through Insurance Proceeds or Liquidation Proceeds from the related Mortgaged Property, as contemplated in Section 4.02. The Servicer shall obtain prior approval of Purchaser as to restoration expenses in excess of one thousand dollars ($1,000). The Servicer shall notify the Purchaser in writing of the commencement of foreclosure proceedings and prior to the acceptance or rejection of any offer of reinstatement. The Servicer shall be responsible for all costs and expenses incurred by it in any such proceedings or functions; provided, however, that it shall be entitled to reimbursement thereof from the related property, as contemplated in Section 4.02. Notwithstanding anything to the contrary contained herein, in connection with a foreclosure or acceptance of a deed in lieu of foreclosure, in the event the Servicer has reasonable cause to believe that a Mortgaged Property is contaminated by hazardous or toxic substances or wastes, or if the Purchaser otherwise requests an environmental inspection or review of such Mortgaged Property, such an inspection or review is to be conducted by a qualified inspector at the Purchaser's expense. Upon completion of the inspection, the Servicer shall promptly provide the Purchaser with a written report of the environmental inspection. After reviewing the environmental inspection report, the Purchaser shall determine how the Servicer shall proceed with respect to the Mortgaged Property.

In the event that a Mortgage Loan becomes part of a REMIC, and becomes REO Property, such property shall be disposed of by the Servicer, with the consent of the Purchaser as required pursuant to this Agreement, within three (3) years after becoming an REO Property, unless the Servicer provides to the trustee under such REMIC an opinion of counsel to the effect that the holding of such REO Property subsequent to three years after its becoming REO Property, will not result in the imposition of taxes on "prohibited transactions" as defined in Section 860F of the Code, or cause the transaction to fail to qualify as a REMIC at any time that certificates are outstanding. The Servicer shall manage, conserve, protect and operate each such REO Property for the certificateholders solely for the purpose of its prompt disposition and sale in a manner which does not cause such property to fail to qualify as "foreclosure property" within the meaning of Section 860F(a)(2)(E) of the Code, or any "net income from foreclosure property" which is subject to taxation under the REMIC provisions of the Code. Pursuant to its efforts to sell such property, the Servicer shall either itself or through an agent selected by the Servicer, protect and conserve such property in the same manner and to such an extent as is customary in the locality where such property is located. Additionally, the Servicer shall perform the tax withholding and reporting related to Sections 1445 and 6050J of the Code.

<table>
<tr><td>Section 1.04</td><td>Payment of Taxes, Insurance and Charges; Maintenance of Primary Mortgage Insurance or LPMI Policies; Collections Thereunder.</td></tr>
</table>

With respect to each Mortgage Loan, the Servicer shall maintain accurate records reflecting the status of ground rents, taxes, assessments, water rates and other charges which are or may become a lien upon the Mortgaged Property and the status of primary mortgage insurance premiums and fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges, including renewal premiums and shall effect payment thereof prior to the applicable penalty or termination date and at a time appropriate for securing maximum discounts allowable, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Servicer in amounts sufficient for such purposes, as allowed under the terms of the Mortgage or applicable law. To the extent

ARTICLE I-3

that the Mortgage does not provide for Escrow Payments, the Servicer shall determine that any such payments are made by the Mortgagor at the time they first become due. The Servicer assumes full responsibility for the timely payment of all such bills and shall effect timely payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments and shall make advances from its own funds to effect such payments.

The Servicer will maintain in full force and effect Primary Mortgage Insurance Policies issued by a Qualified Insurer with respect to each first lien Mortgage Loan for which such coverage is herein required. Such coverage will be maintained until the Loan-to-Value ratio of the related Mortgage Loan is reduced to 80% or less in the case of a first lien Mortgage Loan having a Loan-to-Value Ratio at origination in excess of 80% or as required by state or federal law. The Servicer will not cancel or refuse to renew any Primary Mortgage Insurance Policy in effect on the Closing Date that is required to be kept in force under this Agreement unless a replacement Primary Mortgage Insurance Policy for such canceled or non-renewed policy is obtained from and maintained with a Qualified Insurer. The Servicer shall not take any action which would result in non-coverage under any applicable Primary Mortgage Insurance Policy of any loss which, but for the actions of the Servicer would have been covered thereunder. In connection with any assumption or substitution agreement entered into or to be entered into pursuant to Section 2.01 of this Exhibit, the Servicer shall promptly notify the insurer under the related Primary Mortgage Insurance Policy, if any, of such assumption or substitution of liability in accordance with the terms of such policy and shall take all actions which may be required by such insurer as a condition to the continuation of coverage under the Primary Mortgage Insurance Policy. If such Primary Mortgage Insurance Policy is terminated as a result of such assumption or substitution of liability, the Servicer shall obtain a replacement Primary Mortgage Insurance Policy as provided above.

In connection with its activities as servicer, the Servicer agrees to prepare and present, on behalf of itself and the Purchaser, claims to the insurer under any Primary Mortgage Insurance Policy or LPMI Policy in a timely fashion in accordance with the terms of such Primary Mortgage Insurance Policy or LPMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any Primary Mortgage Insurance Policy or LPMI Policy respecting a defaulted first lien Mortgage Loan. Pursuant to Section 4.02, any amounts collected by the Servicer under any Primary Mortgage Insurance Policy or LPMI Policy shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 4.02.

Section 1.05          Transfer of Accounts.

The Servicer may transfer a Custodial Account or an Escrow Account to a different Eligible Account from time to time. Such transfer shall be made only upon obtaining the prior written consent of the Purchaser, which consent will not be unreasonably withheld.

Section 1.06          Maintenance of Hazard Insurance.

The Servicer shall cause to be maintained for each Mortgage Loan fire and hazard insurance with extended coverage as is acceptable to Fannie Mae and Freddie Mac and customary in the area where the Mortgaged Property is located in an amount which is equal to

ARTICLE I-4

the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loan and (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan, and (b) an amount such that the proceeds thereof shall be sufficient to prevent the Mortgagor and/or the mortgagee from becoming a co-insurer. If required by the Flood Disaster Protection Act of 1973, as amended, each Mortgage Loan shall be covered by a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration in effect with an insurance carrier acceptable to Fannie Mae and/or Freddie Mac, in an amount representing coverage not less than the least of (i) the outstanding principal balance of the Mortgage Loan, (ii) the maximum insurable value of the improvements securing such Mortgage Loan and (iii) the maximum amount of insurance which is available under the Flood Disaster Protection Act of 1973, as amended. If at any time during the term of the Mortgage Loan, the Servicer determines in accordance with applicable law and pursuant to the Fannie Mae Guides that a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the Flood Disaster Protection Act of 1973, as amended, the Servicer shall notify the related Mortgagor that the Mortgagor must obtain such flood insurance coverage, and if said Mortgagor fails to obtain the required flood insurance coverage within forty-five (45) days after such notification, the Servicer shall immediately force place the required flood insurance on the Mortgagor's behalf. The Servicer shall also maintain on each REO Property, fire and hazard insurance with extended coverage in an amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, and, to the extent required and available under the Flood Disaster Protection Act of 1973, as amended, flood insurance in an amount as provided above. Any amounts collected by the Servicer under any such policies other than amounts to be deposited in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or REO Property, or released to the Mortgagor in accordance with Accepted Servicing Practices, shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 4.02. It is understood and agreed that no other additional insurance need be required by the Servicer or maintained on property acquired in respect of the Mortgage Loan, other than pursuant to this Agreement, the Fannie Mae Guides or such applicable state or federal laws and regulations as shall at any time be in force and as shall require such additional insurance. All such policies shall be endorsed with standard mortgagee clauses with loss payable to the Servicer and its successors and/or assigns and shall provide for at least thirty days prior written notice of any cancellation, reduction in the amount or material change in coverage to the Servicer. The Servicer shall not interfere with the Mortgagor's freedom of choice in selecting either his insurance carrier or agent, provided, however, that the Servicer shall not accept any such insurance policies from insurance companies unless such companies are Qualified Insurers.

Section 1.07          Maintenance of Mortgage Impairment Insurance Policy.

In the event that the Servicer shall obtain and maintain a blanket policy issued by an issuer acceptable to Fannie Mae and/or Freddie Mac insuring against hazard losses on all of the Mortgage Loans, then, to the extent such policy provides coverage in an amount equal to the amount required pursuant to Section 1.06 of this Exhibit and otherwise complies with all other requirements of Section 1.06 of this Exhibit, it shall conclusively be deemed to have satisfied its obligations as set forth in Section 1.06 of this Exhibit, it being understood and agreed that such policy may contain a deductible clause, in which case the Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property or REO Property a policy

ARTICLE I-5

complying with Section 1.06 of this Exhibit, and there shall have been a loss which would have been covered by such policy, deposit in the Custodial Account the amount not otherwise payable under the blanket policy because of such deductible clause. In connection with its activities as servicer of the Mortgage Loans, the Servicer agrees to prepare and present, on behalf of the Purchaser, claims under any such blanket policy in a timely fashion in accordance with the terms of such policy. Upon request of the Purchaser, the Servicer shall cause to be delivered to the Purchaser a certified true copy of such policy and shall use its best efforts to obtain a statement from the insurer thereunder that such policy shall in no event be terminated or materially modified without thirty (30) days' prior written notice to the Purchaser.

Section 1.08   <u>Maintenance of Fidelity Bond and Errors and Omissions<br>Insurance.</u>

The Servicer shall maintain, at its own expense, a blanket fidelity bond and an errors and omissions insurance policy, with broad coverage with responsible companies on all officers, employees or other persons acting in any capacity with regard to the Mortgage Loans to handle funds, money, documents and papers relating to the Mortgage Loans. The Fidelity Bond shall be in the form of a mortgage banker's blanket bond and shall protect and insure the Servicer against losses, including forgery, theft, embezzlement and fraud of such persons. The errors and omissions insurance shall protect and insure the Servicer against losses arising out of errors and omissions and negligent acts of such persons. Such errors and omissions insurance shall also protect and insure the Servicer against losses in connection with the failure to maintain any insurance policies required pursuant to this Agreement and the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby. No provision of this Section 1.08 requiring the Fidelity Bond or errors and omissions insurance shall diminish or relieve the Servicer from its duties and obligations as set forth in this Agreement. The minimum coverage under any such bond and insurance policy shall be at least equal to the corresponding amounts required by Fannie Mae in the Fannie Mae Guides or by Freddie Mac in the Freddie Mac Guides. The Servicer shall deliver to the Purchaser a certificate from the surety and the insurer as to the existence of the Fidelity Bond and errors and omissions insurance policy and shall obtain a statement from the surety and the insurer that such Fidelity Bond or insurance policy shall in no event be terminated or materially modified without thirty (30) days' prior written notice to the Purchaser. The Seller shall notify the Purchaser within five (5) business days of receipt of notice that such Fidelity Bond or insurance policy will be, or has been, materially modified or terminated. The Purchaser (or any party having the status of Purchaser hereunder) and any subsidiary thereof and their successors or assigns as their interests may appear must be named as loss payees on the Fidelity Bond and as additional insured on the errors and omissions policy. Upon request by the Purchaser, the Servicer shall provide the Purchaser with an insurance certificate certifying coverage under this Section 1.08, and will provide an update to such certificate upon request, or upon renewal or material modification of coverage.

Section 1.09   <u>Title, Management and Disposition of REO Property.</u>

In the event that title to the Mortgaged Property is acquired in foreclosure, by deed in lieu of foreclosure or other method resulting in full or partial satisfaction of the related Mortgage, the deed or certificate of sale shall be taken in the name of the Purchaser or its

ARTICLE I-6

designee, or in the event the Purchaser or its designee is not authorized or permitted to hold title to real property in the state where the REO Property is located, or would be adversely affected under the "doing business" or tax laws of such state by so holding title, the deed or certificate of sale shall be taken in the name of such Person or Persons as shall be consistent with an opinion of counsel obtained by the Servicer from an attorney duly licensed to practice law in the state where the REO Property is located. Any Person or Persons holding such title other than the Purchaser shall acknowledge in writing that such title is being held as nominee for the benefit of the Purchaser.

The Servicer shall notify the Purchaser in accordance with the Fannie Mae Guides of each acquisition of REO Property upon such acquisition, together with a copy of the drive by appraisal or brokers price opinion of the Mortgaged Property obtained in connection with such acquisition, and thereafter assume the responsibility for marketing such REO Property in accordance with Accepted Servicing Practices. Thereafter, the Servicer shall continue to provide certain administrative services to the Purchaser relating to such REO Property as set forth in this Section 1.09.

The Servicer shall, either itself or through an agent selected by the Servicer, and in accordance with the Fannie Mae Guides manage, conserve, protect and operate each REO Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property is managed. The Servicer shall cause each REO Property to be inspected promptly upon the acquisition of title thereto and shall cause each REO Property to be inspected at least monthly thereafter or more frequently as required by the circumstances. The Servicer shall make or cause to be made a written report of each such inspection. Such reports shall be retained in the Servicing File and copies thereof shall be forwarded by the Servicer to the Purchaser.

The Servicer shall use its best efforts to dispose of the REO Property as soon as possible and shall sell such REO Property in any event within three (3) years after title has been taken to such REO Property, unless the Servicer determines, and gives an appropriate notice to the Purchaser to such effect, that a longer period is necessary for the orderly liquidation of such REO Property. If a longer period than three (3) years is permitted under the foregoing sentence and is necessary to sell any REO Property, the Servicer shall report monthly to the Purchaser as to the progress being made in selling such REO Property. No REO Property shall be marketed for less than the appraised value, without the prior consent of the Purchaser. No REO Property shall be sold for less than ninety percent (90%) of its appraised value, without the prior consent of the Purchaser. If as of the date title to any REO Property was acquired by the Servicer there were outstanding unreimbursed Servicing Advances with respect to the REO Property, the Servicer shall be entitled to immediate reimbursement from the Purchaser for any related unreimbursed Servicing Advances. All requests for reimbursement of Servicing Advances shall be in accordance with the Fannie Mae Guides. The disposition of REO Property shall be carried out by the Servicer at such price, and upon such terms and conditions, as the Servicer deems to be in the best interests of the Purchaser. The Servicer shall provide monthly reports to Purchaser in reference to the status of the marketing of the REO Properties.

ARTICLE I-7

Notwithstanding anything to the contrary contained herein, the Purchaser may, at the Purchaser's sole option, terminate the Servicer as servicer of any such REO Property without payment of any termination fee with respect thereto, provided that the Servicer shall on the date said termination takes effect be reimbursed by withdrawal from the Custodial Account for any unreimbursed Servicing Advances in each case relating to the Mortgage Loan underlying such REO Property.

Section 1.10          Notification of Maturity Date.

With respect to each Mortgage Loan, the Servicer shall execute and deliver to the Mortgagor any and all necessary notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the maturity date if required under applicable law.

ARTICLE I-8

# EXHIBIT A
## Part 5

## ARTICLE II

## GENERAL SERVICING PROCEDURES

Section 2.01          Assumption Agreements.

The Servicer shall, to the extent it has knowledge of any conveyance or prospective conveyance by any Mortgagor of the Mortgaged Property (whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains or is to remain liable under the Mortgage Note and/or the Mortgage), exercise its rights to accelerate the maturity of such Mortgage Loan under any "due-on-sale" clause to the extent permitted by law; provided, however, that the Servicer shall not exercise any such rights if prohibited by law or the terms of the Mortgage Note from doing so or if the exercise of such rights would impair or threaten to impair any recovery under the related Primary Mortgage Insurance Policy, if any. If the Servicer reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause, the Servicer, with the approval of the Purchaser (such approval not to be unreasonably withheld), will enter into an assumption agreement with the person to whom the Mortgaged Property has been conveyed or is proposed to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, to the extent permitted by applicable state law, the Mortgagor remains liable thereon. If the Servicer is prohibited under applicable law from (a) entering into an assumption agreement with the Person to whom the Mortgaged Property has been conveyed or is proposed to be conveyed or (b) requiring the original Mortgagor to remain liable under the Mortgage Note, the Servicer, with the prior consent of the Purchaser and the primary mortgage insurer, if any, is authorized to enter into a substitution of liability agreement with the person to whom the Mortgaged Property has been conveyed or is proposed to be conveyed pursuant to which the original Mortgagor is released from liability and such Person is substituted as mortgagor and becomes liable under the related Mortgage Note. Any such substitution of liability agreement shall be in lieu of an assumption agreement. The Purchaser shall be deemed to have consented to any assumption for which the Purchaser was given notification and requested to consent, but for which neither a consent nor an objection was given by the Purchaser within two Business Days of such notification.

In connection with any such assumption or substitution of liability, the Servicer shall follow the underwriting practices and procedures of the Fannie Mae Guides. With respect to an assumption or substitution of liability, the Mortgage Interest Rate borne by the related Mortgage Note and the amount of the Monthly Payment may not be changed. If the credit of the proposed transferee does not meet such underwriting criteria, the Servicer diligently shall, to the extent permitted by the Mortgage or the Mortgage Note and by applicable law, accelerate the maturity of the Mortgage Loan. The Servicer shall notify the Purchaser that any such substitution of liability or assumption agreement has been completed by forwarding to the Purchaser the original of any such substitution of liability or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof. All fees collected by the Servicer for entering into an assumption or substitution of liability agreement shall belong to the Servicer.

ARTICLE II-1

Notwithstanding the foregoing paragraphs of this Section or any other provision of this Agreement, the Servicer shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Mortgage Loan by operation of law or any assumption which the Servicer may be restricted by law from preventing, for any reason whatsoever. For purposes of this Section 2.01, the term "assumption" is deemed to also include a sale of the Mortgaged Property subject to the Mortgage that is not accompanied by an assumption or substitution of liability agreement.

Section 2.02    Satisfaction of Mortgages and Release of Mortgage Files.

Upon the payment in full of any Mortgage Loan, or the receipt by the Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Servicer will immediately notify the Purchaser by a certification, which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Custodial Account pursuant to Section 4.02 have been or will be so deposited, of a Servicing Officer and shall request delivery to it of the portion of the Mortgage File held by the Purchaser. The Purchaser shall no later than five (5) Business Days after receipt of such certification and request, release or cause to be released to the Servicer, the related Mortgage Loan Documents and, upon its receipt of such documents, the Servicer shall promptly prepare and deliver to the Purchaser the requisite satisfaction or release. No later than three (3) Business Days following its receipt of such satisfaction or release, the Purchaser shall deliver, or cause to be delivered, to the Servicer the release or satisfaction properly executed by the owner of record of the applicable Mortgage or its duly appointed attorney in fact. No expense incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Custodial Account.

In the event the Servicer satisfies or releases a Mortgage without having obtained payment in full of the indebtedness secured by the Mortgage or should it otherwise prejudice any right the Purchaser may have under the Mortgage Loan Documents, the Servicer, upon written demand, shall remit within two (2) Business Days to the Purchaser the then outstanding principal balance of the related Mortgage Loan by deposit thereof in the Custodial Account.

From time to time and as appropriate for the servicing or foreclosure of the Mortgage Loans, including for the purpose of collection under any Primary Mortgage Insurance Policy, the Purchaser shall, upon request of the Servicer and delivery to the Purchaser of a servicing receipt signed by a Servicing Officer, release the portion of the Mortgage File held by the Purchaser to the Servicer. Such servicing receipt shall obligate the Servicer to return such Mortgage Loan Documents to the Purchaser when the need therefor by the Servicer no longer exists, unless the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Custodial Account or the Mortgage File has been delivered to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Servicer has delivered to the Purchaser a certificate of a Servicing Officer certifying as to the name and address of the Person to which such Mortgage File was delivered and the purpose or purposes of such delivery. Upon receipt of a certificate of a Servicing Officer stating that such Mortgage Loan was liquidated, the servicing receipt shall be released by the Purchaser to the Servicer. The Servicer shall indemnify

ARTICLE II-2

the Purchaser, and its designee, from and against any and all losses, claims, damages, penalties, fines, forfeitures, costs and expenses (including court costs and reasonable attorney's fees) resulting from or related to the loss, damage or misplacement of any documentation delivered to the Servicer pursuant to this paragraph.

Section 2.03          Servicing Compensation.

As compensation for its services hereunder, the Servicer shall be entitled to assumption fees, as provided in Section 2.01 of this Exhibit, and late payment charges or otherwise shall be retained by the Servicer to the extent not required to be deposited in the Custodial Account.  The Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement therefor except as specifically provided for.

Section 2.04          Annual Statement as to Compliance.

The Servicer will deliver to the Purchaser as of March 31 of each year, beginning with 200_, an Officers' Certificate stating, as to each signatory thereof, that (i) a review of the activities of the Servicer during the preceding calendar year and of performance under this Agreement has been made under such officers' supervision, and (ii) to the best of such officers' knowledge, based on such review, the Servicer has fulfilled all of its obligations under this Agreement throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officers and the nature and status thereof. Copies of such statement shall be provided by the Servicer to the Purchaser upon request.

Section 2.05          Annual Independent Certified Public Accountants'
                      Servicing Report.

Within one hundred twenty (120) days after the end of the Servicer's fiscal year, beginning in its 2005 fiscal year, the Servicer at its expense shall cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Purchaser to the effect that such firm has examined certain documents and records relating to the Servicer's servicing of mortgage loans of the same type as the Mortgage Loans pursuant to servicing agreements substantially similar to this Agreement, which agreements may include this Agreement, and that, on the basis of such an examination, conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers or the Audit Guide for HUD Approved Title II Approved Mortgagees and Loan Correspondent Programs, such firm is of the opinion that the Servicer's servicing has been conducted in compliance with the agreements examined pursuant to this Section 2.05, except for (i) such exceptions as such firm shall believe to be immaterial, and (ii) such other exceptions as shall be set forth in such statement.  Copies of such statement shall be provided by the Servicer to the Purchaser.  In addition, on an annual basis, the Servicer shall provide the Purchaser with copies of its audited financial statements upon execution by the Purchaser of an agreement to keep confidential the contents of such financial statements.

ARTICLE II-3

Section 2.06          <u>Purchaser's Right to Examine Servicer Records.</u>

The Purchaser shall have the right to examine and audit upon reasonable notice to the Servicer, during business hours or at such other times as might be reasonable under applicable circumstances, any and all of the books, records, documentation or other information of the Servicer, or held by another for the Servicer or on its behalf or otherwise, which relates to the performance or observance by the Servicer of the terms, covenants or conditions of this Agreement.

The Servicer shall provide to the Purchaser and any supervisory agents or examiners representing a state or federal governmental agency having jurisdiction over the Purchaser, including but not limited to OTS, FDIC and other similar entities, access to any documentation regarding the Mortgage Loans in the possession of the Servicer which may be required by any applicable regulations. Such access shall be afforded without charge, upon reasonable request, during normal business hours and at the offices of the Servicer, and in accordance with the federal government, FDIC, OTS, or any other similar regulations.

Section 2.07          <u>Servicer Shall Provide Information as Reasonably Required.</u>

The Seller shall furnish to the Purchaser during the term of this Agreement, at the Servicer's expense, such periodic, special or other reports, information or documentation, whether or not provided for herein, as shall be necessary, reasonable or appropriate in respect to the Purchaser, or otherwise in respect to the Mortgage Loans and the performance of the Servicer under this Agreement, including any reports, information or documentation reasonably required to comply with any regulations regarding any supervisory agents or examiners of the Purchaser all such reports or information to be as provided by and in accordance with such applicable instructions and directions as the Purchaser may reasonably request in relation to this Agreement or the performance of the Servicer under this Agreement. The Servicer agrees to execute and deliver all such instruments and take all such action as the Purchaser, from time to time, may reasonably request in order to effectuate the purpose and to carry out the terms of this Agreement.

In connection with marketing the Mortgage Loans, the Purchaser may make available to a prospective purchaser audited financial statements of the Seller and the Servicer for the most recently completed two (2) fiscal years for which such statements are available, as well as a consolidated statement of condition at the end of the last two (2) fiscal years covered by any consolidated statement of operations. If it has not already done so, the Seller and the Servicer shall furnish promptly to the Purchaser or a prospective purchaser copies of the statements specified above; provided, however, that prior to furnishing such statements or information to any prospective purchaser, the Seller and the Servicer may require such prospective purchaser to execute a confidentiality agreement in a form satisfactory to the Seller or Servicer, as applicable.

The Servicer shall make reasonably available to the Purchaser or any prospective purchaser a knowledgeable financial or accounting officer for the purpose of answering questions and to permit any prospective purchaser to inspect the Servicer's servicing facilities for

ARTICLE II-4

the purpose of satisfying such prospective purchaser that the Servicer has the ability to service the Mortgage Loans as provided in this Agreement.

The Servicer shall maintain with respect to each Mortgage Loan and shall make available for inspection by the Purchaser or its designee the related servicing file during the time the Purchaser retains ownership of a Mortgage Loan and thereafter in accordance with applicable laws and regulations.

Section 2.08          Servicer Not to Resign.

The Servicer shall not resign from the obligations and duties hereby imposed on it except by mutual consent of the Servicer and the Purchaser or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Servicer. Any such determination permitting the resignation of the Servicer shall be evidenced by an Opinion of Counsel to such effect delivered to the Purchaser which Opinion of Counsel shall be in form and substance acceptable to the Purchaser. No such resignation shall become effective until a successor shall have assumed the Servicer's responsibilities and obligations hereunder.

Section 2.09          No Transfer of Servicing.

With respect to the retention of the Servicer to service the Mortgage Loans hereunder, the Servicer acknowledges that the Purchaser has acted in reliance upon the Servicer's independent status, the adequacy of its servicing facilities, plan, personnel, records and procedures, its integrity, reputation and financial standing and the continuance thereof. Without in any way limiting the generality of this Section 2.09, the Servicer shall not either assign this Agreement or the servicing hereunder or delegate its rights or duties hereunder or any portion thereof, or sell or otherwise dispose of all or substantially all of its property or assets, without the prior written approval of the Purchaser, which consent shall be granted or withheld in the Purchaser's sole discretion.

Without in any way limiting the generality of this Section 2.09, in the event that the Servicer either shall assign this Agreement or the servicing responsibilities hereunder or delegate its duties hereunder or any portion thereof without the prior written consent of the Purchaser, then the Purchaser shall have the right to terminate the Servicer, without any payment of any penalty or damages and without any liability whatsoever to the Servicer (other than with respect to accrued but unpaid Servicing Advances remaining unpaid) or any third party.

ARTICLE III

SERVICING TRANSFER

Section 3.01          Transfer.

On the Servicing Transfer Date, the Purchaser, or its designee, shall assume all servicing responsibilities related to, and the Servicer shall cease all servicing responsibilities related to, the Mortgage Loans.  On or prior to the Servicing Transfer Date (or in the case of (c), (d) and (e) below, within five (5) Business Days from and after the Servicing Transfer Date), the Servicer shall take such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the Mortgage Loans to the Purchaser, or its designee, including but not limited to the following:

(a) Notice to Mortgagors.  The Servicer shall mail to each Mortgagor a letter advising the Mortgagor of the transfer of the servicing of the related Mortgage Loan to the Purchaser, or its designee, in accordance with the Real Estate Settlement Procedures Act, Regulation X and other applicable laws and regulations; provided, however, the content and format of the letter in a standard form shall have the prior approval of the Purchaser.  The Servicer shall provide the Purchaser with copies of all such related notices no later than fifteen (15) days from and after the Servicing Transfer Date;

(b) Notice to Taxing Authorities and Insurance Companies.  The Servicer shall transmit to the applicable taxing authorities and insurance companies (including Private Mortgage Insurance Policy insurers, if applicable) and/or agents, notification of the transfer of the servicing to the Purchaser, or its designee, and instructions to deliver all notices, tax bills and insurance statements, as the case may be, to the Purchaser, or its designee, from and after the Servicing Transfer Date and each assignable tax service contract shall be assigned to the Purchaser, or its designee, on the Servicing Transfer Date.  The Servicer shall provide the Purchaser, or its designee, with an Officers' Certificate of a Servicing Officer, confirming that all such notices have been transmitted, together with a copy of the related standard form(s) of such notifications no later than the Servicing Transfer Date;

(c) Delivery of Servicing Records.  The Servicer shall forward to the Purchaser, or its designee, all servicing records and the servicing files in the Servicer's possession relating to each transferring Mortgage Loan, and shall make available to the Purchaser, or its designee, during normal business hours, any such records;

(d) Escrow Payments.  The Servicer shall provide the Purchaser, or its designee, with immediately available funds by wire transfer in the amount of the Escrow Payments and suspense balances and all loss draft balances associated with the Mortgage Loans.  The Servicer shall provide the Purchaser, or its designee, with an accounting statement of Escrow Payments and suspense balances and loss draft balances sufficient to enable the Purchaser, or its designee, to reconcile the amount of such payment with the accounts of the Mortgage Loans.  Additionally, the Servicer shall wire transfer to the Purchaser the amount of any prepaid transferring Mortgage Loan payments and all other similar amounts held by the Servicer;

ARTICLE III-1

(e) <u>Mortgage Payments Received Prior to Servicing Transfer Date</u>. Prior to the Servicing Transfer Date all payments received by the Servicer on each Mortgage Loan shall be properly applied by the Servicer to the account of the particular Mortgagor;

(f) <u>Mortgage Payments Received After Servicing Transfer Date</u>. The amount of any Monthly Payments for the Mortgage Loans received by the Servicer after the Servicing Transfer Date shall be forwarded to the Purchaser or its designee by wire transfer or overnight mail within two (2) Business Days of receipt; provided, however, that any such Monthly Payments received by the Servicer more than thirty (30) days after the Servicing Transfer Date shall be forwarded by the Servicer to the Purchaser or its designee by wire transfer or regular mail within three (3) Business Days of receipt. The Servicer shall notify the Purchaser or its designee of the particulars of the payment, such as the account number, dollar amount, date received and any special Mortgagor application instructions with respect to such Monthly Payments received by the Servicer;

(g) <u>Misapplied Payments</u>. Misapplied payments on Mortgage Loans shall be processed as follows: (i) all parties shall cooperate in correcting misapplication errors; (ii) the party receiving notice of a misapplied payment occurring prior to the Servicing Transfer Date and discovered after the Servicing Transfer Date shall immediately notify the other party; (iii) if a misapplied payment which occurred prior to the Servicing Transfer Date cannot be identified and said misapplied payment has resulted in a shortage in a Custodial Account or Escrow Account, the Servicer shall be liable for the amount of such shortage. The Servicer shall reimburse the Purchaser for the amount of such shortage within thirty (30) days after receipt of written demand therefor from the Purchaser; (iv) if a misapplied payment which occurred prior to the Servicing Transfer Date has created an improper <u>Purchase Price</u> as the result of an inaccurate outstanding principal balance, the party with notice of such misapplied payment shall promptly inform the other party and a wire transfer or a check shall be issued to the party shorted by the improper payment application within ten (10) Business Days after notice thereof by the other party; and (v) any wire transfer or check issued under the provisions of this Section 3.01(g) shall be accompanied by a statement indicating the corresponding Servicer and/or Purchaser Mortgage Loan identification number and an explanation of the allocation of any such payments;

(h) <u>Books and Records</u>. On the Servicing Transfer Date, the books, records and accounts of the Servicer with respect to the servicing of the Mortgage Loans shall be maintained in accordance with Accepted Servicing Practices;

(i) <u>Reconciliation</u>. The Servicer shall, on or before the Servicing Transfer Date, reconcile principal balances and make any monetary adjustments for the Mortgage Loans as agreed to by the Servicer and the Purchaser. Any such monetary adjustments will be transferred between the Servicer and the Purchaser as appropriate;

(j) <u>IRS Forms</u>. The Servicer shall file all IRS Forms 1099, 1099A, 1098 or 1041 and K-1 which are required to be filed on or before the Servicing Transfer Date in relation to the servicing and ownership of the Mortgage Loans. The Servicer shall provide copies of such forms to the Purchaser upon reasonable request and shall reimburse the Purchaser for any penalties or reasonable costs incurred by the Purchaser due to the Servicer's failure to comply with this paragraph;

ARTICLE III-2

(k) Insurance Premiums.  The Servicer shall pay all hazard and flood insurance premiums and Primary Mortgage Insurance Policy premiums, due within thirty (30) days after the Servicing Transfer Date, provided that the Servicer has received bills for insurance premiums at least fourteen (14) days prior to the Servicing Transfer Date; and

(l) Property Taxes.  The Servicer shall pay all tax bills (including interest, late charges and penalties in connection therewith) due within thirty (30) days after the Servicing Transfer Date, provided that the Servicer or its tax service provider has received bills for taxes from a taxing authority at least fourteen (14) days prior to the Servicing Transfer Date.

Section 3.02    Additional Obligations.

(a) Insurance Policies.  For ninety (90) days after the Servicing Transfer Date, the Servicer shall deliver such insurance policies or renewals and invoices as it may receive with respect to the Mortgage Loans to the Purchaser or its designee within ten (10) Business Days of its receipt of same, thereafter the Servicer shall exercise reasonable efforts to deliver such insurance policies or renewals and invoices as it may receive with respect to the Mortgage Loans to the Purchaser or its designee within a reasonable time of its receipt of same.

(b) Property Taxes.  For ninety (90) days after the Servicing Transfer Date, the Servicer shall deliver such tax bills as it may receive with respect to the Mortgage Loans to the Purchaser or its designee within ten (10) Business Days of its receipt of same, thereafter the Servicer shall exercise reasonable efforts to deliver such tax bills as it may receive with respect to the Mortgage Loans to the Purchaser within a reasonable time of its receipt of same.

(c) Escrow Analysis.  If a Mortgage Loan was originated more than twelve (12) months prior to the Servicing Transfer Date, then the Servicer shall conduct such escrow analyses with respect to such Mortgage Loan as may be required under applicable law.  With respect to any such Mortgage Loan, any adjustment to the escrow payment due, refunds of escrow overages and collections of escrow shortages shall have been made in accordance with applicable law prior to the Servicing Transfer Date.

**EXHIBIT I**

Seller Specific Provisions

**Applicable Percentage:** 50%

**Applicable Rate:**

|  | 1-45 days | 46-60 days | 61-75 days | 75 + days |
|---|---|---|---|---|
| 1st Lien | 2.35 bps | 2.60 bps | 2.85 bps | 3.35 bps |
| 2nd Lien | 2.60 bps | 2.85 bps | 3.10 bps | 3.60 bps |
| Heloc | 2.85 bps | 3.10 bps | 3.35 bps | 3.85 bps |

During an Event of Default or Correspondent Trigger Event, this rate shall increase by 300 basis points.

**Approved Takeout Investors**

|  | Investor Name | Code |
|---|---|---|
| 1 | ABN Amro | AMRO |
| 2 | American General | AMGN |
| 3 | Bank of America | BOA |
| 4 | Bank One | BONE |
| 5 | Bear Stearns | BEAR |
| 6 | Branch Bank and Trust | BBT |
| 7 | Chevy Chase Bank | CCHM |
| 8 | Citibank | CITIBK |
| 9 | Commerical Federal Bank | CFMC |
| 10 | Countrywide Home Loans | CWFC |
| 11 | Credit Suisse First Boston | CSFB |
| 12 | Deutsche Bank | DEUT |
| 13 | E-Trade | ETRADE |
| 14 | Fannie Mae | FNMA |
| 15 | First Nationwide | FNWD |
| 16 | First Tennessee | FTENN |
| 17 | First Union | FUMC |
| 18 | Flagstar | FLAG |
| 19 | Freddie Mac | FHLMC |
| 20 | GE Capital | GECM |
| 21 | GMAC | GMAC |
| 22 | Goldman Sachs | GOLD |
| 23 | Green Point Savings Bank | GREEN |

I-1

| 24 | Guaranty Bank | GUAR |
| 25 | Homeside Lending | HOME |
| 26 | Homestar | HSTAR |
| 27 | HSBC | HSBC |
| 28 | Impac | IMPA |
| 29 | IndyMac | INDY |
| 30 | JP Morgan Chase | JPMC |
| 31 | KeyCorp | KEY |
| 32 | Lehman Brothers | LEHB |
| 33 | M&T Bank | M&T |
| 34 | Merrill Lynch | MERR |
| 35 | National City Bank | NCB |
| 36 | Nomura Securities | NOMU |
| 37 | Ohio Savings Bank | OHIO |
| 38 | Popular | POP |
| 39 | Principal Residential | PRIN |
| 40 | Provident Funding | PROV |
| 41 | RBMG | RBMG |
| 42 | Regions Financial | REG |
| 43 | Saxon Mortgage | SAX |
| 44 | Suntrust Bank | SUNT |
| 45 | Temple Inland | TEMP |
| 46 | Thonrburg Mortgage | TBMI |
| 47 | UBS Paine Webber | UBS |
| 48 | US Bank | USB |
| 49 | Union Federal | UNION |
| 51 | Vinning Sparks | VINNING |
| 52 | Washington Mutual Bank | WAMU |
| 53 | Wells Fargo Bank | WELLS |
| 54 | Winter Group (The) | TWG |
| 55 | WMC Mortgage Corp | WMC |

**Available Amount**: $15,000,000

**Cut-off Date**: Date that Purchaser purchases the loan

**Commitment Fee**: $15,000

**Security Deposit Amount**: 1% of the Maximum Purchase Amount

**[Delivery Period**: five (5) Business Days after the Closing Date]

**Ownership**:  Financial Mortgage, Inc.

**Financial Covenants:**

| Tangible Net Worth | $1,600,000 |
| Leverage Ratio | 15:1 |

I-2

Put Back Loan Ratio          4%

Takeout Commitment Ratio for Seller Trigger Event     80%

Takeout Commitment Ratio for Event of Default     90%

**Required Insurance Amount:** $300,000

**Maximum Purchase Amount:** $ 15,000,000

**Seller Concentration Sublimits:**

Dry Funding:          100%

Closing Agent Funding      100%

Warehouse Funding       100%

| Loan Type | Sub-Limits as a Percentage of all Mortgage Loans |
|---|---|
| No Fico | 4% |
| Fico less than or equal to 549 | 5% |
| Fico between 550 and 619 | 10% |
| Fico greater than 619 | 100% |
| Co-op Mortgage | 25% |
| Condominium | 50% |
| Conforming Mortgage | 100% |
| Non-owner Occupied | 25% |
| Second Liens | 45% |
| CLTV greater than 95% | 25% |
| CLTV greater than 95% with Fico less than 620 | 2.25% |
| Market Value less than 98% | 10% |
| Market Value 98% or greater | 100% |
| Principal balance $1 million or less | 100% |
| Principal Balance greater than $1 million | 25% |
| Wet Funding | 37.5% |

**Uncommitted Availability:** 20% of the Available Amount

I-3

**<u>Shortfall Premium:</u>** 0.25% per annum

## EXHIBIT J

### Administrative Costs

All usual and customary costs and expenses incurred by the Purchaser, in connection with processing, administering and settling of Mortgage Loans, currently including, without limitation:

(a)   An internal allocation for processing expense of $35 per dry Mortgage Loan, $45 per Wet Funding Mortgage Loan;

(b)   $15 wire transfer fee for each Mortgage Loan acquired by Purchaser;

(c)   $25 internal allocation for processing files that are deficient in presentation and require correction;

(d)   $100 internal allocation for time and materials associated with re-processing defective Mortgage Loans;

(e)   messenger and overnight courier fees at cost;

(f)   the usual and customary fees and charges of Purchaser's designee in connection with the settlement of Mortgage Loans, if not otherwise included in items, if any, (a) through (d) above;

(g)   any third party due diligence expenses;

(h)   For Wet Funding Mortgage Loans, if the Seller does not deliver the Submission Package within the Delivery Period, $50 per day will be charged until the Custodian receives the Submission Package; and

(i)   $25 for each Exception (as defined at the Program Administrator's sole discretion)

J-1

## EXHIBIT K

### Submission Package Documents

With respect to each Mortgage Loan, the Submission Package Documents shall include each of the following items, which shall be available for inspection by the Purchaser, and which shall be retained by the Seller in the servicing file or delivered to the Purchaser or its designee pursuant to Sections 2.04 and 2.05 of the Seller's Purchase, Warranties and Servicing Agreement.

1.  The original Mortgage Note endorsed "Pay to the order of _____ without recourse," and signed in the name of the Seller by an authorized officer, with all intervening endorsements showing a complete chain of title from the originator to the Seller. If the Mortgage Loan was acquired by the Seller in a merger, the endorsement must be by "[Seller], successor by merger to the [name of predecessor]". If the Mortgage Loan was acquired or originated by the Seller while doing business under another name, the endorsement must be by "[Seller] formerly known as [previous name]". If the original note is unavailable, seller will provide an affidavit of lost note (in form acceptable to the Purchaser) stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note and indemnifying the Purchaser against any and all claims arising as a result of any person or entity claiming they are the holder of the note or that the note has been paid off and returned.

2.  The original Mortgage, or a true certified copy.

3.  The original or certified to be a true copy or if in electronic form identified on the Mortgage Loan Schedule, the certificate number, certified by the Seller, of the related Primary Mortgage Insurance Policy or LPMI Policy, if required.

4.  In the case of each Mortgage Loan that is not a MERS Mortgage Loan, the original Assignment, from the Seller in accordance with Purchaser's instructions, which assignment shall, but for any blanks requested by the Purchaser, be in form and substance acceptable for recording. If the Mortgage Loan was acquired or originated by the Seller while doing business under another name, the Assignment must be by "[Seller] formerly known as [previous name]".

5.  With respect to Mortgage Loans that are not Co-op Loans, the original policy of title insurance, including riders and endorsements thereto, or if the policy has not yet been issued, a written commitment or interim binder or preliminary report of title issued by the title insurance or escrow company.

6.  True certified copy of all intervening Assignments.

7.  True certified copy of each assumption, extension, modification, written assurance or substitution agreements, if applicable.

8.  If the Mortgage Note or Mortgage or any other material document or instrument relating to the Mortgage Loan has been signed by a person on behalf of the Mortgagor, the original power of attorney or other instrument that authorized and empowered such person to sign

bearing evidence that such instrument has been recorded, if so required in the appropriate jurisdiction where the Mortgaged Property is located (or, in lieu thereof, a duplicate or conformed copy of such instrument, if applicable.

9. With respect to a Co-op Loan: (i) a copy of the Co-op Lease and the assignment of such Co-op Lease to the originator of the Mortgage Loan, with all intervening assignments showing a complete chain of title and an assignment thereof by Seller; (ii) the stock certificate together with an undated stock power relating to such stock certificate executed in blank; (iii) the recognition agreement in substantially the same form as standard a "AZTECH" form; (iv) copies of the financial statement filed by the originator as secured party and, if applicable, a filed UCC-3 Assignment of the subject security interest showing a complete chain of title, together with an executed UCC-3 Assignment of such security interest by the Seller in a form sufficient for filing if applicable.

10. The original of any guarantee executed in connection with the Mortgage Note if applicable.

11. The Forward Commitment, except with respect to each Uncovered Mortgage Loan.

12. The Warehouse Lender's Release.

13. Any other documents the Program Administrator may reasonably request at its sole discretion.

Notwithstanding anything to the contrary herein, the Seller may provide one certificate for all of the Mortgage Loans indicating that the requisite documents were delivered for recording.

K-2

**EXHIBIT L**

Form of Escrow Instruction Letter

This agreement entered into by and between Terwin Mortgage Warehouse Trust II, Series VI, a series of Terwin Mortgage Warehouse Trust II, a Delaware statutory trust, (the "Purchaser") and _____ as ("Closing Agent") this _____ day of _____, 2004.

**RECITALS**

     A.     Purchaser buys loans advanced for the purchase or refinance of real estate ("Loans") which Loans are to be secured by Mortgage/Deeds of Trust ("Mortgages") constituting first or second liens on the subject property and have been originated by Financial Mortgage, Inc.

     B.     Closing Agent closes the Loans, disburses Loan funds and delivers and records closing documents pursuant to written instructions. Closing Agent holds funds in trust for Purchaser pending the Loan closing, proper disbursement of Loan proceeds and proper delivery of closing documents. In the event a Loan closing does not occur, Loan proceeds must be immediately wired back to Purchaser and/or its custodian.

     NOW, THEREFORE, in consideration of the benefits accruing to Closing Agent hereunder, and as inducement to Purchaser to fund the Loans, Closing Agent agrees as follows:

     1)     Closing Agent shall close all of the Loans in compliance with applicable laws and regulations.

     2)     For all Mortgage Loans that are Purchased by Purchaser, Closing Agent shall deliver the original Note, the original Allonge endorsed in blank, a fully executed original Assignment in recordable form, a copy of the Deed of Trust/Mortgage and the commitment for the Mortgage Title Policy (collectively, the "Initial Loan Documents"). All of the Submission Package Documents shall be delivered to Purchaser [within the Delivery Period or on the Closing Date, as applicable,] to:

     **Wachovia [Custodian Address et]**

     Closing Agent shall hold the Initial Loan Documents, until delivered as set forth above, in trust for Purchaser.

     3)     Any instructions given by the Originator which contradict the provisions of Paragraph 2 shall be disregarded unless the prior written consent of the Purchaser is obtained.

     4)     This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed under the laws of the State of New York. This Agreement shall

L-1

insure to the benefit of and be binding on the respective successors and assignors of the parties hereto.

                    IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first above written.

PURCHASER:                                     CLOSING AGENT:

Terwin Mortgage Warehouse Trust II, Series VI,
a series of Terwin Mortgage Warehouse Trust II,
a Delaware statutory trust

                                                _____

By:_____          By:_____

Its:_____          Its:_____

**EXHIBIT M**

Insured Closing Protection Letter
**(to be in substantially the same form)**

ABC TITLE CO.
Address
City, State Zip
Tel:
Fax:

Mortgage Co Name
Address
City, State Zip
Attn:

Re:    Closing Protection Letter

When title insurance of ABC Title Insurance Company (the "Company") is provided to and/or specified by you in connection with the closings of real estate transactions in the State of _____ in which you are the seller, lessor or purchaser of an interest in land or a lender [accrual] by a mortgage or an assignee of a mortgage (including any other security instrument) of an interest in land, the Company, subject to the Conditions and Provisions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closings, when such closings are conducted by:

John Doe, A Member of Attorney's Title Company
365 Jones Square
New York, NY  10010

("Approved Closer") and where such loss arises out of:

Failure of the Approved Closer to comply with your written closing instructions received by the Approved Closer prior to closing, to the extent that they relate to the particular transaction, and apply to:

1.    The status of the title to said interest in land or the validity, enforceability and priority of the lien of the mortgage on said interest in land, including the obtaining of such documents and the disbursements of funds, as are necessary to establish the evidence of title or lien; or

The obtaining of any other document, specifically required by you, but not to the extent that the instructions require a determination of the validity, enforceability or effectiveness of any other document; or

M-1

The collection and payment of funds due you; or

2.     Fraud or dishonesty of the Approved Closer in handling your funds or documents in connection with the closing.

As a Lender protected under the foregoing paragraph, your Originator in connection with a loan secured by a mortgage on a one to four family dwelling shall be protected as if this letter were addressed to your Originator.


Conditions and Provisions

The Company will not be liable to you for loss arising out of:

1.     Failure of the Approved Closer to comply with your closing instructions which require title insurance protection inconsistent with that as set forth in the title insurance commitment, binder, or preliminary report issued by the Company.  Instructions, which require the removal of specific exceptions to title or compliance with the requirements contained in the commitment, binder, or preliminary report, shall not be deemed to be inconsistent.  This paragraph shall not be applicable when a commitment, binder or preliminary report has not been requested by you prior to closing.

2.     Loss or impairment of your funds in the course of collection or while on deposit with a bank due to bank failure, insolvency or suspension, except us shall result from failure of the Approved Closer to comply with your written instructions to deposit the funds in a bank which you designated by name.

3.     Mechanics' and other liens in connection with your purchase or lease or sale loan transactions, except to the extent that protection against these liens is afforded by a title insurance commitment, binder, preliminary report or policy of the Company.

When the Company shall reimburse you pursuant to this letter, it shall be subrogated to all rights and remedies which you would have against any person or property had you not been so reimbursed.  Liability of the Company for such reimbursement shall be reduced to the extent that you have knowingly and voluntarily impaired the value of their rights of recovery.

Any liability of the Company for loss incurred by you in connection with closings of real estate transactions by the Approved Closer shall be limited to the protection provided by this letter. However, this letter shall not affect the protection afforded by a title insurance commitment, binder, preliminary report or policy of the Company.

Claims shall be made to the Company at its principal office at _____
_____.  When the failure to give prompt notice shall prejudice the Company, then liability of the Company hereunder shall be reduced to the extent of the prejudice.

M-2

Notwithstanding your instructions to the Approved Closer, nothing herein shall be construed to impose any liability on the Company on account of any consumer credit protection, truth-in-lending, or similar law, or the provisions of the Flood Disaster Protection Act of 1973, as stated.

The protection herein offered will apply only to those closings which occur within one year of the date of this letter.

Any previous issued closing protection letter or similar agreement for real estate transactions in the State of _____ written for Approved Closer is hereby cancelled except as to closings of your real estate transactions regarding which you have previously sent (or within thirty (30) days hereafter send) written closing instructions to the Approved Closer.

ABC Title Company


By:_____
Title:

M-3

## EXHIBIT N

Form of Warehouse Lender's Release

Ladies and Gentlemen:

     We hereby release all right, interest or claim of any kind with respect to the mortgage loan(s) referenced below, such release to be effective automatically without any further action by any person, upon receipt of $_____, in one or more installments, from Wachovia Bank, National Association, in accordance with the wire instructions which we delivered to you in a letter dated _____, 2004, in immediately available funds.

| Loan # | Mortgagor | Street Address | City | State | Zip |
| --- | --- | --- | --- | --- | --- |

Very truly yours,

[WAREHOUSE LENDER]

By:_____
Name:_____
Title:_____

N-1

# EXHIBIT O

## Authorized Representatives of Seller

Name                                          Specimen Signature

_____          _____

_____          _____

_____          _____

_____          _____

O-1

# EXHIBIT B

| cust_loan_id | customer_name | loan_no | bal_orig | bor_name_last | bor_name_first | property_address | property_city | property_state | property_zip | Warehoused Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| FNM-1400 | Financial Mortgage Inc. | 304036488 | | | | | | | | 394,535.80 |
| FNM-1403 | Financial Mortgage Inc. | 304036489 | | | | | | | | 424,016.99 |
| FNM-1404 | Financial Mortgage Inc. | 304036490 | | | | | | | | 493,430.00 |
| FNM-1405 | Financial Mortgage Inc. | 304036491 | | | | | | | | 466,080.00 |
| FNM-1406 | Financial Mortgage Inc. | 304036492 | | | | | | | | 577,461.46 |
| FNM-1408 | Financial Mortgage Inc. | 304036493 | | | | | | | | 443,410.52 |
| FNM-1409 | Financial Mortgage Inc. | 304036494 | | | | | | | | 470,400.00 |
| FNM-1411 | Financial Mortgage Inc. | 304036495 | | | | | | | | 419,381.60 |
| FNM-1412 | Financial Mortgage Inc. | 304036496 | | | | | | | | 421,042.44 |
| FNM-1413 | Financial Mortgage Inc. | 304036497 | | | | | | | | 430,900.80 |
| FNM-1414 | Financial Mortgage Inc. | 304036498 | | | | | | | | 392,000.00 |
| FNM-1416 | Financial Mortgage Inc. | 304036499 | | | | | | | | 562,520.00 |
| FNM-1417 | Financial Mortgage Inc. | 304036500 | | | | | | | | 485,100.00 |
| FNM-1418 | Financial Mortgage Inc. | 304036501 | | | | | | | | 409,344.75 |
| FNM-1419 | Financial Mortgage Inc. | 304036502 | | | | | | | | 548,800.00 |
| FNM-1420 | Financial Mortgage Inc. | 304036503 | | | | | | | | 400,555.18 |
| FNM-1421 | Financial Mortgage Inc. | 304036504 | | | | | | | | 434,140.00 |
| FNM-1423 | Financial Mortgage Inc. | 304036505 | | | | | | | | 457,425.58 |
| FNM-1424 | Financial Mortgage Inc. | 304036506 | | | | | | | | 501,334.01 |

REDACTED

# EXHIBIT C

**From:** Chell, Barbara
**Sent:** Friday, November 02, 2007 12:37 PM
**To:** 'LAWONKAR@VERIZON.NET'; 'vtaneja@aol.com'
**Cc:** Guba, Thomas; Chun, Richard; De La Vega, Scott
**Subject:**

Thank you for your time today. In regards to the credit files they should be sent to the below address and per our conversation we would expect them to be completed by Monday.

EMDS
8742 Lucent Blvd
Suite 500
Highlands Ranch, Co 80129
Attn Leon Niedzwicki

Please let us know as files are completed and shipped.

Just a reminder we were missing 3 pay histories—the borrower last names were Soraide, Rashid and Peter

Thank You


Barbara Chell
SVP/Origination Sales



45 Rockefeller Plaza, Suite 420
New York, New York 10111
212 218 - 5880
212 218 - 5885 fax
barbara.chell@thewintergrp.com

NOTICE: This e-mail and any attachments may be protected by attorney-client privilege or other legal privileges and may contain private or confidential information. If you received this e-mail in error, please delete the entire e-mail from your system and notify the sender of the error by reply e-mail; you may not read, print, copy, disseminate, use, disclose, reproduce, distribute or act on any information contained in this e-mail. Notwithstanding your receipt of this e-mail in error, we hereby expressly reserve, and do not waive, any of our rights to the fullest extent provided under law. Thank you.

# EXHIBIT D

# *SHARMA LAW GROUP*

9911 Georgia Avenue, Silver Spring, MD 20902
Phone:301-593-1983  Fax: 301-681-1222
Email: lawonkar@verizon.net
### *ROCKVILLE OFFICE*
15883 Crabbs Branch Way, Rockville, MD - 20855
Phone : 301-548-9595   Fax : 301- 548-9574

Onkar N.Sharma
Member: DC & MD Bars
Ramesh Khurana
Member: DC Bar

Gerald A. Marks
Marks & Klein

Of Counsel
SJ. Christine Yang
Member CA, NY & DC  Bars
William H. Owens
Member MD Bar
Rajeev Khanna, Esq
Member VA & D.C. Bars

November 2, 2007
By: UPS & E-Mail

Ms. Barbara Chell
45 Rockefeller Plaza
Suite 420
New York, New York 10111

### Ref: Financial Mortgage, Inc. – 19 loans

Dear Ms. Chell:

We enclose a copy of Purchase Agreement for the land in Loudoun County, Ashburn, Virginia.  As per instructions of Financial Mortgage, Inc. ("FMI"), no other credit files will be forwarded to EMDS referenced in your e-mail.

Thank you for your prompt attention to this matter.

Very truly yours

Onkar N. Sharma

Encl. as stated above.

# EXHIBIT E



## TERWIN WAREHOUSE MANAGEMENT LLC

November 6, 2007

**BY TELECOPIER, E-MAIL and FIRST CLASS MAIL**
**Fax No.: 703-691-2475**

Mr. Vijay Taneja
President
Financial Mortgage, Inc.
11211 Waples Mill Rd., #200
Fairfax, VA 22030

### IMPORTANT – DEMAND FOR TURNOVER OF MORTGAGE FILES;
### NOTICE OF MARGIN CALL; and
### NOTICE OF REQUIRED SALE EVENT

Dear Mr. Taneja:

References to Sections are to the Amended and Restated Seller's Purchase, Warranties and Servicing Agreement dated as of March 18, 2005 (the "Agreement"). Capitalized terms used in this Notice are used with the meanings set forth for such terms in the Agreement.

**1.    DEMAND FOR TURNOVER OF MORTGAGE FILES**

Financial Mortgage, Inc. ("FMI") sold Mortgage Loans to Purchaser pursuant to the Agreement, including the Mortgage Loans on the attached schedule (the "Subject Loans"). Pursuant to §§ 2.03 and 2.04 of the Agreement, FMI sold the Subject Loans on a servicing released basis and was obligated to deliver to us, as Program Administrator for the Purchaser, upon request, all Mortgage Files and servicing files, including "all records or documents with respect to the" Subject Loans. We have requested delivery of the Mortgage Files, but you have not complied.

**This constitutes our written demand for immediate delivery to us of all Mortgage Files and servicing files for the Subject Loans, failing which we will institute legal action at your expense to compel their delivery.**

**2.    NOTICE OF MARGIN CALL**

Pursuant to § 12.03 of the Agreement, Terwin Warehouse Management LLC, as Program Administrator, has determined that the Market Value of Uncovered Mortgage Loans held by Purchaser has declined from the Adjusted Purchase Price of the Uncovered Mortgage Loans as of the relevant Closing Date, resulting in a Margin Deficit in the amount of $4,219,001.

**By this notice, pursuant to § 12.03 of the Agreement, the Program Administrator on behalf of the Purchaser requires Seller to transfer to Purchaser cash in the amount of the Margin Deficit set forth above.**

This Margin Call must be satisfied no later than 5:00 p.m. EST tomorrow. If it is not so satisfied, we will institute legal action at your expense to collect the amount of the Margin Call, including from you personally pursuant to your Guaranty.

**3.    NOTICE OF REQUIRED SALE EVENT**

A Required Sale Event has occurred with respect to the Mortgage Loans on the attached schedule because a Settlement Date has not occurred within 45 days of the related Closing Date (or such later date as extended by the Program Administrator pursuant to Section 12.04). Therefore, under Section 12.04, Program Administrator may instruct Purchaser to forthwith sell, assign or otherwise dispose of and deliver the Mortgage Loans on the attached schedule, or any part thereof, at such public or



private sale or sales, at such price or prices and upon such other terms and conditions as Program Administrator may deem best.

**Please be advised that, unless Seller repurchases the Mortgage Loans on the attached schedule at their respective Adjusted Purchase Prices by close of business tomorrow, Purchaser may commence sales or other dispositions of said Mortgage Loans as provided in Section 12.04.**

In that event, Seller, and you personally as guarantor, will be liable to Purchaser for any differences between the Adjusted Purchase Prices of the Mortgage Loans and the amounts realized by such sales or other dispositions of said Mortgage Loans.

Purchaser expressly reserves all its rights and remedies against FMI and you personally under other provisions of the Agreement, the Guaranty and at law or equity.

Very truly yours,

TERWIN WAREHOUSE MANAGEMENT LLC

By: _Scott de la Vega_____

Name: Scott de la Vega

Title: Senior Counsel

| cust_loan_id | customer_name | loan_no | bal_orig | bor_name_last | bor_name_first | property_address | property_city | property_state | property_zip | Warehoused Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| FNM-1400 | Financial Mortgage Inc. | 304036488 | | | | | | | | 394,535.80 |
| FNM-1403 | Financial Mortgage Inc. | 304036489 | | | | | | | | 424,016.99 |
| FNM-1404 | Financial Mortgage Inc. | 304036490 | | | | | | | | 493,430.00 |
| FNM-1405 | Financial Mortgage Inc. | 304036491 | | | | | | | | 486,080.00 |
| FNM-1406 | Financial Mortgage Inc. | 304036492 | | | | | | | | 577,461.46 |
| FNM-1408 | Financial Mortgage Inc. | 304036493 | | | | | | | | 443,410.52 |
| FNM-1409 | Financial Mortgage Inc. | 304036494 | | | | | | | | 470,400.00 |
| FNM-1411 | Financial Mortgage Inc. | 304036495 | | | | REDACTED | | | | 419,391.60 |
| FNM-1412 | Financial Mortgage Inc. | 304036496 | | | | | | | | 421,042.44 |
| FNM-1413 | Financial Mortgage Inc. | 304036497 | | | | | | | | 435,000.80 |
| FNM-1414 | Financial Mortgage Inc. | 304036498 | | | | | | | | 392,000.00 |
| FNM-1416 | Financial Mortgage Inc. | 304036499 | | | | | | | | 562,520.00 |
| FNM-1417 | Financial Mortgage Inc. | 304036500 | | | | | | | | 485,100.00 |
| FNM-1418 | Financial Mortgage Inc. | 304036501 | | | | | | | | 409,344.75 |
| FNM-1419 | Financial Mortgage Inc. | 304036502 | | | | | | | | 548,800.00 |
| FNM-1420 | Financial Mortgage Inc. | 304036503 | | | | | | | | 400,555.18 |
| FNM-1421 | Financial Mortgage Inc. | 304036504 | | | | | | | | 434,140.00 |
| FNM-1423 | Financial Mortgage Inc. | 304036505 | | | | | | | | 457,425.59 |
| FNM-1424 | Financial Mortgage Inc. | 304036506 | | | | | | | | 501,334.01 |